No. 23-1045, 23-1046, 23-1047, and 23-1048

# UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT
## CHICAGO, ILLINOIS 60604

| | | |
|---|---|---|
| IN RE: MICHAEL WOLF, | ) | Appeals from the United States District |
| | ) | Court for the Northern District of |
| Debtor, | ) | Illinois, Eastern Division |
| ---------------------------------------------- | ) | |
| | ) | No. 1:18-cv-07952 |
| N. NEVILLE REID, not individually, | ) | No. 1:18-cv-07953 |
| but solely in his capacity as Chapter 7 | ) | No. 1:19-cv-08154 |
| Trustee of the bankruptcy estate of | ) | No. 1:19-cv-01978 |
| Michael A. Wolf, et al., | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Plaintiff-Appellees, | ) | |
| | ) | Original proceedings from the United |
| No. 23-1045, 23-1046, 23-1047, | ) | States Bankruptcy Court for the |
| and 23-1048          v. | ) | Northern District of Illinois |
| | ) | |
| SCOTT WOLF, MICHAEL WOLF, et al., | ) | No. 16-ap-00066 |
| | ) | No. 16-ap-00482 through 486 |
| Defendants-Appellants. | ) | Judge Deborah L. Thorne |

-------------------------------------------------------------------------------

## BRIEF AND SHORT APPENDIX OF APPELLANT
## SCOTT WOLF

-------------------------------------------------------------------------------

Scott Wolf, *pro se*
320 Central Avenue, Unit 141
Sarasota, Florida 34236
304-769-9828
scottwolf.0330@gmail.com

*Scott Wolf appearing pro se*

-------------------------------------------------------------------------------

## ORAL ARGUMENT RESPECTFULLY REQUESTED

-------------------------------------------------------------------------------

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

SHORT APPENDIX CIRCUIT RULE 30(a) TABLE OF CONTENTS ...................................... ii

TABLE OF CASES, STATUTES AND OTHER AUTHORITIES ........................................... iii

JURISDICTIONAL STATEMENT ..................................................................................... 1

STATEMENT REGARDING ORAL ARGUMENT ................................................................ 4

STATEMENT OF THE ISSUES ........................................................................................ 4

MOTION FOR CERTIFICATION FOR QUESTIONS OF STATE LAW ................................... 7

STATEMENT OF THE CASE ............................................................................................ 8

    A.   Introductory Factual Statement ....................................................................... 8
    B.   Issue Introduction ........................................................................................ 10
    C.   Relevant Detailed Case History and Summary of Alleged Transfers .............. 11

SUMMARY OF THE ARGUMENT .................................................................................. 14

    A.   Any and All Avoidance Actions Must Fail as a Matter of Law ....................... 14
    B.   Gold Bar Example ....................................................................................... 17
    C.   Core Issue Overview .................................................................................... 19
    D.   11 U.S.C. § 544(b) / IUFTA Causes of Action .............................................. 19
    E.   11 U.S.C. § 548 / Bankruptcy Code Avoidance Actions ................................ 20
    F.   Alter-Ego Operation .................................................................................... 21
    G.   Non-Debtor-Spouse Does Not Have a Right to Payment ............................... 22
    H.   Motion for Rehearing .................................................................................. 22

ARGUMENT ............................................................................................................... 23

    A.   *De Novo* Standard of Review ..................................................................... 23
    B.   Trustee's Standing to Avoid Transfers ......................................................... 24
    C.   Marital Property .......................................................................................... 25
    D.   Transfer No. 2 - Debtor's 51% Interest in ZZC ............................................ 25
    E.   Transfer No. 1 - MMQB-Business & Alter-Ego Operation ............................ 32
    F.   Non-Debtor-Spouse's Personal Claim .......................................................... 37
    G.   Domestic-Relations Exception ..................................................................... 40
    H.   Motion for Rehearing .................................................................................. 41

INCORPORATED BRIEF ............................................................................................... 42

CONCLUSION ............................................................................................................. 42

CERTIFICATE OF COMPLIANCE .................................................................................. 46

CIRCUIT RULE 30(d) STATEMENT ........................................................47

CERTIFICATE OF SERVICE ....................................................................48

SHORT APPENDIX .................................................................................49

## SHORT APPENDIX CIRCUIT RULE 30(a) TABLE OF CONTENTS

Appealed From Order (District Court), 09/30/2022, 18-cv-07953, Dkt. No. 37, "*Minute Entry*" .................................................................................................. SA-1

Appealed From Order (District Court), 09/30/2022, 18-cv-07953, Dkt. No. 39, "*Judgment Order*" ................................................................................................ SA-2

Appealed From Order (District Court), 09/30/2022, 18-cv-07953, Dkt. No. 38, "*Memorandum Opinion and Order*" ........................................................................... SA-4

Appealed From Order (District Court), 10/27/2022, 18-cv-07953, Dkt. No. 46, "*Amended Judgment Order*" ...................................................................................... SA-49

Appealed From Order (District Court), 12/08/2022, 18-cv-07953, Dkt. No. 54, "*Order (Regarding Motion for Rehearing / Reconsideration)*" .......................................... SA-54

Appealed From Order, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 658, "*Final Judgment Against Zig Zag Corp., ZZC, Inc., Michael Wolf and Scott Wolf*" ........................ SA-57

Appealed From Order, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 656, "*Final Judgment Against Zig Zag Corp., ZZC, Inc., Michael Wolf and Scott Wolf*" ........................ SA-59

Proposed Findings, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 655, "*Proposed Findings of Fact and Conclusions of Law as to MMQB, Inc. on Counts 1, 7, 8, and 9*" ................ SA-61

Appealed From Order Memorandum Opinion, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 654, "*Memorandum Opinion*" ................................................................... SA-62

Additional Appealed From Order, 12/21/2018, Adv. Proc. 16-00066, Dkt. No. 695, "*Order Denying Scott Wolf's Motion for Reconsideration*" ........................................ SA-142

*Judgment for Dissolution of Marriage*, 12/15/2017 (Illinois Circuit Court) ...................... SA-143

*Findings and Rulings*, 11/13/2017 (Illinois Circuit Court) ................................................. SA-146

## TABLE OF CASES, STATUTES AND OTHER AUTHORITIES

**CASES**

*A.L. Dougherty Real Estate Mgmt. Co. v. Su Chin Tsai & Cube Global, LLC*, 98 N.E.3d 504 (Ill. App. Ct. 2017) .................................................................................................33

*Ankenbrandt v. Richards*, 504 U.S. 689 (1992) ...........................................................41

*Apollo Real Estate Inv. Fund IV, LP v. Gelber*, 935 N.E.2d 963 (Ill. App. Ct. 1st Dist. 2010)...36

*Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) ................................38

*Begier v. Internal Revenue Service*, 496 U.S. 53 (1990)...........................................10, 29, 31, 42

*Birney v. Solomon*, 348 Ill. 410, 414-15, 181 N.E. 318, 320 (1932)...............................37

*Buckley v. Abuzir*, 2014 IL App (1st) 130469 ...............................................................34

*Budorick v. Maneri*, No. 17-1112 (7th Cir. Oct. 11, 2017) ...........................................41

*Cascade Energy and Metals Corp. v. Banks* (10th Cir.1990) 896 F.2d 1557, 1576-1577...........35

*Covey v. Casey's Gen. Stores, Inc. (In re Duckworth)*, Nos. 10-83603, 11-8104, 2012 WL 4434681 (Bankr. C.D. Ill. Sept. 24, 2012) ...................................................................36

*Crystallex International Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79 (3d Cir. 2018).......36

*Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411 (5th Cir.1997).................30

*Cullen v. Cullen*, No. 00 C 6659 (N.D. Ill. Aug. 3, 2001).............................................37

*DeMartini v. DeMartini,* 385 Ill. 128, 52 N.E.2d 133 (1943) .........7, 10, 14, 15, 18, 32, 33, 41, 42

*Dyer v. Eckols*, 808 S.W.2d 531 (Tex.App.1991) .........................................................35

*Edgewater Growth Capital Partners v. H.I.G. Capital, Inc.*, 2010 WL 720150 (Del. Ch. Mar. 3, 2010)........................................................................................................................36

*Essen v. Gilmore*, 607 NW 2d 829 (Neb. Supreme Court 2000) ...................................35

*Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998)...............................................38

*Fowler v. Shadel*, 400 F.3d 1016 (7th Cir. 2005).......................................................16

*Gayton v. Kovanda*, 368 Ill.App.3d 363, ___, 306 Ill.Dec. 530, 533, 857 N.E.2d 929, 932, 2006 WL 3026035 (Oct. 25, 2006) ......................................................................................26, 41

*Gecker v. Flynn (In re Emerald Casino, Inc.)*, 223 F. Supp. 3d 740 (N.D. Ill. 2016) ............27, 41

*Gilbert Bros., Inc. v. Gilbert*, 258 Ill. App. 3d 395, 400 (Ill. App. Ct. 1994) ........................28, 41

*Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26 (1st Cir. 1994)................................................23

*Hofmann v. Hofmann* (1983), 94 Ill.2d 205, 221, 446 N.E.2d 499 ............................................39

*In re Carousel Int'l Corp.* , 89 F.3d 359 (7th Cir. 1996)...............................................................30

*In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803 (7th Cir. 2019) ........................................24

*In re Eagle-Picher Indus., Inc.*, 999 F.2d 969 (6th Cir. 1993) ....................................................23

*In re Estate of Nemecek* (1980), 85 Ill. App.3d 881, 883, 407 N.E.2d 655 ................................39

*In re Foust*, 52 F.3d 766 (8th Cir. 1995) .....................................................................................23

*In re French*, 440 F.3d 145 (4th Cir. 2006)....................................................................16, 31, 42

*In re Glick,* 568 B.R. 634, 661-64 (Bankr. N.D.Ill. 2017) ...............................................................34

*In re Graves*, 33 F.3d 242 (3d Cir. 1994) ....................................................................................23

*In re Marriage of Frederick*, 218 Ill.App.3d 533, 535-36 (2d Dist. 1991) ....................................39

*In re Marriage of Shehade*, 137 Ill. App. 3d 692 (Ill. App. Ct. 1985) ..........................................39

*In re Midway Airlines, Inc.*, 383 F.3d 663 (7th Cir. 2004).............................................................23

*In re Rehabilitation of Centaur Insurance Co.*, 158 Ill. 2d 166, 198 Ill. Dec. 404, 632 N.E.2d
1015 (1994) ..........................................................................................................................34

*In re Rehabilitation of Centaur Insurance Co.*, 238 Ill. App. 3d 292, 299, 179 Ill. Dec. 459, 606
N.E.2d 291 (1992) ................................................................................................................34

*In re Teknek, LLC*, 563 F.3d 639 (7th Cir. 2009) .........................................................................38

*In re Thorpe*, 569 B.R. 310, 315 (C.D. Ill. 2017).................................................................24, 41

*In re Wickes Trust*, 2008 WL 4698477 (Del. Ch. Oct. 16, 2008)..................................................36

*In re Zachmann*, No. 10 B 32410 (Bankr. N.D. Ill. Mar. 25, 2013)..............................................38

*Johnson v. La Grange State Bank*, 73 Ill.2d 342, 356-57 (1978)..................................................39

*Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339 (7th Cir. 1987) ...........................38

*Kujawinski v. Kujawinski,* 71 Ill.2d 563, 574, 17 Ill.Dec. 801, 376 N.E.2d 1382 (1978).............32

*Lewis v. Manufacturers Nat. Bank*, 364 U.S. 603 (1961) .......10, 15, 16, 20, 23, 24, 30, 33, 41, 42

*MacDonald v. Estate of Gayton,* 469 F.3d 1079 (7th Cir. 2006) ....7, 10, 14, 15, 23, 26, 32, 41, 42

*Malek v. Malek*, No. 19 CV 8076 (N.D. Ill. Oct. 15, 2020) ........................................39

*Official Committee of Unsecured Creditors v. Fountainhead Group, Inc. (In re Bridgeview Aerosol, LLC)*, 538 B.R. 477 (Bankr. N.D. Ill. 2015) ........................................31

*Palmer & Palmer, P.C. v. U.S. Tr. (In re Hargis)*, 887 F.2d 77 (5th Cir.1989) .........................30

*Parker v. Four Seasons Hotels, Ltd.* 845 F.3d 807 (7th Cir. 2017) ........................................41

*Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal.App.4th 1510 (Cal. Ct. App. 2008) ............35

*Regan v. Ivanelli*, 246 Ill. App. 3d 798 (1993).................................................................35

*Reinbold v. Thorpe (In re Thorpe)*, 546 B.R. 172 (Bankr. C.D. Ill. 2016)............................31, 41

*Reinbold v. Thorpe (In re Thorpe)*, 881 F.3d 536 (7th Cir. 2018) .... 7, 8, 9, 10, 13, 14, 16, 17, 19, 20, 21, 25, 29, 31, 41, 42, 44

*Spizz v. Goldfarb Seligman & Co. (In re Ampal–Am. Israel Corp.)*, 562 B.R. 601 (Bankr. S.D.N.Y. 2017).................................................................16

*Tidwell v. Smith (In re Smith)*, 582 F.3d 767 (7th Cir. 2009)........................................23

*United States v. Windsor*, 133 S. Ct. 2675, 2691 (2013)................................................41

*Villaverde v. IP Acquisition VIII, LLC*, 2015 IL App (1st) 143187, 69, 395 Ill. Dec. 677, 39 N.E.3d 144, 150.................................................................25, 42

*Wachowski v. Wachowski*, No. 2-16-0416 (Ill. App. Ct. 2017) ........................................35

## STATUTES

11 U.S.C. § 544(b).................................................................5, 9, 13

11 U.S.C. § 544(b)(1).................................................................24

11 U.S.C. § 548 .................................................................5, 9, 16, 20, 31

11 U.S.C. § 548(a).................................................................5, 24

11 U.S.C. § 548(a)(1)(A).................................................................13

11 U.S.C. § 548(a)(1)(B).................................................................13

28 U.S.C. § 1291 .................................................................4

28 U.S.C. § 1334(a).................................................................1

28 U.S.C. § 1334(b) ...........................................................................................1

28 U.S.C. § 157 ..................................................................................................1

28 U.S.C. § 157(a) .............................................................................................1

28 U.S.C. § 157(b)(2) ........................................................................................1

28 U.S.C. § 157(c)(1) .........................................................................................4

28 U.S.C. § 158(a)(1) .........................................................................................2

28 U.S.C. § 158(d)(1) .........................................................................................3

28 U.S.C. § 2106 ................................................................................................4

735 ILCS 5/2-1102 ...........................................................................................40

740 ILCS 160/5(a)(1) .......................................................................................13

740 ILCS 160/5(a)(2) .......................................................................................13

740 ILCS 160/6(a) ............................................................................................13

750 ILCS 5/503(e) ......................................................................................5, 6, 7

Illinois Marriage and Dissolution of Marriage Act, 750 ILCS 5/101, *et seq.* .......................5, 6, 19

Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1, *et seq.* 6, 7, 13, 18, 19, 21, 26, 28, 32, 33, 35, 36, 38, 39, 43, 44

## OTHER AUTHORITIES

Federal Rules of Appellate Procedure - Rule 28(i) .......................................42

Federal Rules of Bankruptcy Procedure - Rule 8002(a) ................................2

Federal Rules of Bankruptcy Procedure - Rule 8002(b)(3) ...........................2

Federal Rules of Bankruptcy Procedure - Rule 8003 .....................................2

Federal Rules of Bankruptcy Procedure - Rule 8022 .....................................2

Federal Rules of Bankruptcy Procedure - Rule 9023 .....................................2

Federal Rules of Civil Procedure - Rule 59 ....................................................2

## JURISDICTIONAL STATEMENT

On July 23, 2014 (the "Petition Date"), Michael A. Wolf (the "Debtor") filed a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court) and, thereby, commenced the bankruptcy case captioned *In re Michael A. Wolf* (Case No. 14-27066) (the "Bankruptcy Case"). Thereafter, Defendant-Appellee N. Neville Reid (the "Trustee") was appointed as chapter 7 trustee of the Debtor's bankruptcy estate (the "Bankruptcy Estate"). The Bankruptcy Court had jurisdiction over the Bankruptcy Case under 28 U.S.C. § 1334(a), as referred to it by the United States District Court for the Northern District of Illinois (the "District Court) pursuant to 28 U.S.C. § 157, Rule 40.3.1 of the District Court's Local Rules, and Internal Operating Procedure 15 of the District Court.

On January 29, 2016, the Trustee commenced an adversary proceeding captioned *Reid, not individually but solely in his capacity v. Wolf, et. al.* (Adv. No. 16-00066) (the "Adversary Proceeding") against multiple defendants, including but not limited to the Debtor and the Debtor's son, Scott Wolf ("Scott"), seeking to, among other related things, avoid the alleged pre-petition fraudulent transfer of a certain business entity that produced a weekly publication dealing with news of the office furniture industry, named *The Monday Morning Quarterback* (the "MMQB-Business"), which was started by the Debtor in 1990, and was owned and operated by Zig-Zag Corp ("Zig-Zag"), an Illinois corporation that was owned by and incorporated by the Debtor in 1987. The Bankruptcy Court had jurisdiction over the Adversary Proceedings as a distinct civil proceeding in the Bankruptcy Case under 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a) and 28 U.S.C. § 157(b)(2).

The Bankruptcy Court held Scott to be in default, as a discovery sanction, on May 24, 2018. The Bankruptcy Court denied Scott's motion to set aside his default on September 13, 2018. The Bankruptcy Court denied Scott's motion to dismiss all of the counts against him on September 13, 2018. The Bankruptcy Court denied Scott's motion for summary judgment on November 20, 2018. A day before that though, on November 19, 2018, the Bankruptcy Court entered an order (the "Bankruptcy Court Judgment") in the Adversary Proceeding, once again denying Scott's earlier requested relief, and granting the entry of a default judgment against Scott (as well as various other entities), and in favor of the Trustee, in the amount of $2,100,000 in relation to the multiple causes of action related to the alleged fraudulent transfer of the MMQB-Business. The Bankruptcy Court Judgment is a final order.

On November 30, 2018, Scott timely filed a notice of appeal of the Bankruptcy Court Judgment to the District Court, pursuant to FRBP 8002(a) and 8003, and also filed a timely FRCP Rule 59 motion to alter or amend the judgment (incorporated into the adversary proceeding via FRBP 9023), which was denied by the Bankruptcy Court on February 26, 2019. Scott subsequently timely filed an amended notice of appeal on March 11, 2019, pursuant to FRBP 8002(b)(3).

The District Court had jurisdiction under 28 U.S.C. § 158(a)(1). On September 30, 2022 the District Court entered an order containing its opinion and also entered a judgment (the "District Court Judgment") affirming the Bankruptcy Court Judgment (although the District Court did find multiple errors with the Bankruptcy Court Judgment, but the ultimate outcome remained unchanged). The District Court Judgment is a final order. On October 14, 2022, Scott timely filed a motion for hearing pursuant to FRBP 8022. The District Court denied the motion for rehearing on December 8, 2022. On January 6, 2023, Scott timely filed a Notice of Appeal of the District

Court Judgment (as well as the motion for rehearing) to the United States Court of Appeals for the Seventh Circuit (the "Court").

The Court has jurisdiction over this appeal under 28 U.S.C. § 158(d)(1). The date of entry of the District Court Judgment sought to be reviewed is September 30, 2022, and the date of entry of the District Court's denial of the motion for rehearing is December 8, 2022. The filing date of the notice of appeal is January 6, 2023. This appeal is from a final judgment of the District Court that disposed of all of the parties' claims.

Additionally, this Court consolidated four appeals, 23-1045, 23-1046, 23-1047 and 23-1048.

Regarding 23-1048, The Bankruptcy Court did not enter a final judgment against one of the original defendants of the adversary proceeding, a corporate entity named MMQB Inc. MMQB Inc did not consent to a final adjudication of the causes of action within the Bankruptcy Court, as the entity was found to be in default. As such, the Bankruptcy Court made proposed findings of fact and conclusions of law to the District Court on November 19, 2018, which were entered into a new District Court case on March 21, 2019. The District Court decided to consolidate all of the pending appeals stemming from the Bankruptcy Case, and therefore the District Court Judgment also granted the entry of a default judgment against MMQB Inc in the amount of $2,100,000 (which was, in part, used as the basis for the $2,100,000 judgment entered against Scott). Scott, as a *pro se* litigant, to ensure that the Court may properly evaluate the issues Scott will present on appeal (and that his standing to appeal was not somehow lost), and ensure that Scott is not liable for any judgment against MMQB Inc (as MMQB Inc's alter-ego), objected to the proposed findings of facts and conclusions of law, as the alleged fraudulent transfer causes of action at issue, as a matter of law, fail to state a claim upon which relief may be granted.

3

This District Court had jurisdiction under 28 U.S.C. § 157(c)(1), and this Court has jurisdiction over this appeal as it relates to Scott as alter-ego of MMQB Inc under 28 U.S.C. § 1291 and 28 U.S.C. § 2106, which said appeal stemming from the same, singular District Court Judgment that was timely appealed in their individual, pre-consolidated cases in the District Court.

## STATEMENT REGARDING ORAL ARGUMENT

Scott believes that oral argument would be helpful, as this case involves issues of first impression in this Court regarding the transfer of non-debtor property and the application of the IUFTA, as well as the proper interpretation of the relationship between the Bankruptcy Code and marital property interests under Illinois law. Even as a *pro se* litigant, oral argument will advance the correct adjudication of this appeal and will help direct the Court to the core issues which both the Bankruptcy Court and District Court overlooked, which all involving applying the proper Seventh Circuit and Supreme Court precedent (which both the Bankruptcy Court and District Court failed to do). As such, Scott respectfully requests that this matter be heard for oral argument, which was denied to him by the District Court, and would have been very helpful.

## STATEMENT OF THE ISSUES

To better understand these issues and how they apply based on the order of events, please first read the **Introductory Factual Statement** in the **Statement of the Case** section.

*The Practitioner's Handbook for Appeals to the United States Court of Appeals for the Seventh Circuit* recommends that, "On occasion, although not usually, the questions may be better understood, or stated more simply, if preceded by an introductory factual paragraph."

While it may be unusual, such is the case here. By providing this limited overview of facts, the statement of issues presented for review may be stated in much simpler terms, while avoiding the confusion that has plagued both the Bankruptcy Court and District Court.

**Issue 1(a):** When one spouse seeks relief under chapter 7 of the Bankruptcy Code while he is a party in a pending action seeking to dissolve his marriage under the Illinois Marriage and Dissolution of Marriage Act, 750 ILCS 5/101 *et seq*. (the "IMDMA"), but before there has been a division of property by the Illinois Circuit Court, may a chapter 7 trustee exercise his rights and powers under 11 U.S.C. § 544(b) and 548 to avoid the transfer of property for the benefit of the debtor's creditors that, if said property had not been transferred, would have become marital property and thus would be (or would have been) encumbered by the non-debtor spouse's contingent interest created under Section 503(e) of the IMDMA, 750 ILCS 5/503(e)?

**Issue 1(b):** Further**,** when the Illinois Circuit Court then divides and awards all marital property (also known as the entire marital estate) to the non-debtor spouse, before the chapter 7 trustee's claims are adjudicated, may a chapter 7 trustee avoid the transfer of property for the benefit of the debtor's creditors that, if said property had not been transferred, would have belonged instead to the non-debtor spouse?

*If the MMQB-Business had not been transferred, it would have remained property of Zig-Zag, and Zig-Zag was awarded to the Non-Debtor-Spouse. Thus, Zig-Zag, and therefore the MMQB-Business, would not have become property of the Bankruptcy Estate, and would not have been available to the Debtor's creditors, even if it had not been transferred.*

**Issue 2:** May a chapter 7 trustee exercise his rights and powers under 11 U.S.C. § 544(b) and 548 to avoid the transfer of property, that did not belong to the debtor at the time of its alleged transfer, by utilizing "the alter-ego doctrine and/or reverse veil piercing" under Illinois law, to treat and/or change history and consider non-debtor property as property belonging to the debtor?

*The MMQB-Business belonged to Zig-Zag at the time of its alleged fraudulent transfer – not the Debtor – however both the Bankruptcy Court and the District Court approved the use of the*

*"alter-ego doctrine and/or reverse veil piercing" to allow the Trustee to instead treat the MMQB-Business as personal property of the Debtor (at the time it was transferred), even though it factually belonged to and was transferred from an entity (Zig-Zag) that was factually awarded to the Non-Debtor-Spouse, and therefore the MMQB-Business would not have been part of the Bankruptcy Estate, even if it wasn't transferred.*

**Issue 3:** Under Illinois law, when one spouse is a party in a pending action seeking to dissolve his marriage under the IMDMA, but before there has been a division of property by the Illinois Circuit Court, may a creditor holding a judgment lien, obtained after the initiation of the marriage dissolution action, exercise his rights and powers under the Illinois Uniform Fraudulent Transfer Act, 740 ILCS 160/1 *et seq.* (the "IUFTA"), to avoid the transfer of property for the satisfaction of said judgment lien, even though if said property had not been transferred, would have become marital property and thus would be (or would have been) encumbered by the by the non-debtor spouse's contingent interest created under Section 503(e) of the IMDMA, 750 ILCS 5/503(e)?

*Even if the MMQB-Business is treated (via the alter-ego doctrine and/or reverse veil piercing) as the Debtor's personal property, had said personal property not been transferred, it would have become marital property before any creditor (or the Trustee) obtained a right to payment, and thus would be encumbered by the Non-Debtor-Spouse's 100% vested interest in all marital property created under Section 503(e) of the IMDMA, which would encumber said property as to render it unavailable to the Debtor's creditors (and therefore the Bankruptcy Estate).*

**Issue 4:** Under Illinois law**,** upon the filing of a marital dissolution petition and/or when the Illinois Circuit Court determines that all marital property is awarded to a single spouse, does such a filing (or such an award) vest the spouse with all of the rights and tools under the IUFTA (and/or any other applicable state law fraud provisions), to avoid or otherwise recover a (pre-marital

dissolution proceedings) transfer of property, that would have become marital property, had said property not been fraudulently transferred, as the awarded spouse would have gained a 100% fully vested interest in the property provided by Section 503(e) of the IMDMA, 750 ILCS 5/503(e)?

*All Illinois case law holds that a Non-Debtor-Spouse may utilize the IUFTA to avoid the fraudulent transfer of property, that would have become marital property, had said property not been transferred by the Debtor, in order to return said property to the marital estate for the benefit of the Non-Debtor-Spouse. As such, the Bankruptcy Estate (or any of the Debtor's creditors) must be subordinate to the Non-Debtor-Spouse, as their rights to payment were established only after the initiation of the marital dissolution proceedings.*

**Issue 5:** Did the District Court overlook, and/or forget to address, and/or properly analyze Scott's arguments contained in his Initial Brief, Reply Brief and/or his Motion for Rehearing, with respect to *Thorpe, MacDonald, Lewis* and *DeMartini* (as well as other similar cases), that would determine if the Trustee's avoidance actions did in fact fail to state claims upon which relief can be granted, due to all marital property being awarded to the Non-Debtor-Spouse, and therefore lack of any award of marital property made in favor of the Debtor?

## MOTION FOR CERTIFICATION FOR QUESTIONS OF STATE LAW

If the Court is "genuinely uncertain about a question of state law that is vital to a correct disposition of the case" as it relates to Issues 1, 2, 3 and 4, then Scott hereby requests, per Seventh Circuit Rule 52(a), that the Court certify any (or all) of the above issues and questions directly to the Illinois Supreme Court, specifically a creditors ability to reach marital property (or property that would have become marital property) under Illinois law.

## STATEMENT OF THE CASE

### A.　Introductory Factual Statement

The Court is being asked here to determine the correct ***order of operations*** in dealing with the adjudication of marital property (including property that would have become marital property had it not been transferred), when a bankruptcy petition is filed subsequently to a marital dissolution petition in the State of Illinois, but before the final adjudication of the marital dissolution petition by the Illinois Circuit Court.

This is an issue that plagued the Bankruptcy Court during the Adversary Proceeding, but this Court provided much needed guidance with relation to marital property when it issued its opinion in *Reinbold v. Thorpe (In re Thorpe)*, 881 F.3d 536, 538 (7th Cir. 2018).

The Debtor and Elizabeth Greenberg Wolf (the "Non-Debtor-Spouse") were married on October 5, 1975, in Chicago, Illinois, and said marriage was registered in Cook County, Illinois[1].

In 1987, during their marriage, the Debtor incorporated Zig-Zag in Illinois, and at all relevant times (before the marriage dissolution proceedings) Zig-Zag was fully owned by the Debtor[2].

Since its inception, Zig-Zag owned and operated the MMQB-Business[3]. The MMQB-Business was found to be "the principal asset of the marriage" and distributed by Zig-Zag[4].

On December 5, 2013, the Non-Debtor-Spouse filed a petition for marital dissolution in Lake County, Illinois[5], which preceded the Bankruptcy Case.

---

[1] *Judgment for Dissolution of Marriage*, Short Appendix SA-143, at Paragraph B.
[2] *Memorandum Opinion*, SA-62, at Pages SA-83, SA-90 (Doc.Pages 22 and 29).
[3] *Id.* at Pages SA-63, SA-84, SA-90 (Doc.Pages 2, 23 and 29).
[4] *Findings and Rulings*, SA-146, at Page SA-147 (Doc.Page 2).
[5] *Memorandum Opinion*, SA-62, at Pages SA-64 (Doc.Page 3).

On December 15, 2017, after the automatic stay was modified, the Illinois Circuit Court divided all of the marital property 100% in favor of the Non-Debtor-Spouse, including the Debtor's 100% interest in Zig-Zag. The Debtor was not awarded any marital property[6].

*Thorpe* instructs that since Zig-Zag was awarded fully to the Non-Debtor-Spouse, the Debtor's interest in Zig-Zag (or any marital property) never became property of the Bankruptcy Estate, as the award of all marital property to the Non-Debtor-Spouse divested the Bankruptcy Estate of all rights to Zig-Zag (and all marital property).

**However,** the Trustee alleged in the Adversary Proceeding, that the MMQB-Business was fraudulently transferred early in 2012, through two different sham corporations, and ultimately made its way to Scott (through his alter-ego MMQB Inc) in early 2014 (before the Bankruptcy Case was commenced). As such, utilizing 11 U.S.C. § 544(b) and 548, the Trustee brought multiple causes of action against Scott (and other entities) seeking the avoidance the fraudulent transfer of the MMQB-Business, for the benefit of creditors of the Bankruptcy Estate. The Bankruptcy Court found that these transfers were "attempts to shield property from the Debtor's then-wife Elizabeth"[7].

Where *Thorpe* dealt directly with the adjudication of marital property – this Court must now take *Thorpe* one step further – and determine to what extent the Trustee may avoid the transfer of property that, had said property not been transferred, would have remained marital property, and therefore would have remained unavailable to the Debtor's creditors (or in this case, the Bankruptcy Estate).

---

[6] *Memorandum Opinion and Order* by the District Court, SA-4, at Page SA-24 (Doc.Page 21); Also *Judgment for Dissolution of Marriage*, SA-143 and *Findings and Rulings*, SA-146, *passim*.
[7] *Memorandum Opinion*, Short Appendix at Page SA-90 (Doc.Page 29).

At bottom, this case simply asks the Court to start with *Thorpe*, and extend it utilizing its

holding in *MacDonald v. Estate of Gayton,* 469 F.3d 1079 (7th Cir. 2006), along with the Illinois

Supreme Court's ruling in *DeMartini v. DeMartini,* 385 Ill. 128, 52 N.E.2d 138 (1943), and two

cases from the Supreme Court of the United States, *Lewis v. Manufacturers Nat. Bank*, 364 U.S.

603 (1961) and *Begier v. Internal Revenue Service*, 496 U.S. 53 (1990).

### B.    Issue Introduction

The core issues surrounding the Bankruptcy Case are very straightforward. As already stated,

this appeal revolves around the proper ***order of operations*** in dealing with the adjudication of

marital property, when a bankruptcy petition is filed subsequently to a marital dissolution petition

in the State of Illinois, but before the final adjudication of the marital dissolution petition by the

Illinois Circuit Court (or after such a final adjudication, where the entire marital estate was awarded

to the non-debtor spouse).

Even though the Bankruptcy Court modified the automatic stay to "to determine the

appropriate allocation of marital property, including any property of the bankruptcy estate"[8], the

Trustee decided to file his Adversary Proceeding on January 29, 2016, seeking to avoid the transfer

of the MMQB-Business.

However, on December 15, 2017, the marital dissolution proceedings were finally adjudicated

by the Illinois Circuit Court, which awarded all marital property to the Non-Debtor-Spouse. The

Bankruptcy Court disagreed, however on appeal, the District Court corrected this (and one other

error) made by the Bankruptcy Court, and correctly determined that:

> Based on the foregoing clarification of the divorce judgment, this
> Court finds that **Michael's marital estate consisted of his entire
> 100% interest in Zig-Zag Corp. and his entire 49% interest in
> ZZC, Inc.** These interests were rendered contingent when Elizabeth

---

[8] Appendix A-105, at Paragraph 2 on Page A-106 (Doc.Page 2).

> petitioned for divorce in December 2013 and therefore succeeded as contingent interests to Michael's bankruptcy estate when Michael petitioned for bankruptcy eight months later. Then, in December 2017, when **the divorce judgment awarded Michael's entire marital estate to Elizabeth**, these contingent interests vanished from the bankruptcy estate. The question that remains is how this corrected understanding of the bankruptcy estate affects the Trustee's claims.

*See Memorandum Opinion and Order* by the District Court, SA-4, at Page SA-24 (Doc.Page 21). The District Court clarified that indeed, the entire marital estate (which included all marital property) was awarded to the Non-Debtor-Spouse.

Therefore, as the District Court said, "[t]he question that remains is how this corrected understanding of the bankruptcy estate affects the Trustee's claims".

The Trustee, and now both the Bankruptcy Court and the District Court, have opined that the divorce judgment didn't and doesn't affect the Trustee's fraudulent transfer claims, at all.

**This is simply impossible**, and the reasons why both the Bankruptcy Court and District Court are wrong, will be explained during the remainder of this brief.

### C.    Relevant Detailed Case History and Summary of Alleged Transfers

The Court needs only to consider how the order of events that occurred affect the Trustee's ability to avoid the transfer of property that would have become marital property, had said property not been transferred. As Scott was found to be in default, he can't challenge any of the factual allegations made by the Trustee within the Adversary Proceeding, but he may attack the sufficiency of the complaint, as well as challenge, as he is doing here, the legal sufficiency of the complaint (Scott argues here that all of the alleged fraudulent transfer causes of action must fail as a matter of law). *See Memorandum Opinion*, SA-62, at Pages SA-73, SA-74 (Doc.Pages 12, 13) ("The Plaintiff must, however, establish that the well-pleaded facts found in the complaint, if taken as true, amount to a legally cognizable claim for relief upon which a judgment may be entered.").

The District Court summarized the fraudulent transfer causes of action into three transfers:

> Following separation from his wife and in anticipation of his impending divorce, Michael began making moves to shield MMQB assets and proceeds from his existing and prospective creditors-most prominently, Elizabeth. First, in 2012, Michael transferred the MMQB business from Zig-Zag Corp. to a shell company he created called ZZC, Inc. ("**Transfer No. 1**"). According to ZZC, Inc.'s 2012 tax return, Michael wholly owned ZZC, Inc. At some point after 2012, however, Michael transferred 51% of the stock in ZZC, Inc. to his adult son, Scott Wolf ("**Transfer No. 2**"). … Finally, in January 2014, Scott (as the controlling shareholder of ZZC, Inc.) transferred the MMQB business yet again to another token entity called MMQB, Inc. ("**Transfer No. 3**"). Scott was the sole owner of MMQB, Inc. and he, much like his father with Zig-Zag Corp., disregarded corporate formalities and used MMQB, Inc. to furtively siphon MMQB proceeds into his and his father's hands.

*Memorandum Opinion and Order*, SA-4, at Page SA-6 (Doc.Page 3). The District Court also included a graphic summary of these events, which it considered the "core" of the appeal:



The District Court also included a table specifying the rights to relief (and mechanism):

| Def. | Liability | Right to Relief | | Factual Basis | Damages |
|------|-----------|-----------------|--|---------------|---------|
| MMQB, Inc. | Fraudulent Conveyance (Actual & Constructive) | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) | Transfer No. 1 (Subsequent Transferee) | $2.1M |
| Scott | Veil Piercing | § 544(a) | | Alter Ego (MMQB, Inc.) | $2.1M |
| | Fraudulent Conveyance (Actual & Constructive) | § 548(a)(1)(A) | | Transfer No. 2 (Initial Transferee) | $1.071M |
| | | § 548(a)(1)(B) | | | |
| | | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) UFTA § 6(a) | | |
| | Corporate Waste | § 541(a)(1) | 805 ILCS 5/12.56 | Transfer No. 3 | $1.029M |

**Transfer No. 1:** The Trustee brought two causes of action under 11 U.S.C. § 544(b), which utilized the IUFTA, specifically 740 ILCS 160/5(a)(1) and 740 ILCS 160/5(a)(2) to avoid the transfer of the MMQB-Business from Zig-Zag to ZZC, Inc ("ZZC"), which occurred in early 2012, and then from ZZC to MMQB, Inc. (as a subsequent transferee) which occurred in early 2014, with Scott liable as the alter-ego of MMQB, Inc. The avoidance of this series of transfers, affixed liability on both MMQB, Inc. and Scott personally and jointly in the amount of $2,100,000.

**Transfer No. 2:** The Trustee brought three causes of action under 11 U.S.C. § 544(b), which utilized the IUFTA, specifically 740 ILCS 160/5(a)(1), 740 ILCS 160/5(a)(2), and 740 ILCS 160/6(a), as well as a cause of action under 11 U.S.C. § 548(a)(1)(A) and fifth cause of action under 11 U.S.C. § 548(a)(1)(B) to avoid the transfer of 51% of the Debtor's interest in ZZC to Scott, occurring sometime after Transfer No. 1, but before the marital dissolution proceedings were initiated. The avoidance of this transfer, affixed liability on Scott in the amount of $1,071,000.

**Transfer No. 3:** The District Court found error with the Trustee's single cause of action, which sought to hold Scott personally liable as a corporate waste claim. *Id.*, SA-4, at Page SA-24 (Doc.Page 21) ("Hence, it was an error to grant the Trustee's corporate waste claim."). As such, there is no need to discuss this cause of action further, as Scott agrees with the District Court's interpretation that the Bankruptcy Estate was left without a $1,029,000 claim, as the Debtor's 49% interest in ZZC was never property of the Bankruptcy Estate (due to *Thorpe*).

# SUMMARY OF THE ARGUMENT

## A.     Any and All Avoidance Actions Must Fail as a Matter of Law

Once again, at bottom, this case simply asks the Court to start with *Thorpe*, and first extend it

utilizing its holding in *MacDonald,* 469 F.3d 1079, 1081 (holding that if a transfer was fraudulent,

the UFTA would "nullify the transfer" and the property would be treated "as though the fraudulent

transfer had not occurred."), which relies on a decision from the Illinois Supreme Court.

Bankruptcy courts are instructed to determine the debtor's interest in property under state law.

Under Illinois law, a fraudulent conveyance is "valid and binding and no interest, legal or

equitable, remains in the grantor…." *DeMartini,* 385 Ill. 128, 133, 52 N.E.2d 138.

In *DeMartini* the Illinois Supreme Court held that "a transfer of property fraudulent and void as to

creditors is nevertheless valid as between the parties thereto. (Citations omitted). A conveyance of

this sort is void only as against creditors, and then only to the extent to which it may be necessary

to deal with the conveyed estate for their satisfaction." *Id.* 385 Ill. at 134. The court further

explained:

> The decree of the circuit court which set aside this conveyance at
> the suit of the plaintiff did not invalidate the conveyance as to them,
> but only as to the plaintiff.... The property did not thereby again
> become that of the [judgment debtor], but **was merely made**
> **subject to be applied to the payment of plaintiff's judgment to**
> **the same extent as it might have been had it remained the**
> **property of the judgment debtor**. [*DeMartini* 385 Ill. at 135, 52
> N.E.2d 138, emphasis added] .

Coupling *Thorpe* with *MacDonald* (which relies on *DeMartini*) demonstrates that a chapter 7

trustee (or any creditor of a debtor in a situation absent a bankruptcy case) may not avoid the

fraudulent transfer of property that would have then first become marital property (and therefore

subject to Illinois Circuit Court allocation), because said transfer may only be voided to apply

payment to a creditor **to the same extent as it might have been** had it remained the property of the judgment debtor.

If the MMQB-Business remained property of the judgment debtor (and/or more accurately, the property of Zig-Zag), the MMQB-Business (and Zig-Zag) would have been fully encumbered by the Non-Debtor-Spouse's 100% contingent interest in all marital property (which would not have become property of the Bankruptcy Estate), thus defeating any and all avoidance actions.

Therefore, under Illinois law, *DeMartini* and *MacDonald* both instruct that a creditor may not avoid the transfer of property that, if said property had not been transferred, would have remained unavailable to the creditor for the satisfaction of debts. Here, this means that, under Illinois law, unless a creditor obtained a right to payment (via a judgment or lien) **before** the marital dissolution proceedings were filed, said creditor could not obtain any property that is or would have become marital property (unless said property was awarded to the debtor by the Illinois Circuit Court).

Looking at it another way, if a right to payment by a creditor is only obtained after a marital dissolution proceeding is filed, then all property that *would have become* marital property, *would then first be* encumbered by the non-debtor spouses' 100% vested marital property interest, before it would be available to creditors of the debtor.

The Supreme Court in *Lewis* already considered this situation, and has disapproved of a trustee avoiding transfers that no creditor could have avoided under applicable state law: "Section 70e enables the trustee to set aside fraudulent transfers which creditors having provable claims could void. The construction of § 70c which petitioner urges would give the trustee power to set aside transactions which no creditor could void and which injured no creditor. That construction would enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy." *Lewis*, 364 U.S. 603, 608-09.

15

Trying to avoid this problem by specifically utilizing 11 U.S.C. § 548 - the Bankruptcy Code's organic fraudulent transfer provision - to avoid the transfers, would still run afoul of *Lewis*.

Further, this concept has already been tested, and all appellate, district and bankruptcy courts have responded in disapproval. *In re French*, 440 F.3d 145 at 151–52 (4th Cir. 2006) (holding that Section 548 "plainly allows a trustee to avoid any transfer of property that would have been 'property of the estate' prior to the transfer in question - as defined by § 541 - even if that property is not 'property of the estate' now ... Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer, would have been property of the estate, wherever that property is located.")

If the MMQB-Business, or the Debtor's 51% interest in ZZC had not been transferred, neither would have become property of the Bankruptcy Estate, as explained in *Thorpe*. Further, if the MMQB-Business had not been transferred, it would have remained property of Zig-Zag, and property of Zig-Zag would not have been property of the Bankruptcy Estate, even if the marital dissolution proceedings were not filed. *See Fowler v. Shadel*, 400 F.3d 1016, 1019 (7th Cir. 2005) (noting that assets of a corporation the debtor owns are neither his assets nor assets of his bankruptcy estate).

This outcome makes sense, because *Thorpe* confirmed that marital property doesn't become property of the bankruptcy estate via section 541(a) (at least, not without an award of property to the debtor by the Illinois Circuit Court). *See Spizz v. Goldfarb Seligman & Co. (In re Ampal–Am. Israel Corp.)*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017) (observing that the "Supreme Court read section 541(a) as a limitation on the trustee's avoiding powers, not as an expansion of those powers").

16

### B.     Gold Bar Example

One of the best ways to understand why all the Trustee's avoidance actions must fail, at least with respect to property that would have become marital property, had said property not been transferred, is to look at a simplified scenario. That is, the facts surrounding the alleged fraudulent transfers are irrelevant. No creditor, or chapter 7 bankruptcy trustee, may avoid the transfer of property in this factual scenario: (1) The transfer(s) involve property that was acquired after the marriage; (2) The creditors only established a right to payment after marital dissolution proceedings were filed; (3) Illinois law controls with respect to the dissolution proceedings and fraudulent transfer proceedings; and (4) The debtor-spouse was not awarded any transferred property.

**Scenario One:**
- Jack and Diane are married in Illinois in 1975.
- In 1990, Jack acquires a gold bar worth $10 million.
- On December 7, 2013, Diane files a marital dissolution proceeding.

In this scenario, the gold bar became marital property on December 7, 2013. Thus, it will be allocated to either Jack or Diane (or in some sort of percentages, requiring the gold bar's sale) as the Illinois Circuit Court decides.

**Scenario Two:**
- Same as scenario one, but now Jack files a chapter 7 bankruptcy on July 23, 2014.

In this scenario, nothing changes. *Thorpe* instructs that the gold bar doesn't become property of the bankruptcy estate. Rather, whatever is awarded to Jack will become bankruptcy estate property, and whatever is awarded to Diane will become her property.

**Scenario Three:**
- Same as scenario two, but now Jack gives his son, Cougar, the gold bar on January 1, 2012, since Jack knew his marriage was failing and he wanted to ensure his wife would not be awarded his gold bar.

**This is the scenario the Court must evaluate in this case.** What happens?  Diane has many tools to recover the gold bar. She may bring claims under the IUFTA (and other fraud provisions) void the transfer of the gold bar to Cougar. She may bring dissipation claims, which, of course, won't do her much good if Jack is bankrupt. So, her best bet would be to recover the gold bar under the IUFTA, by bringing a fraudulent transfer action against Cougar. This action is specifically authorized and endorsed by the Illinois Supreme Court to be utilized within the context of property, that would have become marital property, but instead was transferred (fraudulently) to hide said property from a spouse, thus fraudulently reducing her marital interest.

What about the chapter 7 trustee? He can't bring his own fraudulent transfer actions, as his right to payment only exists as of July 23, 2014 – while the wife *would have gained* a 100% fully vested marital interest in the gold bar on December 7, 2013, had it not been fraudulently transferred away from her. A creditor – or a trustee – can't recover the same property that Diane can recover. That would, of course, be impossible. **There aren't two gold bars.** Only one. So there needs to be some sort of priority established.

Luckily, the Illinois Supreme Court already established this priority in *DeMartini*: "…**made subject to be applied to the payment of plaintiff's judgment <u>to the same extent as it might have been</u> had it remained the property of the judgment debtor**".

If the gold bar **remained the property** of the judgment debtor, then we are back to Scenario Two… where the gold bar does not become property of the bankruptcy estate (unless of course, the gold bar is awarded to Jack by the Illinois Circuit Court).

**That is all there is to it.** The Trustee here believes that he may use avoidance actions to recover the gold bar on behalf of Jack's creditors (and in front of and before Diane). This is a ludicrous

position to take, as it "upsets the priorities and policies underlying the bankruptcy code". *Thorpe*, 881 F.3d 536, 542.

The successful avoidance by the Trustee of the transfer of any property that would have become marital property, would also have the effect of deciding that said property would have been awarded to the Debtor (and thus available to his creditors and therefore not available to the Non-Debtor-Spouse), which is something that a bankruptcy court can't decide due to the domestic-relations exception.

### C.    Core Issue Overview

The overall argument is quite clear as it relates to the core avoidance issue. Both the avoidance of the transfer of the MMQB-Business (Transfer No. 1) and the Debtor's 51% interest in ZZC, Inc (Transfer No. 2), deal with the transfer of property, that, had said property not been transferred, would have become marital property under the IMDMA. As such, the MMQB-Business and the Debtor's 51% interest in ZZC, would not have become property of the Bankruptcy Estate.

With regards to the MMQB-Business specifically, treated factually – the MMQB-Business would have remained property of Zig-Zag, and thus would not have become property of the Bankruptcy Estate because Zig-Zag was fully awarded to the Non-Debtor-Spouse.

Factually, the Illinois Circuit Court did not award **any** marital property to the Debtor, thus no marital property could be available to creditors of the Debtor to satisfy judgments.

### D.    11 U.S.C. § 544(b) / IUFTA Causes of Action

For causes of action utilizing the IUFTA, all controlling Illinois case law explains that the effect of avoiding a transfer under the IUFTA, is to treat the property as it would have been had it not been transferred. In doing this, the property would have then become encumbered as marital

property, keeping it out of reach of the Trustee (or any of the Debtor's creditors), as the Non-Debtor-Spouse would have first gained a 100%, fully vested interest in said property.

Thus, case law provides that the avoidance of said property may only be applied to satisfy a debt "to the same extent as it might have been had it remained the property of the judgment debtor".

### E.     11 U.S.C. § 548 / Bankruptcy Code Avoidance Actions

A similar theory applies to all causes of action utilizing the Bankruptcy Code's organic fraudulent transfer provisions, 11 U.S.C. § 548.

First, section 548 allows the trustee to avoid the transfer "of an interest of the debtor in property", but such a term is not defined within the Bankruptcy Code. The Supreme Court has defined this term, in the context of an avoidance action, to mean "property that would have been part of the [bankruptcy] estate had it not been transferred before the commencement of bankruptcy proceedings."

It has already been well established that any property, that would have become marital property had it not been transferred, would not have become property of the Bankruptcy Estate, as *Thorpe* explains, unless said property was awarded to the Debtor by the Illinois Circuit Court.

Second, the Supreme Court in *Lewis* has specifically disallowed the use of section 548 in this way, as it has consistently held that the Bankruptcy Code can't be utilize to "enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy."

While the Non-Debtor-Spouse isn't an *actual*, *bona fid*e creditor of the Debtor, the Non-Debtor-Spouse **does have security** by way of a 100% vested property interest in all marital property, thereby preventing unsecured creditors from avoiding the transfer of property that would have been encumbered by said interest. It's this gained interest that keeps marital property out of

the bankruptcy estate in *Thorpe*, and it similarly here keeps any applicable avoidance remedies available exclusively to the Non-Debtor-Spouse.

Third, the Supreme Court has also specifically disallowed the use of any fraudulent transfer provisions of the Bankruptcy Code to "set aside transactions which no creditor could void and which injured no creditor." Therefore, the Trustee can't avoid the transfer of property that wouldn't have become property of the Bankruptcy Estate had it not been transferred, because no creditor would have or could have been injured by such a transfer.

### F.     Alter-Ego Operation

The IUFTA only operates on the fraudulent transfer of property belonging to the Debtor. Since the MMQB-Business was property of Zig-Zag, its transfer to ZZC could not have been fraudulent to the Debtor's creditors under the IUFTA. To "get around" this requirement, the Bankruptcy Court utilized the alter-ego doctrine (and/or reverse veil piercing) to rewrite history and treat all property of Zig-Zag, including the MMQB-Business, instead as property of the Debtor. This concept has never been approved by any state court applying their state's version of the UFTA – but has been rejected by a few.

Even so, such an operation is an exercise in futility, as even if all of Zig-Zag's property was instead treated as the Debtor's personal property – said property would have become marital property and thus would have been subject to the Non-Debtor-Spouse's 100% vested interest in all marital property, thus encumbering said property and rendering the Trustee subordinate.

Given that the Debtor's 100% interest in Zig-Zag was factually awarded to the Non-Debtor-Spouse, even if such an alter-ego operation would be possible under Illinois law – it could only be used by those with an interest in Zig-Zag, as otherwise the Trustee is asking for a remedy (to reach

the assets of Zig-Zag) that can't be applied in equity (Zig-Zag, and its assets, are not and can never by property of the Bankruptcy Estate due to the award of Zig-Zag to the Non-Debtor-Spouse).

### G.      Non-Debtor-Spouse Does Not Have a Right to Payment

As the Non-Debtor-Spouse was not awarded a monetary judgment by the Illinois Circuit Court (or put another way, as of the Petition Date, the Non-Debtor-Spouse did not possess a right to a monetary payment and did not obtain any monetary judgment against the Debtor), the Non-Debtor-Spouse is not a creditor of the Bankruptcy Estate.

However, the Non-Debtor-Spouse, through the protection of her 100% vested interest in all marital property, holds a special and unique *personal* claim, which ensures that only she could be the beneficiary of any avoidance action related to property that would have become marital property, had said property not been transferred.

### H.      Motion for Rehearing

The District Court failed to evaluate the effect that the marital property award (or lack of award to the Debtor) had on the Trustee's avoidance causes of action. In fact, the District Court didn't discuss **any** of the well cited cases and arguments made by Scott that would cause the Trustee's avoidance actions to fail as a matter of law. When this was pointed out by Scott in his Motion for Rehearing, the District Court responded that there was "no trace"[9] of such an argument, even though the argument, as all of the relevant cases, were cited and well argued.

---

[9] *Order (Regarding Motion for Rehearing / Reconsideration)*, SA-52 at Page SA-55 (Doc.Page 4).

## ARGUMENT

### A.     *De Novo* Standard of Review

The Court applies the same standard of review as the District Court and reviews the Bankruptcy Court's findings of fact for clear error and its legal conclusions *de novo*. *See Tidwell v. Smith (In re Smith)*, 582 F.3d 767, 777 (7th Cir. 2009). The marital property award and how it relates the Trustee's ability to bring any and all avoidance actions, the Trustee's ability to utilize alter-ego, the Trustee's ability to acquire any property that would have become marital property had said property not been transferred and the Non-Debtor-Spouse's status as holding a personal claim and therefore is not a creditor, are all issues of law reviewed *de novo*. The District Court's failure to respond to or address many arguments raised by Scott and cases cited by Scott (such as *MacDonald* and *Lewis*) are reviewed for clear error. The decision whether to grant summary judgment is a legal conclusion. *See In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004).

**In an appeal from district court review of a bankruptcy court order, the circuit court of appeals independently reviews the bankruptcy court's order without deference to the district court's determination.** *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994); *accord In re Foust*, 52 F.3d 766, 768 (8th Cir. 1995) ("Although the district court's conclusions about the bankruptcy court's decisions may carry some persuasive weight, our appellate review of the bankruptcy court's decision is independent of the district court's opinion."); *In re Graves*, 33 F.3d 242, 246 (3d Cir. 1994) (circuit court's review in a bankruptcy appeal "duplicates that of the district court and [it] view[s] the bankruptcy court decision unfettered by the district court's determination"); *In re Eagle-Picher Indus., Inc.*, 999 F.2d 969, 972 (6th Cir. 1993) (same).

### B.    Trustee's Standing to Avoid Transfers

Whereas section 544(a) allows for avoidance of unperfected and incomplete transfers, sections 544(b) and 548 allow for avoidance of fraudulent transfers. Under section 544(b), "the trustee may avoid any transfer of an interest of the debtor in property... that is voidable under applicable law by a creditor holding an unsecured claim..." 11 U.S.C. § 544(b)(1). This "enables a trustee to step into the shoes of an unsecured creditor who existed at the time of the transfer and vindicate that creditor's state-law rights." *In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 811 (7th Cir. 2019). Similarly, under section 548, "[t]he trustee may avoid any transfer ... of an interest of the debtor in property" if the debtor made the transfer with either (A) the "actual intent to hinder, delay, or defraud" a creditor, or where (B) the debtor "received less than a reasonably equivalent value in exchange for such transfer" and was insolvent on the date of transfer or became insolvent because of the transfer or made the transfer to benefit an insider. 11 U.S.C. § 548(a).

**However**, any right conferred upon the trustee only exists as of the commencement of the bankruptcy case. *Lewis*, 364 U.S. 603, 607 ("We think that one consistent theory underlies the several versions of § 70c which we have set forth, *viz.*, that **the rights of creditors - whether they are existing or hypothetical - to which the trustee succeeds are to be ascertained as of "the date of bankruptcy," not at an anterior point of time**. That is to say, the trustee acquires the status of a creditor as of the time when the petition in bankruptcy is filed. We read the statutory words "the rights . . . of a creditor [existing or hypothetical] then holding a lien" to refer to that date."). *See also In re Thorpe*, 569 B.R. 310, 315 (C.D. Ill. 2017).

### C.     Marital Property

Under Illinois law, the term "marital property" is statutorily defined. Illinois courts do not need to make determinations of what is and what isn't marital property – as it is very easy to determine what is and what isn't marital property. Any property owned by either spouse, acquired after the parties are married, is marital property.

Therefore, any property acquired by either the Debtor, or the Non-Debtor-Spouse, after October 5, 1975, became marital property upon the initiation of marital dissolution proceedings:

> Section 503(a) describes marital property as "all property ... acquired by either spouse subsequent to the marriage." 750 ILL. COMP. STAT. 5/503(a). Section 503(e) then explains that "[e]ach spouse has a species of common ownership in the marital property which vests at the time dissolution proceedings are commenced." *Id.* § 5/503(e).
>
> These provisions quickly resolve at least the threshold question that puzzled the lower courts. **The Thorpe home is clearly marital property; it was acquired after Timothy and Belva were married.** Moreover, § 503(e) applies to marital property by its plain terms. The Thorpe home thus falls within § 503(e) 's reach.

*Thorpe*, 881 F.3d 536, 540.

### D.     Transfer No. 2 - Debtor's 51% Interest in ZZC

The Trustee brought causes of action under both sections 544(b) and 548 to avoid the Debtor's pre-petition transfer of his 51% interest in ZZC to Scott. As this appeal is based on the law – it doesn't matter if this was a constructive or actual fraudulent transfer – all that matters is if the Trustee can state a claim upon which relief may be granted given the factual circumstances.

"The UFTA allows a creditor to defeat a debtor's transfer **of assets to which the creditor was entitled**. 740 ILCS 160/5." *Villaverde v. IP Acquisition VIII, LLC*, 2015 IL App (1st) 143187, 69, 395 Ill. Dec. 677, 39 N.E.3d 144, 150.

Here, all of the Trustee's fraudulent transfer actions must fail, *as a matter of **law**,* as the Trustee (or any of the Debtor's creditors) are not entitled to property that would have become marital property, had said property not been transferred.

With respect to causes of action under the IUFTA via Section 544(b), the Seventh Circuit explained in *MacDonald* that under Illinois law, the effect of an avoidance action is to treat the transferred property as though the transfer had not occurred, in order to correctly establish the rights (and priorities) of creditors (or others) to said property:

> Assuming that Gayton's transfer of his interest in his family home was fraudulent, the UFTA would nullify the transfer and the property would be restored to the joint tenancy with right of survivorship. *See Gayton v. Kovanda*, 368 Ill.App.3d 363, ___, 306 Ill.Dec. 530, 533, 857 N.E.2d 929, 932, 2006 WL 3026035, at *4 (Oct. 25, 2006) (stating that fraudulent transfer of a joint tenant's interest in property does not sever the joint tenancy) (citing *Gilbert Bros.*). In other words, we would treat the property as though the fraudulent transfer had not occurred. *Id.* (citing *DeMartini* (a fraudulent conveyance is void only as against creditors and the conveyance is treated as though it had not occurred)). After Gayton transferred his interest in the property to Monica and before his death, Gayton and Monica held the property as joint tenants. Once Gayton died, his interest in the property passed to Monica as a joint tenant through rights of survivorship.
>
> For Macdonald to reach the property for the purpose of satisfying the $357,139.89 judgment, **he must have perfected a lien on the property while Gayton held an interest in the property**.
>
> …
>
> Since Macdonald did not record a lien against the property while Gayton was alive, the property passed to Monica unencumbered by the judgment at Gayton's death. **Neither the UFTA nor the district court's entry of judgment nunc pro tunc cures Macdonald's inability to file a judgment lien while Gayton held an interest in the property**. Thus, the district court properly granted summary judgment to Monica because the **UFTA affords Gayton no relief**.

*MacDonald*, 469 F.3d 1079, 1082 (emphasis added). Other federal courts applying Illinois law have also come to the same conclusion:

> The court concludes only that it has jurisdiction to oversee a search for assets of the judgment debtor, which includes disputes about whether those assets are now in the hands of other persons or institutions. Because of the probate exception's bar against allocating the assets of an estate, however, it appears unlikely that this court will be able to award the property to any particular claimant. If the trust or Susan is found to have collectable property because property was transferred fraudulently to avoid the judgment as the Trustee implies (Trustee Br. 4–6), **the appropriate remedy is for the court to reinstate the property as it was before the transfer was made**, *Gayton v. Kovanda*; *Gilbert Bros. Inc. v. Gilbert* , 258 Ill.App.3d 395, 400, 630 N.E.2d 189, 192–93, 196 Ill.Dec. 492 (4th Dist. 1994), **which would place it in Kevin's estate**.

*Gecker v. Flynn (In re Emerald Casino, Inc.)*, 223 F. Supp. 3d 740, 755 (N.D. Ill. 2016) (emphasis added). There exists no transferee, lienholder, or judgment creditor – hypothetical or not – that could take marital property away from the marital estate. The Trustee may only act as a judgment creditor as of the Petition Date.

When the Non-Debtor-Spouse initiated the marital dissolution proceedings, it's as if the Debtor died – since all of his property, and any interests in property he had or might have had, became marital property and thus part of the marital estate. When the Non-Debtor-Spouse was awarded the marital estate (consisting of all marital property), all of the marital property became hers.

As illustrated above, the plain effect of the marital dissolution proceedings was to **(a)** cause all of the Debtor's property acquired after 1975 to become marital property (and thus encumbered as not being available to any creditors (unless they obtained a legal right to payment – such as a judgment – before the initiation of the marital dissolution proceedings) → **(b)** later ripen into the Non-Debtor-Spouses' 100% exclusive property. Step **a** happened before the Bankruptcy Estate had any legal right to payment, so there is no recourse for the Trustee.

As illustrated above, creditors (and the Trustee) are not entitled to any recovery of any marital property, or any property that would have become marital property had said property been

transferred, as no such lien or other rights were perfected by any creditor before the initiation of the marital dissolution proceedings.

Illinois appellate courts have also ruled the same way – when dealing with the avoidance of property that would have been fully encumbered (or put another way, would no longer have been property of the debtor by the time the creditor obtained a legal right to payment):

> Moreover, apart from the dismissal, the Company's claim is moot because the Company alleges that Nick, as a joint tenant, fraudulently transferred his interest to the other joint tenant, his wife, and then he died. Assuming the Company was successful on the merits of its claim for fraudulent transfer, the court would reinstate the property **as it was at the time prior to the fraudulent transfer**. Because Nick's death occurred prior to any judgment received by the Company, the property **would have transferred** to the surviving joint tenant at that time of death, **extinguishing any rights** the Company may have had.

*Gilbert Bros., Inc. v. Gilbert*, 258 Ill. App. 3d 395, 400 (Ill. App. Ct. 1994) (emphasis added).

Applying the same logic here, the Illinois appellate court would rule: The Trustee's claim is moot because he alleges that the Debtor fraudulently transferred his 51% interest in ZZC to Scott, and then his wife filed a marital dissolution petition before he filed for bankruptcy. Assuming the Trustee was successful on the merits of his claim for fraudulent transfer, the court would reinstate the property **as it was at the time prior** to the fraudulent transfer. Because the dissolution filing occurred prior to any unsecured creditor receiving a judgment (a hypothetical one was received upon the filing of the bankruptcy), the Debtor's 51% interest in ZZC **would still be *subject to*** Non-Debtor-Spouse's 100% vested interest, **extinguishing any rights** the Trustee may have had.

Therefore, the Trustee's causes of action brought utilizing the IUFTA must fail, with regards to Transfer No. 2. In fact, the Trustee's causes of action brought to avoid the transfer of any property, that would have become marital property, had said property not been transferred, must fail as a matter of law under the IUFTA. Absent an award of said property, in favor of the Debtor

by the Illinois Circuit Court, the Trustee can't defeat the Non-Debtor-Spouse's 100% vested interest that she would have gained, had said property not been transferred.

The same reasoning applies to causes of action brought under section 548. Section 548 allows the trustee to avoid the transfer "of an interest of the debtor in property", the Supreme Court has defined "an interest of the debtor in property", within the context of an avoidance action, to mean "property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." *Begier*, 496 U.S. 53, 58, 59 n.3, 65. *Begier* says more:

> Although not defined by the Code, "property of the debtor" is best understood to mean property that **would have been** part of the estate **had it not been transferred**. Its meaning is coextensive with its postpetition analog "property of the estate," which includes all of the debtor's legal or equitable interests in property as of the commencement of the case. § 541(a)(1). Since a debtor does not own an equitable interest in property he holds in trust for another, that interest is not "property of the estate" and, likewise, not "property of the debtor."

*Begier*, 496 U.S. 53, 54. The key here is "all of the debtor's legal or equitable interests in property as of the commencement of the case". At the commencement of the Bankruptcy Case, if the Debtor did not transfer his 51% interest in ZZC , said interest would have been *contingent*, and therefore the actual interest in ZZC would not have been part of the Bankruptcy Estate.

It has already been well established that marital property would only have become property of the Bankruptcy Estate if the Debtor was awarded said property by the Illinois Circuit Court. The Debtor was not awarded any marital property; so *Thorpe* instructs that the Debtor's 51% interest in ZZC, had it not been transferred, would have been encumbered by the Non-Debtor's Spouses 100% vested marital property interest, and thus would not have been part of the Bankruptcy Estate. There is no way around the fact that an order from the Illinois Circuit Court, allocating said property to the Debtor, is required to place any marital property into the Bankruptcy Estate. *See Thorpe*, 881 F.3d 536, 542 ("We have also explained that "[t]he estate's property does not include

the thing to which it lays claim until the matter is adjudicated or resolved by the parties." *In re Carousel Int'l Corp.* , 89 F.3d 359, 362 (7th Cir. 1996).")

*Lewis* makes this same point while rejecting a construction of the former Bankruptcy Act that "would enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy". The Debtor's creditors, absent a bankruptcy filing, still couldn't avoid the transfer of marital property under the same circumstances, so section 548 can't be utilized in this way either.

Other circuits that have considered the definition of "an interest of the debtor in property", as it relates to avoidance provisions of the Bankruptcy Code, have come to the same conclusion, limiting the scope of section 548 to apply only to the alleged fraudulent transfer of property that otherwise would have become property of the bankruptcy estate, had said transfer not occurred:

> Section 541 defines "property of the estate" as, *inter alia*, all "interests of the debtor in property." 11 U.S.C. § 541(a)(1). In turn, § 548 allows the avoidance of certain transfers of such "interest[s] of the debtor in property." 11 U.S.C. § 548(a)(1). By incorporating the language of § 541 to define what property a trustee may recover under his avoidance powers, § 548 plainly allows a trustee to avoid any transfer of property that ***would have been*** "property of the estate" prior to the transfer in question-as defined by § 541-even if that property is not "property of the estate" *now*. *Cf. Begier v. IRS* (reaching a similar conclusion about another avoidance provision, § 547 of the Bankruptcy Code); *Cullen Ctr. Bank & Trust v. Hensley (In re Criswell)*, 102 F.3d 1411, 1416 (5th Cir.1997) ("These § 541 'property of the estate' definitions have been directly linked with the term 'interest of the debtor in property' under § 547(b)."). Through this incorporation, Congress made manifest its intent that § 548 apply to all property that, absent a prepetition transfer, ***would have been property of the estate***, wherever that property is located.
>
> This interpretation fully accords with the purpose of the Bankruptcy Code's avoidance provisions, which is to prevent debtors from illegitimately disposing of property ***that should be available to their creditors***. *See Palmer & Palmer, P.C. v. U.S. Tr. (In re Hargis)*, 887 F.2d 77, 79 (5th Cir.1989) (avoidance provisions

"protect!] the rights of creditors **via protection of the bankruptcy estate**")…

*French*, 440 F.3d 145, 151-152, *cert. denied*, 549 U.S. 815 (2006) (emphasis added). *See also Official Committee of Unsecured Creditors v. Fountainhead Group, Inc. (In re Bridgeview Aerosol, LLC)*, 538 B.R. 477, 505 (Bankr. N.D. Ill. 2015) (discussing an avoidance action brought under 11 U.S.C. § 548).

*French* (relying on *Begier*) clearly established that the Bankruptcy Code's avoidance provisions exist to "prevent debtors from illegitimately disposing of property **that should be available to their creditors"**, therefore it can't have any application to property that would not and could not have been available to the Debtor's creditors – as only the Non-Debtor-Spouse could be the beneficiary of any avoidance action, through her 100% fully vested marital property interest establishing and protecting her rights, which are superior to any creditor (which is exactly what *Thorpe* said – that a trustee can't access any marital property, for the benefit of creditors (and/or the bankruptcy estate), without first securing an allocation of said marital property from the Illinois Circuit Court in favor of the debtor.

No property, including property that is alleged to have been fraudulently transferred, may become property of the Bankruptcy Estate, without further order by the Illinois Circuit Court to determine the *contingency*. *Reinbold v. Thorpe (In re Thorpe)*, 546 B.R. 172, 177 (Bankr. C.D. Ill. 2016) ("Until the state court equitably divides the marital property, what is property of the bankruptcy estate is unclear.")

This is the only viable legal outcome, as the Illinois Supreme Court already explained that marital assets may only be encumbered pre-divorce. Obtaining a right to marital property, after the filing of a divorce, affords a creditor no protection under Illinois law. *Reinbold v. Thorpe (In re Thorpe)*, 546 B.R. 172, 178 (Bankr. C.D. Ill. 2016) ("Where the divorce proceeding is commenced

31

before any such lien rights are obtained by a creditor, it is this Court's view that Illinois courts have the authority to accord primacy to the spouse's marital property interest, except as to assets that were already encumbered, pre-divorce, by a mortgage, security interest or other contractual claim."). *See also Kujawinski v. Kujawinski,* 71 Ill.2d 563, 574, 17 Ill.Dec. 801, 376 N.E.2d 1382 (1978) (marital property to be divided "so as to avoid the impairment of any contractual obligations owed to third parties").

### E.     Transfer No. 1 - MMQB-Business & Alter-Ego Operation

As a threshold matter, the MMQB-Business was not, and was never property of the debtor. At the time of its transfer, the MMQB-Business belonged to Zig-Zag.

Thus, under *DeMartini*, if the MMQB-Business hadn't been transferred, it would have remained property of Zig-Zag, and **factually** the Bankrputcy Estate never gained any interest in Zig-Zag, as the Debtor's entire interest in Zig-Zag was awarded to the Non-Debtor-Spouse. Thus, the Bankruptcy Estate is left without a claim involving anything to do with Zig-Zag (which includes all property of Zig-Zag, which includes the MMQB-Business).

Even so, all IUFTA causes of action with respect to Transfer No. 1 must fail because of *MacDonald* and *DeMartini* (for the same reasons Transfer No. 2 fails), and even if the Trustee had a valid section 548 claim[10], it too would fail for the same reasons that Transfer No. 2 fails – because the MMQB-Business would still not have become property of the Bankruptcy Estate, even if it hadn't been transferred, because it would have remained property of Zig-Zag, which was awarded to the Non-Debtor-Spouse.

---

[10] The Trustee was only awarded relief with respect to Transfer No. 1 under section 544(b) via the IUFTA.

To get around this problem, both the Bankruptcy Court and District Court applied the concepts of alter-ego and/or reverse veil piercing, to treat the MMQB-Business instead as the Debtor's personal property, at the time of its transfer in 2012.

Even if the concepts of alter-ego / reverse veil piercing would and could have such an effect as to alter the parties to a historic transaction (by rewriting history), it would be irrelevant.

If the MMQB-Business was instead the Debtor's personal property, it would be treated just as the Debtor's 51% interest in ZZC… which would be property that would have become marital property, and thus wouldn't have become property of the Bankruptcy Estate, even if it hadn't been transferred. Under the *DeMartini* test, the IUFTA causes of action would still fail as to the MMQB-Business, because even restoring the property, not to that of Zig-Zag but utilizing alter-ego / reverse veil piercing to treat it as the Debtor's personal property, said property would still then become encumbered by the Non-Debtor-Spouse's 100% vested interest in all marital property.

Zig-Zag was awarded to the Non-Debtor-Spouse, thus no creditor would have an interest in anything that transpired or may have been transferred from Zig-Zag, so *Lewis* would also bar the Trustee's use of alter-ego in this way. The Trustee is attempting to use a remedy to which he is not entitled, to obtain relief which no creditor could obtain, to obtain property which belonged to an entity that is out of reach of creditors.

Illinois **does not** even recognize the alter-ego doctrine as a standalone remedy. *A.L. Dougherty Real Estate Mgmt. Co. v. Su Chin Tsai & Cube Global, LLC*, 98 N.E.3d 504 (Ill. App. Ct. 2017) ("We do note, however, that defendants are correct that there is no "stand-alone" alter-ego cause of action.").

Illinois courts have held that the alter-ego doctrine "fastens **_liability_** on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business." _Peetoom v. Swanson_, 334 Ill. App. 3d 523, 526 (2002).

Piercing the corporate veil is not a separate cause of action but instead is a means for imposing _liability_ in an underlying cause of action. _Id._; _See also Buckley v. Abuzir_, 2014 IL App (1st) 130469, ¶ 9. This doctrine fastens _liability_ on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business. _In re Rehabilitation of Centaur Insurance Co._, 238 Ill. App. 3d 292, 299, 179 Ill. Dec. 459, 606 N.E.2d 291 (1992), _aff'd_, 158 Ill. 2d 166, 198 Ill. Dec. 404, 632 N.E.2d 1015 (1994). Such _liability_ arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation. _Id_. The doctrine of piercing the corporate veil is an equitable remedy; it is not itself a cause of action but rather is a means of imposing liability on an underlying cause of action, such as a tort or breach of contract. _Id_.

Here, even though it has already shown to be futile, the Trustee is asking that the alter-ego doctrine be utilized along with reverse veil-piercing to somehow collapse all of the assets of Zig-Zag into personal property of the Debtor, even though the Non-Debtor-Spouse has ownership of Zig-Zag (and at no time did the Bankruptcy Estate have an interest in Zig-Zag).

Even so, "Illinois has no more recognized outside reverse piercing than Delaware… No Illinois decision approves reverse piercing." _In re Glick,_ 568 B.R. 634, 661-64 (Bankr. N.D.Ill. 2017).

The Trustee is simply trying to hijack the past and change history to take assets away from Zig-Zag (and thus the Non-Debtor-Spouse), and instead acquire them for the benefit of the Bankruptcy Estate, even though the Bankruptcy Estate has no interest in Zig-Zag.

Such an operation simply cannot stand. In fact, many other states, in rejecting reverse veil-piercing, have come to the same conclusion. *See Cascade Energy and Metals Corp. v. Banks* 896 F.2d 1557, 1576-1577 (10th Cir.1990) ("[T]o the extent that the corporation has other non-culpable shareholders, they obviously will be prejudiced if the corporation's assets can be attached directly. In contrast, in ordinary piercing cases, only the assets of the particular shareholder who is determined to be the corporation's alter-ego are subject to attachment.") *See also Postal Instant Press, Inc. v. Kaswa Corp.*, 162 Cal.App.4th 1510 (Cal. Ct. App. 2008).

Notwithstanding all of the other problems with the alter-ego operation – such an operation would still not satisfy a claim for relief under the IUFTA, which requires that the debtor have an interest in the property transferred – **when the transfer occurred**. An Illinois Appellate Court recently confirmed as much:

> Section 7(d) of the UFTA states that "a transfer is not made until the debtor has acquired rights in the asset transferred." 740 ILCS 160/7(d) (West 2014). Section 2(b) defines an "[a]sset" as "property of a debtor." 740 ILCS 160/2(b) (West 2014). Section 2(l) defines a "[t]ransfer" as "disposing of or parting with an asset." 740 ILCS 160/2(l) (West 2014). **Thus the only property which can be conveyed to defraud creditors is that in which the debtor has an interest.** *Regan v. Ivanelli*, 246 Ill. App. 3d 798, 804 (1993).

*Wachowski v. Wachowski*, No. 2-16-0416 (Ill. App. Ct. 2017) (emphasis added). Other state Supreme Courts have come to the same conclusion regarding the UFTA:

> The UFTA further provides that "a transfer is not made until the debtor has acquired rights in the asset transferred." § 36-707(4). Thus, explicit in the act of transferring property in contravention of the UFTA is the prerequisite that the transferor has acquired rights to the asset transferred. It has been observed that under the UFTA, **a person cannot transfer or otherwise dispose of something which he or she does not possess or does not yet rightfully possess**. *Dyer v. Eckols*, 808 S.W.2d 531 (Tex.App.1991).

*Essen v. Gilmore*, 607 NW 2d 829 (Neb. Supreme Court 2000),  259 Neb. 55  (emphasis added).

In *Crystallex International Corp. v. Petróleos de Venezuela, S.A.*, 879 F.3d 79 (3d Cir. 2018), the Third Circuit ruled that transfers by non-debtor subsidiary corporations to their ultimate parent corporation, which was alleged to be the Republic of Venezuela's alter-ego, were not fraudulent transfers under the Delaware Uniform Fraudulent Transfer Act ("DUFTA"). *See also Edgewater Growth Capital Partners v. H.I.G. Capital, Inc.*, 2010 WL 720150 (Del. Ch. Mar. 3, 2010), and *In re Wickes Trust*, 2008 WL 4698477 (Del. Ch. Oct. 16, 2008) (transfers by non-debtors cannot be avoided under DUFTA).

Either way, reverse piercing would not apply retroactively to treat property that was supposedly fraudulently transferred by an alter-ego as if it had been transferred by the debtor. *Covey v. Casey's Gen. Stores, Inc. (In re Duckworth)*, Nos. 10-83603, 11-8104, 2012 WL 4434681, at *8 (Bankr. C.D. Ill. Sept. 24, 2012) (refusing to permit a trustee to use piercing "to rewrite history," calling it "a gross overextension of the alter-ego doctrine").

The fact that Zig-Zag was awarded to the Non-Debtor-Spouse by the Illinois Circuit Court causes all of the Trustee's claims under the IUFTA to fail anyway.

The Bankruptcy Estate (and the Debtor's creditors) were never entitled to any marital property since the Debtor wasn't awarded any marital property. Thus, the IUFTA can't be used to defeat the transfer of the MMQB-Business (or the transfer of the Debtor's 51% interest in ZZC), because said transfers could not have harmed creditors (since it has already been established that the property, had it not been transferred, would not have become property of the Bankruptcy Estate).

The Illinois court in *Apollo Real Estate Inv. Fund IV, LP v. Gelber*, 935 N.E.2d 963, 976 (Ill. App. Ct. 1st Dist. 2010) confirmed this as well, as creditors would have needed to have suffered an injury due to the alleged transfers:

> The test set forth by the Illinois Supreme Court to determine the validity of a transfer under the Uniform Fraudulent Transfer Act is

> "'whether or not it directly tended to or did impair the rights of creditors.... A donor may make a conveyance with the most upright intentions, and yet, **if the transfer hinders, delays, or defrauds his creditors**, it may be set aside as fraudulent.'" *In re Martin*, 145 B.R. at 947, quoting *Birney v. Solomon*, 348 Ill. 410, 414-15, 181 N.E. 318, 320 (1932).

Transfers No. 1 and No. 2 had no effect on the Debtor's creditors – as if said transfers were not made, the MMQB-Business and the Debtor's 51% interest in ZZC would have become marital property, and thus encumbered by the Non-Debtor-Spouse's 100% vested marital property interest (and would remain unavailable to the Debtor's creditors and the Bankruptcy Estate).

### F.      Non-Debtor-Spouse's Personal Claim

The Non-Debtor-Spouse was awarded all marital property. She was awarded the entire marital estate. She was ***not*** awarded a money judgment. She has no right of payment from the Debtor as the Petition Date. As a matter of law, she is not a creditor of the bankruptcy estate. *Cullen v. Cullen*, No. 00 C 6659, at *1 (N.D. Ill. Aug. 3, 2001) ("Finally, the divorce decree does not create a debtor/creditor relationship between the debtor spouse and the non-debtor spouse. Rather, each becomes an owner of a portion of the pension. Appellant is mistaken;"). This is because the Non-Debtor-Spouse was awarded all marital property, not a right to payment of the value of the marital property.

> **Once marital property has been divided**, however, the **non-debtor spouse does not hold a mere "claim" against the bankruptcy estate** like all pre-petition creditors of the debtor. Instead, **that spouse is the owner of the property in question**, which is deemed not to be property of the estate. *See Skorich*, 482 F.3d at 24-27. A "claim" is defined in § 101(5) as a right to payment or the right to an equitable remedy for breach of performance if such breach gives rise to a right to payment. When a divorce court awards specific property to the non-debtor spouse, that award does not fall within the definition of a "claim" in § 101(5). *Skorich*, 482 F.3d at 25-27. As the *Skorich* court held in similar circumstances, **the divorce court did *not* award the non-debtor spouse a right to payment in lieu of an equitable division of property instead, the**

> **divorce court matured Skorich's equitable interest in the marital property.**" *Id*. at 26. In this case, the state court awarded the stock to Richard, not the value of the stock. He has a right to the stock itself, not a mere right to be paid the value of the stock as a claim against the bankruptcy estate.

*In re Zachmann*, No. 10 B 32410, at *5-6 (Bankr. N.D. Ill. Mar. 25, 2013) (emphasis added).

The Non-Debtor-Spouse is not a creditor, and as such the Trustee is not and cannot be tasked with ***her*** recovery). Instead, the Non-Debtor-Spouse is the owner of all marital property, including Zig-Zag, thus any rights with respect to the MMQB-Business, transferred away from Zig-Zag, are her personal claims. So too are any clams related to any property that would have become marital property, as **only the Non-Debtor-Spouse could be harmed** by the fraudulent transfer of any property that would have become marital property.

As such, the Non-Debtor-Spouse instead has her own unique remedies, which are *personal* to her, and are superior to those of the Trustee. In this case, "the trustee has the sole right and responsibility to bring claims on behalf ... of creditors as a class-so-called 'general' claims." *In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009) (citing *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987)). "Individual creditors," however, "retain the right to bring 'personal' claims that do not implicate the trustee's purpose." *Id*. Personal claims are defined as "those in which the claimant is harmed and 'no other claimant or creditor has an interest in the cause.'" *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (quoting *Koch*, 831 F.2d at 1348); *see, e.g.*, *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) (RICO plaintiffs were entitled to sue on their own for injuries that resulted from the diversion of corporate assets and were distinct from the injuries to creditors in general).

Under Illinois law, the Non-Debtor-Spouse, herself, may use the IUFTA to recover property that would have become marital property. The Trustee can't avoid the same property as the Non-Debtor-Spouse (two parties can't recover the same thing), and since the Trustee is subordinate to

the Non-Debtor-Spouse's marital property interest (or the property interest that she would have gained had the transfer not occurred), he has no interest in any avoidance actions, as only the Non-Debtor-Spouse can benefit from the avoidance of the transfer of any property that would have become marital property (unless of course, an order exists from the Illinois Circuit Court that awards property to the Debtor).

Illinois Courts have consistently held that the Non-Debtor-Spouse may utilize available fraud provisions, including the IUFTA, to avoid any transfers of property that fraudulently diminished the marital estate – that were made to specifically remove property so that it was out of reach of allocation by the Illinois Circuit Court.

> In Illinois, a spouse may dispose of property during the marriage, even if the transfer is "for the precise purpose of minimizing or defeating the statutory marital interests of the spouse in the property conveyed." *LaRocque*, 2018 IL App (2d) 160973, ¶ 45 (quoting *Johnson v. La Grange State Bank*, 73 Ill.2d 342, 356-57 (1978)). **But he may not do so if the transfer is "tantamount to a fraud," meaning colorable or illusory.** *Id.* (citation omitted); *see In re Marriage of Frederick*, 218 Ill.App.3d 533, 535-36 (2d Dist. 1991) (**circumstances of transfer showed a sham transaction to defraud spouse's marital rights**).

*Malek v. Malek*, No. 19 CV 8076, at *18 (N.D. Ill. Oct. 15, 2020) (emphasis added). Other Illinois courts have referenced these and similar cases, all holding that the Non-Debtor-Spouse has the ability to attack any transfer that minimizes her statutory marital interest, if the transfer was made with fraudulent intent.

> **Nevertheless, where a conveyance from a spouse to a third party is essentially nothing more than a sham transaction, it is tantamount to a fraud and subject to defeasance by the other spouse.** *Hofmann v. Hofmann* (1983), 94 Ill.2d 205, 221, 446 N.E.2d 499; *In re Estate of Nemecek* (1980), 85 Ill. App.3d 881, 883, 407 N.E.2d 655.

*In re Marriage of Shehade*, 137 Ill. App. 3d 692, 699-700 (Ill. App. Ct. 1985) (emphasis added). The Illinois Circuit Court was aware of these provisions and precedent, and specifically

opined that, "should Mrs. Wolf find assets which were fraudulently concealed from her she has the possibility of relief under §1102 of the Code of Civil Procedure."[11] This provision allows the Non-Debtor-Spouse to conduct further examinations to aid in uncovering of property that was fraudulently concealed from her. *See* 735 ILCS 5/2-1102.

Further, the Illinois Circuit Court awarded the Non-Debtor-Spouse with not just the entire marital estate, "but, will award to Mrs. Wolf any interest that Mr. Wolf had subject to determination of assets owned by Mr. Wolf by the bankruptcy court in case no. 14 B 27066 in the United States Bankruptcy Court Northern District of Illinois."[12]

Therefore, whatever assets the Bankruptcy Court determines belonged to the Debtor… those assets were and are awarded to the Non-Debtor-Spouse. As such, there can't be, and there can never be, any marital property recovered for the benefit of the Bankruptcy Estate, as all marital property, and interests in any marital property that the Debtor had, were awarded to the Non-Debtor-Spouse. This is the very definition of a *personal,* superior claim – not a priority claim entitled to payment… but complete ownership of any property that is or would have become marital property, had said property not been transferred fraudulently.

### G.     Domestic-Relations Exception

As illustrated above, if the Trustee were to prevail on any avoidance action, the effect of said avoidance would be to remove the encumbrance of the Non-Debtor-Spouse's marital interest, thereby allocating said property, that would have become marital property, as having been awarded to the Debtor, thus available to his creditors. This is not an action that a federal court may take.

> [H]is essential grievance is that the disputed funds are marital property, that his wife wrongfully diverted the funds to her parents, and that he is entitled to his share. **These are matters for the state**

---

[11] *Findings and Rulings*, SA-146, at Page SA-152 (Doc.Page 7).
[12] *Id.*, SA-146, at Page SA-148 (Doc.Page 3).

> **court to decide during the ongoing divorce proceedings.** *See*
> *United States v. Windsor*, 133 S. Ct. 2675,
> 2691 (2013); *Ankenbrandt*, 504 U.S. at 704. If there was any
> misconduct by his wife or the Maneris, the state court will take that
> into account when dividing the Budoricks' marital estate. This case
> falls squarely within the domestic-relations exception.

*Budorick v. Maneri*, No. 17-1112, at *3 (7th Cir. Oct. 11, 2017).

Any property, that would have become marital property had said property not been transferred, would be automatically encumbered by the Non-Debtor-Spouse's marital interest. Said marital interest can only be determined by the Illinois Circuit Court – which already awarded nothing to the Debtor, and everything to the Non-Debtor-Spouse. A federal court does not have the power grant the avoidance of property that would have become marital property, and thus been encumbered and unavailable to the Debtor's creditors.

### H.     Motion for Rehearing

The following cases cited above, were also cited by Scott in his *Opening Brief*[13] to the District Court: *DeMartini, MacDonald, Gayton, Gilbert Brothers, Emerald Casino, Thorpe* (bankruptcy, district and seventh circuit) and *Lewis.*

 **Yet,** only the seventh circuit *Thorpe* case was discussed or referenced by the District Court in its *Memorandum Opinion and Order*[14]. This is a clear error committed by the District Court, especially since *pro se* appeal filings should be construed liberally and the District Court should have addressed any cogent arguments it was able to discern in Scott's briefs. *Parker v. Four Seasons Hotels, Ltd*. 845 F.3d 807, 811 (7th Cir. 2017). Scott properly developed the arguments (over 10+ pages), and they were well supported with the relevant cases cited above.

**The District Court just didn't even consider it.**

---

[13] Appendix A-409.
[14] Short Appendix, SA-4, *passim*.

After this appeal was docketed, Scott filed a Rule 60(b)(1) motion[15] addressing this clear error, which contains over seven pages of reprinted arguments that were contained in Scott's *Opening Brief*[16] and his *Reply Brief*[17]. Clearly, the arguments related to *DeMartini, MacDonald, Lewis, etc.* are there.

The District Court simply did not conduct any sort of analysis of the well cited case law guiding the Trustee's ability to avoid the transfer of property that would have become marital property.

## INCORPORATED BRIEF

Per FRAP 28(i), Scott hereby adopts by reference and includes all additional issues, arguments and facts that appear in briefs filed by the Debtor, Michael Wolf, in the pending related appeals.

## CONCLUSION

The IUFTA only allows a creditor to defeat a debtor's transfer of assets to which the creditor was entitled. *Villaverde.* The Trustee can't set aside transactions which no creditor could avoid – which injured no creditor. *Lewis*. The Trustee can't avoid transfers of property that would not have become Bankruptcy Estate when said property is treated as if it hadn't been transferred. *MacDonald, Begier, French.*

Simply put, the Trustee may not avoid the transfer for property – that – if said property had not been transferred, would still not have been available to creditors of the Debtor. Only property awarded to the Debtor by the Illinois Circuit Court is available to his creditors. *Thorpe.*

---

[15] Appendix A-107.
[16] Appendix A-409.
[17] Appendix A-485.

The Non-Debtor-Spouse's gained and fully vested 100% interest in all marital property, upon the filing of her marital dissolution proceedings, which protects all marital property, including property that would become marital property, from the Debtor's creditors.

The Trustee can't utilize the IUFTA, as he did not defeat the Non-Debtor-Spouse's fully vested 100% interest in all marital property (including the interest that she would have gained, had Transfers No. 1 and No. 2 not occurred). Further, Zig-Zag was awarded to the Non-Debtor-Spouse, putting the company, and its assets, out of reach of the Bankruptcy Estate. Thus, whatever property may have been transferred, is of no consequence to the Trustee. Even employing the history changing alter-ego theory – all personal property of the Debtor would still have become marital property and thus encumbered by the Non-Debtor-Spouse's marital property interest.

Absent an award of marital property to the Debtor, the Trustee does not have a legally actionable avoidance cause of action, under section 544(b) or 548, because he did not establish that said property, had it not been transferred, would have become property of the Bankruptcy Estate; And he can't establish this, because an order from the Illinois Circuit Court is required to adjudicate any marital property.

The Trustee could have obtained such an order from the Illinois Circuit Court, or he could have fought for an equal distribution of the marital estate – or attacked the award of all marital property to the Non-Debtor-Spouse. He did not. Instead, he brought avoidance actions seeking to obtain property that no creditor could obtain, that was already (or would have been) encumbered by the Non-Debtor-Spouse's 100% fully vested marital property interest.

All applicable case law instructs that the property should be treated as if it wasn't transferred – and *then* applied to the creditors as it *may* have been. In this case, the property alleged to have been transferred would have become marital property (or would have remained with Zig-Zag), and

thus would have been still been encumbered and unavailable to the Bankruptcy Estate (or any creditor). *Thorpe* specifically confirmed that further order from the Illinois Circuit Court is needed. Section 548 doesn't help the Trustee, as the property wouldn't have become Bankruptcy Estate property had the transfers not have been made. The same is true under section 544(b) – the IUFTA only operates on property to which a creditor would have been entitled. No creditor is entitled to marital property here, as the Debtor was not awarded any marital property.

The entire marital estate was awarded to the Non-Debtor-Spouse, and she is specifically empowered to void any transactions that fraudulently harmed her statutory marital interest (which is what the Trustee has alleged in the Adversary Proceeding) – thus the Trustee has plead himself out of court. The Trustee admits that he is bringing his causes of action on behalf of the Non-Debtor-Spouse, which he is not authorized to do, as all causes of action related to the fraudulent transfer of property that the Non-Debtor-Spouse would have had a marital interest in, are her *personal* claims, which do not implicate the Trustee's purpose.

As such, the Trustee's causes of action, all of them, for the avoidance of any and all property at issue, fail to state a claim upon which relief can be granted, as a matter of law.

WHEREFORE, Scott respectfully requests that the Court enter an order:

1) reversing the District Court Judgment;

2) reversing the Bankruptcy Court Judgment;

3) denying the Trustee's motion for the entry of a default judgment against Scott;

4) granting Scott's motions for judgment on the pleadings[18] and/or motion for summary judgment[19];

---

[18] Appendix A-21.
[19] Appendix A-135.

5) dismissing all causes of action against Scott[20] as a matter of law for their failure to state claims upon which relief can be granted, as well as any other party alleged to have been involved in any alleged fraudulent transfers, and therefore mooting Scott's default[21];

6) remanding the Adversary Proceeding to the Bankruptcy Court for further proceedings; and

7) granting such other or further relief as the Court deems just or appropriate.

Dated: February 21, 2023

Prepared By:

Scott Wolf (304-769-9828)
scottwolf.0330@gmail.com
320 Central Avenue, Unit 141
Sarasota, Florida 34236

Respectfully Submitted,

/s/Scott Wolf
Scott Wolf, *pro se*
320 Central Avenue, Unit 141
Sarasota, Florida 34236
304-769-9828
scottwolf.0330@gmail.com

---

[20] Appendix A-53.
[21] Appendix A-121.

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) as modified by Circuit Rule 32(c), because this document contains 13,977 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as modified by Circuit Rule 32(b) because this document has been prepared in a proportionally spaced typeface in 12 point font Times New Roman, with 11 point font Times New Roman for footnotes.

Dated: February 21, 2023                                Signed and certified,

                                                        /s/Scott Wolf
                                                        Scott Wolf, *pro se*
                                                        320 Central Avenue, Unit 141
                                                        Sarasota, Florida 34236
                                                        304-769-9828
                                                        scottwolf.0330@gmail.com

## CIRCUIT RULE 30(d) STATEMENT

Pursuant to Circuit Rule 30(d), Scott Wolf certifies that all material required by Circuit Rule

30(a) and (b) are included in the Appendix and/or the required Short Appendix.

.

Dated: February 21, 2023                          Signed and certified,

                                                 /s/Scott Wolf
                                                 Scott Wolf, *pro se*
                                                 320 Central Avenue, Unit 141
                                                 Sarasota, Florida 34236
                                                 304-769-9828
                                                 scottwolf.0330@gmail.com

## CERTIFICATE OF SERVICE

I, Scott Wolf, hereby certify that I caused a true and correct copy of the foregoing *BRIEF AND SHORT APPENDIX OF APPELLANT SCOTT WOLF*, and the documents referred to therein, to be served on the parties listed below via third-party commercial carrier and/or mail, and/or via email, and/or via fax, as well as electronically via the Court's CM/ECF system (all as indicated below on the service list), on the 21st day of February, 2023.

### SERVICE LIST

via ELECTRONIC MAIL (and via CM/ECF where noted):

| | | |
|---|---|---|
| N. Neville Reid | CM/ECF | nreid@foxswibel.com |
| Daniel Patrick Dawson | CM/ECF | adrag@nisen.com, ddawson@nisen.com |
| Catherine L. Steege | CM/ECF | docketing@jenner.com |
| | | csteege@jenner.com |
| Faye B. Feinstein | | faye.feinstein@quarles.com |
| Hailey Ann Varner | | HVarner@perkinscoie.com |
| Travis Jon Eliason | | Travis.Eliason@quarles.com |
| Holly A. Harrison | | hollyharrison@hlawllc.com |
| Jason Fitterer | | JasonFitterer@hlawllc.com |
| United States Trustee | | pat.s.layng@usdoj.gov |

Dated: February 21, 2023

Signed,

/s/Scott Wolf
Scott Wolf, *pro se*
320 Central Avenue, Unit 141
Sarasota, Florida 34236
304-769-9828
scottwolf.0330@gmail.com

# SHORT APPENDIX

Appealed From Order (District Court), 09/30/2022, 18-cv-07953, Dkt. No. 37, "*Minute Entry*" ................................................................................................................................... SA-1

Appealed From Order (District Court), 09/30/2022, 18-cv-07953, Dkt. No. 39, "*Judgment Order*" ...................................................................................................................... SA-2

Appealed From Order (District Court), 09/30/2022, 18-cv-07953, Dkt. No. 38, "*Memorandum Opinion and Order*" ................................................................................................ SA-4

Appealed From Order (District Court), 10/27/2022, 18-cv-07953, Dkt. No. 46, "*Amended Judgment Order*" ...................................................................................................... SA-49

Appealed From Order (District Court), 12/08/2022, 18-cv-07953, Dkt. No. 54, "*Order (Regarding Motion for Rehearing / Reconsideration)*" .......................................... SA-54

Appealed From Order, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 658, "*Final Judgment Against Zig Zag Corp., ZZC, Inc., Michael Wolf and Scott Wolf*" ......................... SA-57

Appealed From Order, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 656, "*Final Judgment Against Zig Zag Corp., ZZC, Inc., Michael Wolf and Scott Wolf*" ......................... SA-59

Proposed Findings, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 655, "*Proposed Findings of Fact and Conclusions of Law as to MMQB, Inc. on Counts 1, 7, 8, and 9*" ................................. SA-61

Appealed From Order Memorandum Opinion, 11/19/2018, Adv. Proc. 16-00066, Dkt. No. 654, "*Memorandum Opinion*" ........................................................................................ SA-62

Additional Appealed From Order, 12/21/2018, Adv. Proc. 16-00066, Dkt. No. 695, "*Order Denying Scott Wolf's Motion for Reconsideration*" .......................................... SA-142

*Judgment for Dissolution of Marriage*, 12/15/2017 (Illinois Circuit Court) ...................... SA-143

*Findings and Rulings*, 11/13/2017 (Illinois Circuit Court) ................................................ SA-146

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois – CM/ECF NextGen 1.6.3**
**Eastern Division**

Scott Wolf
                    Plaintiff,

v.                                          Case No.: 1:18−cv−07953
                                            Honorable John J. Tharp Jr.

N. Neville Reid
                    Defendant.

---

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Friday, September 30, 2022:

        MINUTE entry before the Honorable John J. Tharp, Jr: For the reasons explained in the Court's Memorandum Opinion and Order, the Bankruptcy Court's orders are affirmed. Judgment is entered in favor of the appellees. Civil case terminated. Mailed notice(air, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**[Srt App SA-1]**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re MICHAEL WOLF, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ------------------------------------------------- | ) | Nos. 18 C 07952, 18 C 07953, |
| | ) | 19 C 01978, 19 C 08154, and |
| N. NEVILLE REID, not individually, | ) | 19 C 08299 |
| but solely in his capacity as Chapter 7 | ) | |
| Trustee of the bankruptcy estate of | ) | Judge John J. Tharp, Jr. |
| Michael A. Wolf, et al., | ) | |
| | ) | (Bankr. No. 14 B 27066) |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL WOLF, SCOTT WOLF, et | ) | |
| al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## JUDGMENT ORDER

This action having been decided by Judge John J. Tharp, Jr., on appeal from the United States Bankruptcy Court for the Northern District of Illinois following (1) a February 9, 2017 judgment order dismissing a joint third-party complaint in adversarial proceeding 16-00066; (2) a November 11, 2018 final default judgment (incorporating associated proposed findings of fact and conclusions of law) in adversarial proceeding 16-00066; (3) a December 3, 2019 order denying a motion to amend an order dismissing adversarial proceeding 16-00482; (4) a December 3, 2019 order denying a motion to amend an order dismissing adversarial proceeding 16-00485; and (5) two December 12, 2019 orders of civil contempt issued in adversarial proceeding 16-00066; it is hereby ORDERED:

The Bankruptcy Court's orders are AFFIRMED. Judgment is entered in favor of appellees N. Neville Reid, Barry B. White, Eleanor G. White, Foley Hoag LLP, Egg Worldwide,

**[Srt App SA-2]**

Inc., and Edward R. Lewis and against appellants Michael Wolf, Scott Wolf, Peter Wolf, Zig-Zag, Corp., ZZC, Inc., MMQB, Inc., Hound Ventures, Inc., SHBM, Inc., Ma Cherie LLC, Melissa Scolnick, and Four Legs, Inc. Costs are awarded to the appellees.

Date: September 30, 2022

John J. Tharp, Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re MICHAEL WOLF, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ------------------------------------------------- | ) | Nos. 18 C 07952, 18 C 07953, |
| | ) | 19 C 01978, 19 C 08154, and |
| N. NEVILLE REID, not individually, | ) | 19 C 08299 |
| but solely in his capacity as Chapter 7 | ) | |
| Trustee of the bankruptcy estate of | ) | Judge John J. Tharp, Jr. |
| Michael A. Wolf, et al., | ) | |
| | ) | (Bankr. No. 14 B 27066) |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL WOLF, SCOTT WOLF, et | ) | |
| al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

**MEMORANDUM OPINION AND ORDER**

This is a bankruptcy appeal concerning the debtor's pre-petition transfer of assets. Michael Wolf owned and published a commercial trade magazine for many years before he and his wife, Elizabeth Wolf, separated. In anticipation of divorce, Michael conveyed the publication to his son, Scott Wolf, through the conduit of various sham corporations.[1] After Elizabeth filed for divorce, Michael filed Chapter 7 bankruptcy. Neville Reid was appointed as Trustee to oversee the bankruptcy estate.

Michael's bankruptcy case centered on the Trustee's attempt to avoid three fraudulent transfers of assets related to Michael's publishing business. Amid labyrinthine adversarial proceedings, the bankruptcy court sanctioned Michael and Scott with default and, for reasons

---

[1] To avoid confusion arising from their common last name, this opinion will refer to the various members of the Wolf family by their first names.

**[Srt App SA-4]**

explained in a comprehensive and careful opinion, issued a final default judgment against them for the value of Michael's business.

Michael and Scott now appeal a litany of the bankruptcy court's rulings. They challenge the bankruptcy court's designation of certain shareholder interests as vested within Michael's bankruptcy estate—a ruling based primarily on how Michael's divorce judgment divided his marital property. They also challenge the use of Illinois law to pierce the veil of one of Michael's corporations; the sufficiency of the Trustee's complaint; the denial of Michael's discharge; the dismissal of their third-party complaint against the Trustee; and the bankruptcy court's refusal to award Michael and Scott costs. This Court concludes that the bankruptcy court ruled correctly in all ways except one. Because that error is harmless, the judgment is affirmed.

## I. PROCEDURAL POSTURE

Given the lens through which the facts in this case are viewed, it is important to establish the procedural posture at the outset.

This Court sits in review of the bankruptcy court's final default judgment pursuant to 28 U.S.C. § 158(a). The bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact are reviewed for clear error. *Stamat v. Neary*, 635 F.3d 974, 979 (7th Cir. 2011). The bankruptcy court's proposed findings of fact and conclusions of law are reviewed *de novo*. 28 U.S.C. § 157(c)(1).

Here, the bankruptcy court below entered default against all defendants. "Upon default, the well-pleaded allegations of a complaint relating to liability are taken as true." *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th Cir. 1983). The defendants, however, do not appeal any entry of default, *see* part III; therefore, they waive their challenge to the bankruptcy court's findings of fact. *Cf. In re Sharma*, No. CC–12–1302–

**[Srt App SA-5]**

MkTaMo, 2013 WL 1987351, at *9 (B.A.P. 9th Cir. May 14, 2013), *aff'd*, 607 F. App'x 713 (9th Cir. 2015) (on appeal of a default judgment, the issue becomes "whether the facts alleged in the Complaint, and deemed true upon . . . default, support the bankruptcy court's determination"). The bankruptcy court sourced its facts, as this Court does here, from the well-pled allegations within the Trustee's operative complaint. *See* First Am. Compl., *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. May 31, 2016), ECF No. 95 ("FAC"). Winnowed of inconsequential detail, those facts are as follows.

## II. BACKGROUND

Michael and Elizabeth Wolf married in 1975 and in the ensuing decades Michael published a successful trade publication for the commercial furniture industry entitled Monday Morning Quarterback (MMQB). The publication was nominally owned and distributed by Zig-Zag Corp., although Michael was Zig-Zag Corp.'s sole owner and used Zig-Zag Corp. to pay his and his family's personal creditors. Then in 2011, Michael and Elizabeth separated.

Following separation from his wife and in anticipation of his impending divorce, Michael began making moves to shield MMQB assets and proceeds from his existing and prospective creditors—most prominently, Elizabeth. First, in 2012, Michael transferred the MMQB business from Zig-Zag Corp. to a shell company he created called ZZC, Inc. ("Transfer No. 1"). According to ZZC, Inc.'s 2012 tax return, Michael wholly owned ZZC, Inc. At some point after 2012, however, Michael transferred 51% of the stock in ZZC, Inc. to his adult son, Scott Wolf ("Transfer No. 2"). Between December 2013 and July 2014, Michael also personally gave ZZC, Inc. a total of $234,396 to satisfy a promissory note—debt the Trustee characterizes as illusory. Finally, in January 2014, Scott (as the controlling shareholder of ZZC, Inc.) transferred the MMQB business yet again to another token entity called MMQB, Inc. ("Transfer No. 3").

**[Srt App SA-6]**

3

Scott was the sole owner of MMQB, Inc. and he, much like his father with Zig-Zag Corp., disregarded corporate formalities and used MMQB, Inc. to furtively siphon MMQB proceeds into his and his father's hands. No consideration was given and no written agreement was used for any of the three transfers just described.

About a month prior to Transfer No. 3, Elizabeth petitioned for divorce. In due course, the Circuit Court of Lake County, Illinois, awarded Elizabeth temporary maintenance. For that purpose, the Circuit Court ordered Michael to sell his custom Aston Martin luxury automobile and surrender the proceeds. Michael then "sold" the vehicle for less than its market value to yet another sham entity wholly owned by Scott (Ma Cherie LLC)—who, in turn, allowed Michael to retain possession of the car. When Michael refused to relinquish even these proceeds, he was held in contempt and sentenced to fourteen days in jail. Mercifully, the Circuit Court allotted him fourteen days to purge the contempt. Instead of purging, however, on July 23, 2014, Michael filed a Chapter 7 bankruptcy petition to stay his contempt proceeding.[2] The stay also precluded the Circuit Court from dividing Michael and Elizabeth's marital property. Yet soon thereafter, the bankruptcy court modified the stay to permit the Circuit Court "to determine the appropriate allocation of marital property, including any property of the bankruptcy estate . . . ." Order 2, *In re Wolf*, No. 14-bk-27066 (Bankr. N.D. Ill. Nov. 19, 2014), ECF No. 53.

The chart below provides a graphic summary of the transfers at the core of this appeal:

---

[2] It is unclear whether the Circuit Court treated Michael's contempt proceeding as automatically stayed. The bankruptcy court itself appeared uncertain as to whether 11 U.S.C. § 362(a)(1) required it. *See* Order 2, *In re Wolf*, No. 14-bk-27066 (Bankr. N.D. Ill. Nov. 19, 2014), ECF No. 53 (noting that the "automatic stay ***potentially*** does apply to the contempt proceedings" (emphasis added)). In any case, Michael successfully forestalled his incarceration by convincing the Circuit Court that he was precluded from purging his contempt because all of his assets were confined within his bankruptcy estate. *See* Trustee Br. 121, No. 18-cv-07952, ECF No. 41 (citing Circuit Court filings).

**[Srt App SA-7]**

4

**Overview of Property Interests and Transfers[3]**



Meanwhile in bankruptcy court, the Trustee initiated an adversarial proceeding against Michael and Scott to avoid Transfers Nos. 1–3 and recover to the estate the value of the MMQB business. Initially, to accord with Local Bankruptcy Rule 7020-1, the bankruptcy court ordered this adversarial proceeding split into seven different proceedings.[4] Shortly after the Trustee complied, the bankruptcy court reevaluated Rule 7020-1's import, determined that separate proceedings were not necessary, and granted the Trustee leave to file an amended complaint reconsolidating the seven proceedings. Before the Trustee refiled, however, Michael filed his

---

[3] The "C" affixed to Michael's January 2014 interests indicates the interests are contingent. Upon petition for divorce, both Michael and Elizabeth hold a contingent interest in all marital property. These contingent interests either ripen or vanish depending on how martial property is eventually divided by Michael's December 2017 judgment for dissolution of marriage. *See* part IV.A.

[4] Local Bankruptcy Rule 7020-1 has since been repealed.

**[Srt App SA-8]**

own third-party complaint in five of the proceedings, prompting the bankruptcy court to vacate its consolidation order. Michael's second adult son, Peter, joined this complaint; his interests are discussed in part IV.E below.

Michael's third-party complaint, in the view of the bankruptcy court, was nothing more than an "attempt[] to stop the Adversary litigation and create more expense, all to frustrate the Trustee into halting the marshaling of that assets belonging to the Debtor's estate." Dismissal Order 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Dec. 16, 2016), ECF No. 407. In substance, it was a 374-page, 108-count "rambling narrative" brought against thirty-eight individuals and law firms, including the Trustee, the Trustee's counsel, and every member of the counsel's law firm. *Id*. The complaint's "length, redundancy and irrelevant nature" made it "nearly impossible to follow or analyze," and therefore, the bankruptcy court dismissed it for failure to comply with Federal Rule of Civil Procedure 8(a)'s short, plain statement requirement. *Id*. at 3. Because the bankruptcy court also held that Michael's complaint, even if stated succinctly, could not state judicial actions in light of *Barton v. Barbour*, 104 U.S. 126 (1881), and other statutory impediments, the dismissal was issued with prejudice. *Id.* at 4; *see generally Matter of Linton*, 136 F.3d 544, 545 (7th Cir. 1998) (explaining that a bankruptcy trustee, under the *Barton* doctrine, cannot be sued without leave of the court that appointed him).

During the contentious discovery period that followed, Michael repeatedly refused to comply with the bankruptcy court's discovery orders; and so, the bankruptcy court entered default against him. For similar reasons, the same sanction befell Scott. Zig-Zag Corp., ZZC, Inc., and MMQB, Inc. all failed to defend, so they too were held in default.

An entry of default only establishes liability, it does not itself determine a plaintiff's right to relief. *VLM Food Trading Int'l, Inc. v. Ill. Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016). For

**[Srt App SA-9]**

a default judgment to enter against a defendant in default, it is still left to the plaintiff to establish an entitlement to relief. *Id.* As noted previously, for this purpose, "the well-pleaded allegations of a complaint relating to liability are taken as true." *Id.* (quoting *Dundee*, 722 F.2d at 1323).

The Trustee's operative complaint alleged twenty-eight counts against eight defaulted defendants. The bankruptcy court ultimately held that twelve counts—asserted against Michael, Scott, Zig-Zag Corp., ZZC, Inc., and MMQB, Inc.—entitled the Trustee to relief. In reaching this conclusion, the bankruptcy court held that it had both statutory and constitutional authority to issue final judgment on most counts. *In re Wolf*, 595 B.R. 735, 749–52 (Bankr. N.D. Ill. 2018); *accord* 28 U.S.C. § 157(b); *Stern v. Marshall*, 564 U.S. 462 (2011). For the remainder, it held it had the consent of the parties to issue the same. *In re Wolf*, 595 B.R. at 752–54; *accord* 28 U.S.C. § 157(c)(2); *Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665 (2015). The only exception involved the counts asserted against MMQB, Inc. for which the bankruptcy court held it lacked both authority and consent to issue final judgment. For this reason, the rulings against MMQB, Inc., and only those, take the form of proposed findings of fact and conclusions of law.

The bankruptcy court's final default judgment comprises three components. First, the bankruptcy court held that the Trustee may avoid and recover as preferential transfers the $234,396 in payments Michael made to ZZC, Inc. within the year prior to Michael's bankruptcy petition. *In re Wolf*, 595 B.R. at 783; *accord* 11 U.S.C. § 547. (This component is noted for completeness; it is not challenged on appeal.) Second, the bankruptcy court denied Michael's discharge. This component is the only component of the default judgment rendered against Michael directly. The bankruptcy court found that four exceptions to the presumption of discharge applied: (1) Michael "intend[ed] to hinder, delay, or defraud a creditor" when he—in contempt of the Illinois Circuit Court—fraudulently transferred his Aston Martin instead of

**[Srt App SA-10]**

selling it to pay Elizabeth's temporary maintenance, *see* 11 U.S.C. § 727(a)(2); (2) Michael "failed to keep or preserve any recorded information" about his ownership interests in ZZC, Inc., *see id.* § 727(a)(3); (3) Michael "knowingly . . . made a false oath" about his ownership interests in ZZC, Inc., *see id.* § 727(a)(4); and (4) Michael had "failed to explain satisfactorily" Transfers Nos. 1–3, which caused a "deficiency of assets to meet [his] liabilities," *see id.* § 727(a)(5). *In re Wolf*, 595 B.R. at 786–87. Finally, as the third component of the default judgment, ZZC, Inc., MMQB, Inc., and Scott were held jointly and severally liable for the value of the MMQB business—found to be $2,100,000. *Id.* at 793–94.

Numerous theories of relief applicable to Transfers Nos. 1–3 undergird the default judgment's third component. As for Transfer No. 1—the transfer of the MMQB business from Zig-Zag Corp. to ZZC, Inc.—the bankruptcy court found it to be both actually and constructively fraudulent and therefore avoidable by the Trustee under Illinois' Uniform Fraudulent Transfer Act (UFTA), 740 Ill. Comp. Stat. 160/5(a), 6(a) (incorporated by 11 U.S.C. § 544(b)). *In re Wolf*, 595 B.R. at 778–82. A bankruptcy trustee's avoidance powers are generally limited to "transfer[s] of an interest of the debtor in property." *See, e.g.*, 11 U.S.C. § 544(b). Transfer No. 1, however, involved the transfer of Zig-Zag Corp.'s legal interest, not Michael's. Nonetheless, the bankruptcy court held that the Trustee could still avoid Transfer No. 1 by reverse veil piercing under 11 U.S.C. § 544(a). In granting this claim, the bankruptcy court invoked the alter ego doctrine and found that

> Michael Wolf failed to observe corporate formalities and commingled funds by paying personal and family expenses . . . directly with corporate funds, diverted assets from Zig Zag to a closely related entity (ZZC) to the detriment of creditors, and, in transferring the MMQB business assets for no consideration to ZZC, failed to maintain ***arms-length*** relationships among related entities. Also, the fact that Michael Wolf, as alleged, continues to run the MMQB business and continues to receive income from it,

**[Srt App SA-11]**

8

> along with the fact that he built and ran the business for nearly
> three decades, points to Zig Zag having been used as a mere façade
> for the operation of its **sole** stockholder, Michael Wolf. Thus, . . .
> Zig Zag and Michael Wolf should be treated as the same legal
> personality.

*In re Wolf*, 595 B.R. at 769 (citations omitted; emphasis in original). Given the Trustee's right to

avoid Transfer No. 1 and recover the value of the MMQB business (*i.e.*, $2,100,000), the

bankruptcy court held ZZC, Inc. (as the initial transferee) and MMQB, Inc. (as the subsequent

transferee) jointly and severally liable. *Id.* at 788–92; *accord* 11 U.S.C. § 550(a). It similarly held

Scott liable as a subsequent transferee under the theory that MMQB, Inc. was Scott's alter ego.

*In re Wolf*, 595 B.R. at 789–90.

As for Transfer No. 2—the transfer of 51% of ZZC, Inc.'s stock from Michael to Scott—

the bankruptcy court found that it too was both actually and constructively fraudulent under

UFTA sections 5(a) and 6(a), as incorporated by 11 U.S.C. § 544(b). *In re Wolf*, 595 B.R. at

778–83. The court also held that 11 U.S.C. § 548—the Bankruptcy Code's organic fraudulent

transfer provision—independently supported the right to relief. *Id.* at 775–78. As the initial

transferee, Scott was held liable for the value of 51% of ZZC, Inc.'s stock and, because the only

asset ZZC, Inc. held was the MMQB business, this value was found to be equivalent to 51% of

the MMQB business's value (*i.e.*, 51% of $2,100,000). *Id.* at 792–93. In so ruling, the

bankruptcy court rejected Scott's argument that the Trustee's operative complaint failed under

Federal Rule of Civil Procedure 9(b) to allege fraud with particularity.

Finally, as for Transfer No. 3—the transfer of the MMQB business from ZZC, Inc. to

MMQB, Inc.—the bankruptcy court held that Scott (as the controlling shareholder of ZZC, Inc.)

was liable under the Illinois Business Corporation Act, 805 Ill. Comp. Stat. 5/12.56, to

shareholders for transferring ZZC, Inc. assets to another corporation for no consideration. *In re*

*Wolf*, 595 B.R. at 784–86. Assuming Michael maintained a pre-bankruptcy shareholder interest

**[Srt App SA-12]**

in ZZC, Inc., the right to recover under this corporate waste claim vested in Michael's bankruptcy estate pursuant to 11 U.S.C. § 541(a)(1). But Transfer No. 3 occurred after Elizabeth petitioned for divorce, and so whether or not Michael's pre-divorce interests (especially his interest in 49% of ZZC, Inc.'s stock) transferred to his bankruptcy estate depended on how the Illinois Circuit Court divided Michael's marital estate. That division occurred in December 2017 by way of a judgment for dissolution of marriage, which awarded the ***entire*** marital estate to Elizabeth. The judgment also listed—in an inarguably circuitous way—what property comprised Michael and Elizabeth's marital estate, and the bankruptcy court construed from this list that ***none*** of Michael's pre-divorce interests in ZZC, Inc. were included. *In re Wolf*, 595 B.R. at 755–56. Accordingly, because Michael's shareholder interests were not lost to Elizabeth prior to bankruptcy, the bankruptcy court determined that 49% of ZZC, Inc.'s stock vested in Michael's bankruptcy estate; and so, the Trustee was entitled to recover 49% of the corporate waste (*i.e.*, 49% of $2,100,000) from Scott. *Id.* at 793.

**[Srt App SA-13]**

The following table summarizes the components of the default judgment entered by the bankruptcy court:

### Summary of Default Judgment

| Def. | Liability | Right to Relief | | Factual Basis | Damages |
|------|-----------|-----------------|---|---------------|---------|
| Michael | Denial of Discharge | § 727(a)(2)-(5) | | Fraudulent Transfer; Failure to Keep Records; Lying Under Oath; Failure to Explain Loss | n/a |
| | Reverse Veil Piercing | § 544(a) | | Alter Ego (Zig-Zag Corp.) | n/a |
| ZZC, Inc. | Fraudulent Conveyance (Actual & Constructive) | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) UFTA § 6(a) | Transfer No. 1 (Initial Transferee) | $2.1M |
| | Preferential Transfers | § 547 | | Michael's Payments to ZZC, Inc. | $234k |
| MMQB, Inc. | Fraudulent Conveyance (Actual & Constructive) | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) | Transfer No. 1 (Subsequent Transferee) | $2.1M |
| Scott | Veil Piercing | § 544(a) | | Alter Ego (MMQB, Inc.) | $2.1M |
| | Fraudulent Conveyance (Actual & Constructive) | § 548(a)(1)(A) § 548(a)(1)(B) | | Transfer No. 2 (Initial Transferee) | $1.071M |
| | | § 544(b) | UFTA § 5(a)(1) UFTA § 5(a)(2) UFTA § 6(a) | | |
| | Corporate Waste | § 541(a)(1) | 805 ILCS 5/12.56 | Transfer No. 3 | $1.029M |

The default judgment terminated "in all respects" the adversarial proceedings against the defaulted defendants, *id.* at 794; yet several of the seven total adversarial proceedings remained active. These ongoing proceedings involved claims against various additional sham entities (such as Hound Ventures, Inc. and SHBM, Inc.) that Michael and Scott used to siphon off MMQB proceeds. Although the default judgment allowed the Trustee to recover the ***value*** of the MMQB business, the bankruptcy court precluded the Trustee from recovering transferred MMQB ***proceeds*** without submitting further evidence to ascertain their amounts. *In re Wolf*, 595 B.R. at 791 & n.47. The Trustee determined, however, that Michael's bankruptcy estate could not afford an additional forensic investigation into the transferred proceeds; and therefore, moved to dismiss the remaining adversarial proceedings. Mot. to Dismiss 4, *In re Wolf*, No. 16-ap-00482

**[Srt App SA-14]**

(Bankr. N.D. Ill. Sept. 26, 2019), ECF No. 89; *see also id.* at 1–4 (summarizing relevant procedural history). Subsequently, Michael and Scott—who were nominally still defendants in these proceedings and who, upon voluntary dismissal, characterized themselves as prevailing parties—requested costs under Federal Rule of Civil Procedure 54. In the alternative, they also requested sanctions against the Trustee for "multipl[ying] the proceedings . . . unreasonably and vexatiously." *See* 28 U.S.C. § 1927. Both requests were denied.

Michael and Scott now appeal *pro se*.

### III. ISSUES PRESENTED

This matter consolidates six appeals and one petition for review of the bankruptcy court's proposed findings of fact and conclusions of law.[5] All were born from three adversarial proceedings.[6] In the aggregate, Michael and Scott assign error to an unfathomable number of issues. Between the first two docketed cases alone, Michael and Scott purport to appeal seventy-nine issues across twenty-eight rulings. Yet they support only a few with adequate argument. For this reason, the vast majority are forfeited. *See Scheidler v. Indiana*, 914 F.3d 535, 540 (7th Cir. 2019) ("A party . . . generally forfeits issues and arguments it fails to raise in its initial appellate brief. Insufficiently developed issues and arguments are also forfeited." (citations omitted)).

Most notably, included within these forfeit arguments is any challenge to the bankruptcy court's entries of default. In their respective statements of issues, Michael and Scott both assign error to the default entered against them, but nowhere in either of their briefs is argument offered as to why the default entries were infirm. The only exception is a solitary, throw-away comment that appears in Michael's conclusion, stating that he "should not have been held in default"

---

[5] Cases Nos. 19-cv-08162 and 19-cv-08302 have been consolidated with the five cases identified in the caption and administratively terminated.

[6] Adversarial Proceedings Nos. 16-ap-00066, 16-ap-00482, and 16-ap-00485.

**[Srt App SA-15]**

because the claims against him are "moot." Michael Br. 23, No. 18-cv-07952, ECF No. 28. Also forfeit is any challenge to two orders of civil contempt issued against Michael and Scott following the final default judgment. Those orders are the subject of appeals Nos. 19-cv-08299 and 19-cv-08302; however, neither Michael nor Scott submitted a brief for these appeals.

The Trustee is the predominant appellee in these matters. Others join him, and their briefs have informed this opinion. However, their interests are aligned with the Trustee's, so it serves no purpose to detail their particular concerns. Additionally, the Trustee has filed a cross-appeal in the three lowest-numbered cases. He presents each cross-appeal as conditional—in other words, arguments that support the bankruptcy court's holdings for alternative reasons not discussed by the bankruptcy court. As such, the Trustee's cross-appeal is only addressed where relevant to reversible error.

In view of the foregoing, this Court finds only the following issues sufficiently presented for review:

a. Whether the bankruptcy court misinterpreted how Michael's judgment for dissolution of marriage divided his marital property, and if so, what effect that misinterpretation had on the property interests recovered by the Trustee.

b. Whether the bankruptcy court misapplied Illinois law when granting the Trustee's reverse veil piercing claim—a necessary predicate to the fraudulent transfer claims associated with Transfer No. 1.

c. Whether the bankruptcy court erred in denying Scott's Federal Rule of Civil Procedure 9(b) challenge to the fraudulent transfer claims associated with Transfer No. 2.

d. Whether the bankruptcy court erred in denying Michael's discharge.

**[Srt App SA-16]**

e.    Whether the bankruptcy court erred in dismissing Michael's third-party complaint with prejudice under Federal Rule of Civil Procedure 8(a) and the *Barton* doctrine.

f.    Whether the bankruptcy court erred in denying Michael and Scott costs in the voluntarily dismissed adversarial proceedings, and if not, whether Michael and Scott's appeal of the issue is frivolous under Federal Rule of Appellate Procedure 38.

## IV. DISCUSSION

The two overarching goals of bankruptcy law are to promote equality of distribution among similarly situated creditors and to afford the honest debtor a fresh economic start. *Williams v. U.S. Fid. & Guar. Co.*, 236 U.S. 549, 554–55 (1915). In service of the former, it is a Chapter 7 trustee's duty to collect and liquidate the property of the bankruptcy estate. 11 U.S.C. § 704(a)(1). The first two questions presented here concern whether relevant property interests were appropriately deemed property of Michael's bankruptcy estate.

Unless exempted, a bankruptcy estate comprises "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). These interests are broadly construed to include "every conceivable interest of the debtor, future, nonpossessory, contingent, speculative, and derivative . . . ." *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993), *abrogated on other grounds by Law v. Siegel*, 571 U.S. 415 (2014). In general, then, any property interest (as defined by state law, *Rodriguez v. Federal Deposit Insurance Corp.*, 140 S. Ct. 713, 718 (2020)) that a debtor holds on the day bankruptcy begins vests in the bankruptcy estate for the purpose of satisfying creditors. *Matter of Burciaga*, 944 F.3d 681, 685 (7th Cir. 2019).

**[Srt App SA-17]**

Although section 541(a)(1) often provides the bulk of bankruptcy estate assets, the trustee's avoidance powers also allow the trustee to enlarge the property of the estate after commencement of the case. *See* 11 U.S.C. §§ 542–53; Robert E. Ginsberg et al., Ginsberg & Martin on Bankruptcy § 8.01 (5th ed. 2021) ("An avoiding power is the power of the trustee to undo certain voluntary or involuntary transfers of the debtor's interests in property to bring the property back into the bankruptcy estate for distribution purposes."). Three variations of those powers are relevant here.

Section 544(a), known as the "strong-arm power," allows a trustee to avoid most unperfected and incomplete transfers of the debtor's real and personal property. *See* 11 U.S.C. § 544(a). More importantly, for present purposes, section 544(a) also equips a trustee with "the rights and powers of" creditors. *Id*. In this capacity, "the trustee has the sole right and responsibility to bring claims on behalf . . . of creditors as a class—so-called 'general' claims." *In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009) (citing *Koch Ref. v. Farmers Union Cent. Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987)). "Individual creditors," however, "retain the right to bring 'personal' claims that do not implicate the trustee's purpose." *Id*. Personal claims are defined as "those in which the claimant is harmed and 'no other claimant or creditor has an interest in the cause.'" *Fisher v. Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (quoting *Koch*, 831 F.2d at 1348); *see, e.g.*, *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) (RICO plaintiffs were entitled to sue on their own for injuries that resulted from the diversion of corporate assets and were distinct from the injuries to creditors in general).

Whereas section 544(a) allows for avoidance of unperfected and incomplete transfers, sections 544(b) and 548 allow for avoidance of fraudulent transfers. Under section 544(b), "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under

**[Srt App SA-18]**

applicable law by a creditor holding an unsecured claim . . . ." 11 U.S.C. § 544(b)(1). This "enables a trustee to step into the shoes of an unsecured creditor who existed at the time of the transfer and vindicate that creditor's state-law rights." *In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 811 (7th Cir. 2019). Similarly, under section 548, "[t]he trustee may avoid any transfer . . . of an interest of the debtor in property" if the debtor made the transfer with either (A) the "actual intent to hinder, delay, or defraud" a creditor, or where (B) the debtor "received less than a reasonably equivalent value in exchange for such transfer" and was insolvent on the date of transfer or became insolvent because of the transfer or made the transfer to benefit an insider. 11 U.S.C. § 548(a). Sections 544(b) and 548 serve the same ends; however, section 548 does not rely on state fraudulent transfer laws, is therefore not vulnerable to state-law defenses, but carries a more-restrictive statute of limitations. *Compare id.* (2 years), *with* 740 Ill. Comp. Stat. 160/10 (4 years).

With the legal framework established, Michael and Scott's arguments may be addressed.

## A.     Marital Property Division

As shown, sections 541, 544, and 548 are all tethered in one way or another to the debtor's interests in property. Michael and Scott argue that the Trustee has no justifiable claim under any of these statutes because Michael simply did not possess ***any*** interests in property on the day he petitioned for bankruptcy. To reach this conclusion, they contend that the bankruptcy court misinterpreted how Michael's judgment for dissolution of marriage divided his marital property between he and Elizabeth.

Their logic goes like this: Elizabeth petitioned for divorce eight months prior to the commencement of Michael's bankruptcy. When she did, Michael acquired a contingent interest in their marital estate, which, he says, comprised everything he owned. Most relevantly, at that

**[Srt App SA-19]**

time, everything Michael owned included a 100% interest in Zig-Zag Corp. and a 49% interest in ZZC, Inc. These **contingent** interests are what vested in Michael's bankruptcy estate, and when the Illinois Circuit Court eventually awarded the entire marital estate to Elizabeth, the contingent interests vanished, leaving no debtor property interests within the bankruptcy estate for the Trustee to claim or recover.

Michael and Scott are correct when it comes to their application of the Illinois Marriage and Dissolution of Marriage Act, 750 Ill. Comp. Stat. 5/101–802:

> Unlike community-property states, Illinois law does not establish independent ownership interests in marital property at the moment it is acquired. Nor does Illinois wait to establish such interests until the divorce court issues a final order. Instead, Illinois occupies a middle ground. Divorcing spouses are vested with independent contingent interests in all marital property at the moment a divorce petition is filed. When the divorce court eventually divides marital property, the obtaining spouse's contingent interest in that property ripens into a full ownership interest. Conversely, the spouse who is not awarded the property sees his contingent interest vanish.

*In re Thorpe*, 881 F.3d 536, 540 (7th Cir. 2018); *see also* 750 Ill. Comp. Stat. 5/503(e) ("Each spouse has a species of common ownership in the marital property which vests at the time dissolution proceedings are commenced and continues only during the pendency of the action."); *Kujawinski v. Kujawinski*, 71 Ill. 2d 563, 573 (1978) ("The [Illinois Marriage and Dissolution of Marriage] Act does not purport to affect property interests during the marriage. The term 'marital property' is a nomenclature devised to realize an equitable distribution of property upon termination of the marriage. Operation of the term 'marital property' under the Act is not triggered until the time of dissolution.").

So, indeed, any contingent marital interests which succeeded to Michael's bankruptcy estate vanished when the Illinois Circuit Court eventually awarded the entire marital estate to Elizabeth. But Michael and Scott disagree with the bankruptcy court as to what comprised

**[Srt App SA-20]**

Michael's marital estate. Michael's judgment for dissolution of marriage is the authority on that

question. In relevant part, it states:

> [Elizabeth] is awarded the marital estate, comprised of [Michael's]
> 49% interest in Zig Zag Corporation, the proceeds from the sale of
> [various real property], the Fiat automobile, [and] the Mercedes
> Benz [Elizabeth] drives.

J. for Dissolution of Marriage 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018),

ECF No. 597-1 (judgment entered Dec. 15, 2017). Had the judgment stopped there, there would

be little room for disagreement as to what property comprised Michael's marital estate. The

judgment, however, also notes that its attached "Findings and Rulings" are "incorporated herein

by reference as though set forth *verbatim* herein." *Id*. Those findings explain:

> [Michael] asserts no interest in any martial assets and assigns any
> interest that he might have in Zig Zag Corporation, the proceeds
> from the sale of [various real property], a Fiat automobile, the
> Mercedes Benz that [Elizabeth] drives, his forty-nine per cent
> (49%) interest in Zig Zag Corporation and any claim that he has
> arising out of the bankruptcy proceeding (he has a rather
> substantial counter-claim on file) to [Elizabeth]. Based upon
> [Michael's] offer, the Court will . . . award those properties to
> [Elizabeth] . . . .

Findings & Rulings 3, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No.

597-1 (dated Nov. 13, 2017).

Thus, in the same breath, the Circuit Court's "Findings and Rulings" award Elizabeth

"any interest [Michael] might have" in Zig-Zag Corp. ***and*** Michael's "forty-nine per cent (49%)

interest" in Zig-Zag Corp. *Id*. The two statements are not necessarily incongruent, but they

suggest something is confused. The bankruptcy court noted this ambiguity but found that the

statements did not obscure the judgment's main-body text. *See In re Wolf*, 595 B.R. at 756 n.17.

The bankruptcy court reasoned that notwithstanding the incorporated "Findings and Rulings,"

the judgment's main-body text alone denoted what property comprised Michael's marital estate.

**[Srt App SA-21]**

*See id.* That text clearly states that 49% of Michael's interest in Zig-Zag Corp. was a part of his marital estate. More importantly, the text also omits any reference to Michael's 49% interest in ZZC, Inc. Hence, the bankruptcy court ultimately found, as the logical corollary to its disregard of the "Findings and Rulings" portion of the divorce judgment, that 51% of Michael's interest in Zig-Zag Corp. and his 49% interest in ZZC, Inc. remained outside Michael's marital estate and succeeded to his bankruptcy estate unencumbered. *Id.* at 756.

Michael and Scott argue that the bankruptcy court's reading of the divorce judgment is wrong. They press a different interpretation: that, in actuality, the judgment assigned ***all*** of Michael interests in Zig-Zag Corp. and ZZC, Inc. to his marital estate and thereby left no interests to succeed unencumbered to his bankruptcy estate. This Court agrees.

To begin, although the divorce judgment's main-body text is clear when read in isolation, it is unreasonable to simply disregard the "Findings and Rulings," which are expressly incorporated into the judgment. The noted ambiguity within the "Findings and Rulings" must therefore be resolved. The "Findings and Rulings" make two consecutive references to Michael's interests in Zig-Zag Corp. The first is equivocal ("any interest that he might have"); the second is defined ("his forty-nine per cent (49%) interest"). In order to reconcile this dissonance, it is reasonable to infer that one of the two Zig-Zag Corp. references is an error. Because the name *Zig-Zag Corp.* resembles *ZZC, Inc.*, it is also reasonable to infer that the Circuit Court actually meant *ZZC, Inc.* for one of the references. *See generally Divco-Wayne Sales Fin. Corp. v. Martin Vehicle Sales, Inc.*, 45 Ill. App. 2d 192, 197, 195 N.E.2d 287, 290 (Ill. App. Ct. 1963) ("Confusion often results from the operation of various related corporations especially where names similar in sound are used." (quoting *John Sexton & Co. v. Libr. Plaza Hotel Corp.*, 270 Ill. App. 107, 110 (Ill. App. Ct. 1933)).

**[Srt App SA-22]**

The second, particularized reference is the reference in error for two reasons. First, it accords with the Trustee's understanding of Michael's pre-petition interests in ZZC, Inc. to presume that the Circuit Court meant Michael's "forty-nine per cent (49%) interest" in ZZC, Inc., not Zig-Zag Corp. *See* FAC ¶¶ 60–62. The Trustee similarly understood that Michael's ownership interest in Zig-Zag Corp. was always 100% (or eventually zero); it was never 49%. *Id.* ¶ 168. Second, Elizabeth advised the Circuit Court that Michael divested his interest in Zig-Zag Corp. shortly before her divorce petition. Findings & Rulings 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (dated Nov. 13, 2017). The Trustee also alleged that Zig-Zag Corp. had been dissolved at some point prior to filing his complaint. *See* FAC ¶ 38. Therefore, it is understandable that the Circuit Court would equivocate about "any interest that [Michael] might have" in Zig-Zag Corp., not ZZC, Inc.

Since the reference to Michael's 49% interest in Zig-Zag Corp. in the "Findings and Rulings" is an error, so too must be the same reference to Michael's 49% interest in Zig-Zag Corp. found in the divorce judgment's main-body text. This is the only interpretation that comports with Illinois' definition of marital property. *See* 750 Ill. Comp. Stat. 5/503(a) ("'[M]arital property' means all property . . . acquired by either spouse subsequent to the marriage . . . ."). Michael and Elizabeth married in 1975. J. for Dissolution of Marriage 1, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (judgment entered Dec. 15, 2017). Michael incorporated Zig-Zag Corp. as its sole-owner in 1987. FAC ¶ 18. Hence, it would not make sense for the Circuit Court to deem only 49% of Michael's interest in Zig-Zag Corp. to be marital property when Michael acquired 100% of his interest in Zig-Zag Corp. subsequent to his marriage.

**[Srt App SA-23]**

Based on the foregoing clarification of the divorce judgment, this Court finds that Michael's marital estate consisted of his entire 100% interest in Zig-Zag Corp. and his entire 49% interest in ZZC, Inc. These interests were rendered contingent when Elizabeth petitioned for divorce in December 2013 and therefore succeeded as contingent interests to Michael's bankruptcy estate when Michael petitioned for bankruptcy eight months later. Then, in December 2017, when the divorce judgment awarded Michael's entire marital estate to Elizabeth, these contingent interests vanished from the bankruptcy estate. The question that remains is how this corrected understanding of the bankruptcy estate affects the Trustee's claims.

The most obvious impact is to the Trustee's corporate waste claim. Under the Illinois Business Corporation Act, shareholders may be afforded relief if "corporation assets are being misapplied or wasted." 805 Ill. Comp. Stat. 5/12.56(a)(4). The bankruptcy court held Scott liable for corporate waste when he transferred the MMQB business from ZZC, Inc. to MMQB, Inc. for no consideration (*i.e.*, Transfer No. 3). But the Trustee is empowered to bring this claim on behalf of the debtor's estate only if Michael possessed it "as of the commencement of the [bankruptcy] case." 11 U.S.C. § 541(a)(1); *see Biesek v. Soo Line R. Co.*, 440 F.3d 410, 413 (7th Cir. 2006) ("Pre-bankruptcy claims are part of debtors' estates . . . ."). But as just determined, as of the commencement of Michael's bankruptcy case, Michael was no longer a shareholder of ZZC, Inc. because, according to the Illinois Circuit Court, his 49% interest in ZZC, Inc. became marital property when Elizabeth filed for divorce eight months before Michael filed a bankruptcy petition. Hence, it was an error to grant the Trustee's corporate waste claim. *See In re Thorpe*, 881 F.3d at 539–40 ("[O]nce the divorce court awarded [the non-debtor spouse] the entire marital [property] . . . [it left] the estate without a claim.").

**[Srt App SA-24]**

The claims founded on sections 544(b) and 548 are a different matter. Those relate to Transfers Nos. 1 and 2. Michael and Scott cite *Thorpe* to argue that these claims are impaired for the same reason the Trustee's section 541 claim is—that is, because the assets involved were ultimately held to be Elizabeth's marital property. The Bankruptcy Code, they quote, only permits the Trustee to "avoid any transfer of an interest of the debtor in property . . . ." 11 U.S.C. § 544(b)(1); *see id.* § 548(a)(1) (same). It follows, they say, that the Trustee cannot avoid Transfers Nos. 1 and 2 because, in light of the divorce judgment, the predicate interests were no longer interests "of the debtor."

At least with respect to Transfer No. 2, this argument gets the facts wrong. Michael's judgment for dissolution of marriage only awarded Elizabeth his 49% interest in ZZC, Inc. The judgment did not include the additional 51% interest in ZZC, Inc. that Michael originally owned prior to its transfer to Scott (*i.e.*, Transfer No. 2).

As for Transfer No. 1, Michael and Scott are wrong on the law. Although they cite *Thorpe* as support, *Thorpe* directly contradicts their position. There, the Seventh Circuit expressly noted that—notwithstanding the effects of the Illinois Dissolution of Marriage Act on property of the debtor's estate—"fraudulent transfer laws remain a viable tool to protect the estate's assets." 881 F.3d at 542. The reason is because the Bankruptcy Code empowers trustees to avoid ***past*** interests of the debtor in property. Any other construction would produce absurd results. A transferred interest is by definition no longer a ***present*** interest of the debtor's. And accepting Michael and Scott's position—that the transferred interest must be an interest of the debtor as of the commencement of the bankruptcy case—would nullify all trustee avoidance powers save for section 549, which applies expressly to post-petition transfers. Thus, so long as the transferred interest in question was "an interest of the debtor in property" ***at the time of the***

**[Srt App SA-25]**

*transfer*, sections 544(b) and 548 are viable. That is the case here: Transfer No. 1 occurred in early 2012, and Elizabeth did not petition for divorce until December 2013. FAC ¶¶ 52, 171.

This is not to say these avoidance powers are without limit. Under section 544(b), and in accordance with Illinois' UFTA, fraudulent transfers are avoidable except where asserted against "a person who took in good faith and for a reasonably equivalent value . . . ." 740 Ill. Comp. Stat. 160/9. Likewise, section 548 makes exception for a transferee "that takes for value and in good faith . . . ." 11 U.S.C. § 548(c). All that is left to show, then, is whether the Trustee's interest in ZZC, Inc.'s stock and the MMQB business is superior to other claimants (*i.e.*, ZZC, Inc., MMQB, Inc., and Scott). And here, no consideration was given for either Transfer No. 1 or Transfer No. 2. FAC ¶¶ 48, 63. It was therefore not improper for the bankruptcy court to grant the Trustee's sections 544(b) and 548 claims.

**B. Reverse Veil Piercing Claim**

The preceding analysis regarding Transfer No. 1 assumes that it is permissible for the Trustee to satisfy the liabilities of an individual shareholder (Michael) with corporate assets— specifically, the MMQB publication (owned at the time of Transfer No. 1 by Zig-Zag Corp.). This is what is known as a reverse veil piercing claim. Michael and Scott challenge the validity of the Trustee's invocation of reverse veil piercing on its face. In other words, they do not challenge the bankruptcy court's finding that Zig-Zag Corp. was Michael's alter ego, nor do they take issue with any of the equitable considerations the bankruptcy court relied upon in granting the Trustee's reverse veil piercing claim. They instead argue that reverse veil piercing is categorically unrecognized under Illinois law.

In Illinois, as elsewhere, "[a] corporation is a legal entity separate and distinct from its shareholders, directors, and officers." *In re Rehab. of Centaur Ins. Co.*, 158 Ill. 2d 166, 172, 632

**[Srt App SA-26]**

N.E.2d 1015, 1017 (1994). "However, this separate and distinct legal entity will be disregarded, and the corporate veil pierced, where . . . observance of the fiction of separate identities would sanction a fraud or promote injustice under the circumstances." *Id.* at 172–73, 632 N.E.2d at 1017–18. The circumstances justifying piercing of the corporate veil are those "where the corporation is an alter ego or business conduit of the governing or dominant personality." *Semande v. Estes*, 374 Ill. App. 3d 468, 471, 871 N.E.2d 268, 271 (2007). Hence, to pierce the corporate veil, "(1) there must be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and (2) circumstances must exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences." *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500, 840 N.E.2d 767, 776 (2005).

There are two forms of veil piercing. Conventional veil piercing "imposes liability on the individual or entity that uses a corporation merely as an instrumentality to conduct that person's or entity's business." *Fontana*, 362 Ill. App. 3d at 500, 840 N.E.2d at 775–76.[7] The second form—reverse veil piercing—holds "the corporation liable for the actions of its shareholder or someone who controls the entity." 1 William Meade Fletcher et al., Fletcher Cyclopedia of the Law of Corporations § 41.70 (rev. vol. 2022); *see Scholes v. Lehmann*, 56 F.3d 750, 758 (7th Cir. 1995) ("Direct piercing of the corporate veil occurs when creditors of the corporation are trying to reach the shareholder; reverse piercing occurs when creditors of the shareholder are trying to reach the corporation."). A bankruptcy trustee is empowered by section 544(a) to assert a reverse veil-piercing claim on behalf of creditors generally. *Koch Ref. v. Farmers Union Cent.*

---

[7] Applying Delaware law, the bankruptcy court granted this form of veil piercing to impose liability on Scott after finding that MMQB, Inc. was Scott's alter ego and that MMQB, Inc. was liable under 11 U.S.C. 550(a)(2) as the subsequent transferee of Transfer No. 1. *In re Wolf*, 595 B.R. at 789–90. Scott does not challenge this holding.

**[Srt App SA-27]**

*Exch., Inc.*, 831 F.2d 1339, 1352 (7th Cir. 1987).[8] Nonetheless, "reverse piercing of the corporate veil is a 'rarity,' and it is rarer yet in bankruptcy." *In re KZK Livestock, Inc.*, 221 B.R. 471, 478 (Bankr. C.D. Ill. 1998) (quoting *Scholes*, 56 F.3d at 758).[9]

Reverse veil piercing itself comes in two varieties. "'Inside reverse veil piercing' involves a controlling insider who attempts . . . to disregard the corporate form of which he or she is a part." 1 Fletcher Cyc. Corp. § 41.70. "'Outside reverse veil piercing,' sometimes referred to as 'third-party reverse piercing,' extends the traditional veil-piercing doctrine to permit a third-party creditor to pierce the corporate veil to satisfy the debts of an individual shareholder out of the corporation's assets." *Id.* Inside reverse veil piercing is not recognized in Illinois. *See Centaur*, 158 Ill. 2d at 174, 632 N.E.2d at 1018; *Semande*, 374 Ill. App. 3d at 471–72, 871 N.E.2d at 271. The narrow question presented here is whether Illinois would recognize outside reverse veil piercing in this case.

Michael and Scott rely exclusively on *In re Glick*, 568 B.R. 634 (Bankr. N.D. Ill. 2017), to argue that Illinois has not recognized outside reverse veil piercing, and therefore, the bankruptcy court impermissibly expanded Illinois law when it granted the Trustee's outside

---

[8] This holding from *Koch* is not free of controversy. *See* Richard J. Mason & Patricia K. Smoots, *When Do the Creditors' Shoes Fit?: A Bankruptcy Estate's Power to Assert the Rights of a Hypothetical Judgment Creditor*, 91 Am. Bankr. L.J. 435, 447–455 (2017) (examining inconsistent post-*Koch* analysis from the Seventh Circuit and a circuit-split over section 544(a)'s reach). Nevertheless, *Koch* remains viable. *See In re Teknek, LLC*, 563 F.3d 639, 646 (7th Cir. 2009) (reaffirming *Koch*).

[9] Michael and Scott press a confusing argument that takes issue with the ***retroactive*** application of section 544(a) to define Michael's property interests. *See, e.g.*, Scott Br. 31–32, No. 18-cv-07953, ECF No. 19 ("The [bankruptcy court] invented a new doctrine that allows the alter ego doctrine to rewrite history to transform property rights in the past . . . ." (citing *In re Duckworth*, No. 10-83603, 2012 WL 4434681, at *6 (Bankr. C.D. Ill. Sept. 24, 2012)). In *Duckworth*, the court rejected a trustee's "creative attempt to use the alter ego doctrine" to recover a ***post***-petition transfer. *Duckworth* is therefore inapposite. *See also Belisle v. Plunkett*, 877 F.2d 512, 516 (7th Cir. 1989) ("[W]e believe that allowing the estate to benefit from property that the debtor did not own is exactly what the strong-arm powers are about." (quotation omitted)).

**[Srt App SA-28]**

25

reverse veil-piercing claim. In *Glick*, the bankruptcy court denied an outside reverse veil-piercing

claim after finding that the propriety of reverse veil piercing in Illinois was unsettled and

difficult to predict. 568 B.R. at 664. "No Illinois decision," the *Glick* court noted, "approves

reverse piercing." *Id.* at 662. The court continued:

> Despite this dearth of authority, several federal decisions from this
> circuit assert (usually with no discussion or analysis) that Illinois
> recognizes reverse piercing. But the foundation for these assertions
> is shaky at best. The decisions tend to rely on *Boatmen's Nat'l
> Bank v. Smith*, 706 F. Supp. 30 (N.D. Ill. 1989), a pre-*Centaur* case
> in which the court found "nothing problematic about reversing the
> traditional piercing procedure" although "no Illinois court ha[d]
> squarely addressed this issue." They also rely on *Sea-Land Servs.,
> Inc. v. Pepper Source*, 941 F.2d 519 (7th Cir. 1991), and *Scholes v.
> Lehmann*, 56 F.3d 750 (7th Cir. 1995). *Sea-Land*, another pre-
> *Centaur* case, did not address either the validity of reverse piercing
> or whether Illinois would recognize it. Neither did *Scholes*, which
> treated reverse piercing in *dictum* as a given and did not discuss
> Illinois law. For the most part, the federal decisions simply cite and
> rely on each other. The entire body of case law is nothing but a
> house of cards.

*In re Glick*, 568 B.R. at 663 (citations omitted).

Leaning heavily on *Centaur* and *Forsythe v. Clark USA, Inc.*, 224 Ill. 2d 274, 864 N.E.2d

227 (2007)—two Illinois Supreme Court cases which reject ***inside*** reverse veil piercing—the

*Glick* court concluded that "the tenor of Illinois law suggests the state is unlikely to accept

outside reverse piercing." 568 B.R. at 663. It therefore held that "the proper tack is to let things

be rather than advance Illinois law in a direction Illinois courts have not yet taken." *Id.* at 664;

*see generally Ostrowski v. Lake Cnty.*, 33 F.4th 960, 967 (7th Cir. 2022) ("Federal courts must

exercise caution before recognizing novel legal theories brought under uncharted state laws.").

*Glick*'s appraisal of Illinois decisions appears astute. With the exception of *Crum v. Krol*,

99 Ill. App. 3d 651, 425 N.E.2d 1081 (1981), this Court has found no Illinois decision approving

**[Srt App SA-29]**

a reverse veil piercing claim.[10] (*Crum* will be discussed momentarily.) *Glick*'s appraisal of federal decisions on this matter also appears astute. In *Sea-Land*, the Seventh Circuit assumes without questioning that Illinois recognizes outside reverse veil piercing before denying the claim on its merits using the conventional veil-piercing test. 941 F.2d at 520–24. In *Scholes*, the Seventh Circuit's outside reverse veil-piercing discussion is—as *Glick* labels—*dictum*. *See* 56 F.3d at 758. And in *Boatmen's*, the district court cites only two cases to support its finding that there is "nothing problematic about reversing the traditional piercing procedure [in Illinois]." 706 F. Supp. at 32. The first is *FMC Finance Corp. v. Murphee*, wherein the Fifth Circuit rules that an outside reverse veil-piercing question should have been submitted to the jury. 632 F.2d 413, 422 (5th Cir. 1980). Much like *Sea-Land*, however, it simply assumes the doctrine is supported in Illinois alongside conventional veil piercing. *See id.* at 422–24. The second case is *Crum*.[11]

On its face, *Crum v. Krol* is a decision granting an inside reverse veil-piercing claim. *See* 99 Ill. App. 3d at 660–662, 425 N.E.2d at 1088–89. Given the subsequent decisions in *Centaur* and *Forsythe* rejecting inside reverse veil piercing, the *Glick* court declared that "*Crum* is no longer good law." 568 B.R. at 663. But this is not so certain. *See Trossman v. Philipsborn*, 373 Ill. App. 3d 1020, 1050, 869 N.E.2d 1147, 1171 (2007) (citing but not discussing *Crum*'s durability in the wake of *Centaur* and *Forsythe*). Neither *Centaur* nor *Forsythe* cite *Crum*, and despite the *Crum* court's own characterization that it was "allowing an 'insider' to pierce the corporate veil from within the corporation," *see* 99 Ill. App. 3d at 661, 425 N.E.2d at 1088, *Crum*

---

[10] The Trustee apparently cannot find one either. *See* Trustee Br. 91, No. 18-cv-07952, ECF No. 41. He also only addresses *Glick* insofar as to distinguish its procedural posture from that of this case. *Id.* at 91 n.17. But the fact the *Glick* was decided on a motion to dismiss rather than a motion for default judgment does nothing to undermine the legal proposition for which Michael and Scott cite *Glick*.

[11] In actuality, *Boatmen's* cites a third case: *Earp v. Schmitz*, 334 Ill. App. 382, 79 N.E.2d 637 (1948). However, *Earp* is cited and discussed in *Crum*, *see* 99 Ill. App. 3d at 661, 425 N.E.2d at 1089; therefore, its survey here would be redundant.

**[Srt App SA-30]**

does not readily fit *Centaur*'s definition of inside reverse veil piercing. In *Crum*, the Illinois appellate court, employing the alter ego doctrine, affirmed the joinder of the plaintiff's corporation during closing arguments in a breach of contract trial. *Id.* at 660, 425 N.E.2d at 1088. The joinder allowed the plaintiff—standing in the shoes of his wholly-owned corporation, a third-party beneficiary to the contract—to collect the corporation's reliance damages. *Id.* at 662, 425 N.E.2d at 1089. Hence, *Crum* is not a case where an insider attempts to pierce the corporate veil in order to "bring[] an action ***against*** its . . . corporation," *Centaur*, 158 Ill. 2d at 174, 632 N.E.2d at 1018 (emphasis added), and it is a far cry from allowing an insider "to pierce its own corporate veil in order to ***avoid liability***," *Forsythe*, 224 Ill. 2d at 297, 864 N.E.2d at 241 (emphasis added).

Although outside reverse veil piercing typically focuses on injustices perpetuated ***against*** third parties, *Crum*, in this Court's reading, simply stands for the proposition that Illinois does not doggedly adhere to the corporate form whenever doing so would sanction an injustice perpetuated ***by*** a third party. *See* 99 Ill. App. 3d at 661, 425 N.E.2d at 1088–89 ("While we realize that the concept of a 'reverse pierce' has not been at issue in the overwhelming number of the corporate veil cases, we believe the same equitable considerations of preventing injustice apply when it is a third party, rather than a shareholder or officer, who attempts to use the corporate entity as a shield."); *see also Earp v. Schmitz*, 334 Ill. App. 382, 388, 79 N.E.2d 637, 639 (1948) ("[I]t is not only where third parties need protection that the courts have thought it just to treat a corporation and its sole stockholder as one and the same person."). In this way, *Crum* is distinct from *Centaur* and *Forsythe* and is ostensibly good law. Nevertheless, *Crum* still does not provide direct support for the proposition that Illinois recognizes outside reverse veil piercing. It does, however, provide some indication as to whether the Illinois Supreme Court

**[Srt App SA-31]**

would. *See generally Neth. Ins. Co. v. Phusion Projects, Inc.*, 737 F.3d 1174, 1177 (7th Cir. 2013) ("In the absence of Illinois Supreme Court precedent, [federal courts] must use [their] best judgment to determine how that court would construe its own law, and may consider the decisions of the Illinois appellate courts, well-reasoned decisions from other jurisdictions, as well as persuasive authorities." (internal quotations omitted)). Contrary to the *Glick* court, then, this Court does not find Illinois law to be prohibitively unpredictable.

This Court's own reading of Illinois law supports the notion that the Illinois Supreme Court views conventional veil piercing and outside reverse veil piercing as the same doctrine and would therefore approve of the latter. *See generally* 1 Fletcher Cyc. Corp. § 41.70. ("Many, but not all, jurisdictions recognize that the same considerations justifying piercing the corporate veil may justify piercing the veil in 'reverse.'"). In *Main Bank of Chicago v. Baker*, for instance, the Illinois Supreme Court referenced both conventional and outside reverse veil piercing as though the doctrines were interchangeable: "[O]rdinarily . . . a party seeks to pierce the corporate veil to hold a parent liable for its subsidiary's acts [read: conventional veil piercing] or the subsidiary responsible for the acts of its parent [read: outside reverse veil piercing] . . . ." 86 Ill. 2d 188, 205, 427 N.E.2d 94, 101 (1981). A year prior to *Baker*, an Illinois appellate court also viewed both doctrines as coterminous: "The judgment [below] . . . pierc[ed] the corporate veil in reverse interposition of its customary orientation. Whether sought to be pierced in either direction, however, . . . [t]he distinction between a corporation and its owner may be disregarded only when recognition of the separate identities of the two would be fraudulent or promote illegality." *Bankers Tr. Co. v. Chi. Title & Tr. Co.*, 89 Ill. App. 3d 1014, 1019, 412 N.E.2d 660, 663 (1980); *see also id.* at 1019, 412 N.E.2d at 664 (declining to grant the outside reverse veil-piercing claim based on the facts before it).

**[Srt App SA-32]**

Based on the foregoing, this Court concludes that Illinois would recognize outside reverse veil piercing generally. This assessment is in harmony with *Scholes* and *Sea-Land*—whose tacit approval of the same, while not dispositive, has nonetheless spawned a significant body of similar precedent within this circuit. *See In re Glick*, 568 B.R. at 663 n.26 (collecting federal cases relying on *Scholes*, *Sea-Land*, and *Boatmen's* to support Illinois outside reverse veil piercing). Given *Scholes'* and *Sea-Land's* resonance, it is also telling that the Illinois Supreme Court has refrained from disagreeing with the Seventh Circuit in the thirty-one years since *Sea-Land. See Wesbrook v. Ulrich*, 840 F.3d 388, 399 (7th Cir. 2016) ("The state courts are quite capable of signaling when they disagree with a federal court's interpretation of state law.").

This Court also predicts that Illinois would recognize outside reverse veil piercing in this case specifically. Michael and Scott wield a handful of policy arguments to claim otherwise. To summarize, Michael and Scott argue that innocent shareholders and creditors of Zig-Zag Corp. will be prejudiced if Zig-Zag Corp.'s corporate assets are used to satisfy Michael's personal debts. *Cf. Acree v. McMahan*, 276 Ga. 880, 881, 585 S.E.2d 873, 874 (2003) (echoing the same concerns; noting that some jurisdictions require proof "that no innocent third-party creditor or shareholder would suffer harm or prejudice as a consequence of reverse veil-piercing and that there is no other available remedy, such as the usual judgment collection procedures"); *Scholes*, 56 F.3d at 758 ("Reverse piercing is ordinarily possible only in one-man corporations, since if there is more than one shareholder the seizing of the corporation's assets to pay a shareholder's debts would be a wrong to the other shareholders. . . . Even in one-man corporations . . . a simple transfer of the indebted shareholder's stock to his creditors will usually give them all they could get from seizing the assets directly."). But this concern is misplaced here. Michael was Zig-Zag Corp.'s ***sole*** shareholder, so there are no innocent shareholders to speak of. And to the extent that

**[Srt App SA-33]**

Zig-Zag Corp. may have innocent creditors, those creditors—given that Zig-Zag Corp. was found to be Michael's alter ego—may protect their interests in bankruptcy court along with the rest of Michael's creditors.

In short, the bankruptcy court did not misapply Illinois law by granting the Trustee's outside reverse veil piercing claim.

## C. Rule 9(b) Challenge to Transfer No. 2 Claims

With respect to Transfer No. 2, Scott also argues that the Trustee failed to allege fraud with particularity in accordance with Federal Rule of Civil Procedure 9(b)—a rule that applies to fraudulent transfer claims, both actual and constructive. *See Gen. Elec. Cap. Corp. v. Lease Resol. Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997) (constructive); *Peterson v. Colony Am. Fin. Lender LLC*, 634 B.R. 1010, 1020 (Bankr. N.D. Ill. 2021) (actual); Fed. R. Bankr. P. 7009 (applying Rule 9(b) to adversarial proceedings).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud . . . ." Fed. R. Civ. P. 9(b). Ordinarily, this "requires describing the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011); *accord DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). Here, Scott contends that the *what* and *when* elements of Transfer No. 2 were inadequately pled.[12]

---

[12] Scott also argues that the Trustee impermissibly based his allegations regarding Transfer No. 2 "on information and belief." *See* FAC ¶¶ 19, 20, 180, 184. Indeed, the Seventh Circuit does "frown on making allegations 'on information and belief' in the fraud context and generally find[s] that such claims do not meet Rule 9(b)'s particularity requirement." *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 948 (7th Cir. 2013). However, "the practice is permissible, so long as (1) the facts constituting the fraud are not accessible to the plaintiff and (2) the plaintiff provides the grounds for his suspicions." *Id.* (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 443 (7th Cir. 2011)) (alterations removed). These two conditions are present here; therefore, the allegations made "on information

**[Srt App SA-34]**

Recall that Transfer No. 2 refers to the transfer of 51% of ZZC, Inc.'s stock from Michael to Scott. The *what* element of Transfer No. 2, then, is ZZC, Inc.'s stock. The issue, however, is that there were evidently two companies incorporated under the name ZZC, Inc. In the "Parties" section of the complaint, the Trustee alleges that Michael incorporated one ZZC, Inc. in Illinois in December 2011 and another in Delaware during the same month. FAC ¶¶ 19–20. This is the only reference to ZZC, Inc. as two companies. Everywhere else in the complaint, the Trustee simply refers to ZZC, Inc. without identifying whether it is the Illinois or the Delaware company. *See, e.g.*, *id.* ¶¶ 180–85. The bankruptcy court, for its part, intentionally treated each company as one and the same. *In re Wolf*, 595 B.R. at 747 n.1. In so doing, the bankruptcy court applied both Illinois and Delaware law where pertinent, *see id.* at 770, 784; but otherwise, ZZC, Inc.'s supposed duality had no meaningful effect on the default judgment.

As for *when* Transfer No. 2 occurred, the operative complaint provides two guideposts. First, ZZC, Inc.'s 2012 tax return allegedly lists Michael as owner of 100% of ZZC, Inc.'s common and preferred stock. FAC ¶¶ 49, 181. Then in July 2014, Michael's bankruptcy schedule claimed he owned only 49% of ZZC, Inc. *Id.* ¶ 61. Thus, according to the complaint, Transfer No. 2 occurred sometime between the end of 2012 and July 2014; or as the bankruptcy court put it: "no earlier than in 2013 . . . ." *In re Wolf*, 595 B.R. at 764.

Despite Scott's insistence, these two ambiguities within the Trustee's complaint do not breach Rule 9(b). Rule 9(b) requires "[h]eightened pleading . . . in part because of the potential stigmatic injury that comes with alleging fraud and the concomitant desire to ensure that such fraught allegations are not lightly leveled." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits*

---

and belief" are permitted. In any event, not all relevant allegations are asserted "on information and belief," and sufficient particularities for Transfer No. 2 may be gleaned from the complaint by relying exclusively on the allegations that omit the qualifier.

**[Srt App SA-35]**

*Tr. v. Walgreen Co.*, 631 F.3d 436, 442 (7th Cir. 2011). To assure that a charge of fraud is responsible and supported, plaintiffs are expected "to conduct a precomplaint investigation in sufficient depth . . . ." *Ackerman v. Nw. Mut. Life Ins. Co.*, 172 F.3d 467, 469 (7th Cir. 1999). However, "Rule 9(b) does not require plaintiffs to plead facts to which they lack access prior to discovery." *Katz v. Household Int'l, Inc.*, 91 F.3d 1036, 1040 (7th Cir. 1996). "[C]ourts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail." *Pirelli*, 631 F.3d at 443. Thus, "[t]he degree of particularity required will necessarily vary depending on the circumstances . . . ." *Gandhi v. Sitara Cap. Mgmt., LLC*, 721 F.3d 865, 870 (7th Cir. 2013). For instance, when details are within the defendant's exclusive knowledge or when a plaintiff is alleging fraud against a third party, specificity requirements may be relaxed. *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994) (exclusive knowledge); *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992) (third party). Under these circumstances, a plaintiff must allege enough grounds for their suspicions sufficient to make fraud appear plausible. *Pirelli*, 631 F.3d at 443. Because bankruptcy trustees inevitably lack knowledge concerning acts of fraud previously committed against debtors or third parties, bankruptcy cases "have held that the Rule 9(b) requirement of particularity is relaxed" in cases involving bankruptcy trustees. 10 Collier on Bankruptcy ¶ 7009.03 (16th ed. 2022); *see, e.g.*, *In re Mack Indus., Ltd.*, 622 B.R. 887, 896 (Bankr. N.D. Ill. 2020); *In re Grube*, 500 B.R. 764, 776 (Bankr. C.D. Ill. 2013); *In re Hearthside Baking Co., Inc.*, 402 B.R. 233, 255 (Bankr. N.D. Ill. 2009).

The circumstances here similarly justify a relaxed particularity standard. At least until Elizabeth filed her divorce petition, ZZC, Inc. was always a privately owned corporation held entirely by Michael and Scott. The transfer in question also occurred between immediate family

**[Srt App SA-36]**

members—Michael and Scott. Thus, the details that Scott claims are missing from the Trustee's complaint are in their exclusive control. This is also a situation where the Trustee's fraudulent transfer claims are asserted on behalf of third parties (*i.e.*, Michael's creditors). No more particularity is possible, then, without discovery.[13]

In light of these considerations, the Trustee's grounds for suspicion are sufficient. The bankruptcy court identified five "badges of fraud" within the Trustee's complaint (four of those, the court said, were "conclusive" indications of fraudulent intent). *In re Wolf*, 595 B.R. at 776–77. These badges comprised facts indicating that (1) the transferee (Scott) shared a close familial relationship with the debtor (his father); (2) Michael received no consideration for Transfer No. 2; (3) Transfer No. 2 was concealed; (4) Michael became insolvent at the time of Transfer No. 2; and (5) Transfer No. 2 potentially occurred after Michael was threatened with suit by a creditor (Elizabeth). *Id*.

Scott challenges none of these. The ambiguities he does challenge do not deprive him of sufficient notice of the claim against him. *See Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 949 (7th Cir. 2013) (one purpose behind Rule 9(b) is to provide adequate notice "so that opposing parties can respond effectively"). For instance, the *what* element permits exactly two possibilities: stock from one of the two wholly-owned, identically-named companies that Michael incorporated in December 2011. Furthermore, if Michael's representations before the Illinois Circuit Court are to be believed, Michael never incorporated an Illinois variant of ZZC, Inc. *See* Resp. to Divorce Pet. 10, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Apr. 16, 2016),

---

[13] While not relevant to Scott's Rule 9(b) challenge, it is worth noting that the record in this matter is replete with bad faith and contemptuous refusal from Michael and Scott to participate in even the most basic forms of discovery. *See, e.g.*, Order of Default 2–4, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Apr. 13, 2017), ECF No. 444 (reviewing Michael's sanctionable conduct); Order of Default 3–5, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. May 24, 2018), ECF No. 574 (reviewing Scott's).

**[Srt App SA-37]**

ECF No. 71-2. Therefore, based on the complaint, Scott should have little trouble understanding what stock the Trustee is alleging he fraudulently received.

The Trustee also isolates *when* Transfer No. 2 occurred to a 19-month window: between January 2013 and July 2014.[14] This timeframe may be too ambiguous for Rule 9(b) if viewed in isolation, *cf. Beyrer*, 722 F.3d at 950 (rejecting a 7-month timeframe); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 774, 778 (7th Cir. 1994) (rejecting a 10-month timeframe); but given that the details needed to narrow it are within Michael and Scott's exclusive possession, and in light of the badges of fraud, Rule 9(b) is satisfied.

Scott argues that permitting a timeframe this broad for Transfer No. 2 has implications beyond Rule 9(b). True, if Transfer No. 2 occurred sometime after Elizabeth petitioned for divorce in December 2013 **and** the entirety of Michael's interests in ZZC, Inc. transferred to Elizabeth via their marital estate, then the transferred property interests in question would have been Elizabeth's, not Michael's. Such finding would vitiate the Trustee's ability to avoid Transfer No. 2 under sections 544(b) and 548. That must mean, Scott says, that the complaint is insufficiently particular. Not so. A sufficient complaint is a prerequisite for default judgment. *See Black v. Lane*, 22 F.3d 1395, 1399 (7th Cir. 1994) ("The entry of a default order does not . . . preclude a party from challenging the sufficiency of the complaint."); *Nishimatsu Constr. Co., Ltd. v. Hous. Nat. Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("[A] defendant's default does not in itself warrant the court in entering a default judgment. . . . The defendant is not held to admit

---

[14]   In actuality, the Trustee could have further tapered this time window. The record contains at least two claims by Michael that he was "fired" from ZZC, Inc. by Scott in February 2014. *See* Resp. to Divorce Pet. 19, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Apr. 16, 2016), ECF No. 71-2; Schedule of Personal Property 2, *In re Wolf*, No. 14-bk-27066 (Bankr. N.D. Ill. July 23, 2014), ECF No. 1. If so, Michael had transferred a controlling share of ZZC, Inc. to Scott by February 2014. The Trustee's complaint does not reference these extrinsic claims by Michael; therefore, the sufficiency of the complaint is judged without them.

**[Srt App SA–38]**

facts that are not well-pleaded or to admit conclusions of law."); *Terio v. Great W. Bank*, 166

B.R. 213, 218 (S.D.N.Y. 1994) ("The conclusion that the complaint is subject to dismissal

strongly militates against granting Plaintiff's application for a default judgment."). But this does

not mean that a complaint is insufficient simply because it cannot support default judgment on

the strength of its factual allegations alone. The Federal Rules of Civil Procedure expressly

permit a court, in granting a default judgment, to consider extrinsic evidence to, among other

reasons, "establish the truth of any allegation." Fed. R. Civ. P. 55(a)(2); *see also Domanus v.*

*Lewicki*, 742 F.3d 290, 301 (7th Cir. 2014) (a court's grant of default judgment is reviewed only

for an abuse of discretion). And here, neither this Court nor the bankruptcy court read the

judgment for dissolution of marriage as including within the marital estate the 51% of ZZC, Inc.

that Scott received from Michael.

The bankruptcy court did not err in holding the Trustee's complaint sufficient.

## D. Denial of Discharge

The bankruptcy court denied Michael's discharge for four independent reasons. Michael

assigns error to all of them.[15] This Court need affirm only one to uphold the judgment.

Among other reasons, a bankruptcy debtor's debt will not be discharged if "the debtor,

with intent to hinder, delay, or defraud a creditor . . . has transferred, removed, destroyed,

mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or

concealed property of the debtor, within one year before the date of the filing of the

---

[15] The Trustee contends that Michael's arguments contesting the denial of his discharge
are waived because he did not raise them below. That is not correct. *See* Mot. for Recons. 4–11,
*In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Nov. 30, 2018), ECF No. 670; Denial Order 1, *In*
*re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Dec. 21, 2018), ECF No. 694 ("[T]he [denial of
discharge] issues raised by Michael . . . have already been considered by the court and were
addressed in the court's opinion.").

**[Srt App SA-39]**

petition . . . ." 11 U.S.C. § 727(a)(2)(A). The bankruptcy court held that the sham "sale" of Michael's Aston Martin luxury automobile fit this criterion.

According to the operative complaint, after Elizabeth petitioned for divorce, the Illinois Circuit Court ordered Michael to sell his Aston Martin and relinquish the proceeds to Elizabeth's attorneys. FAC ¶ 115. Michael sold the vehicle to a dealership, which then sold it to Ma Cherie LLC, an entity wholly owned by Scott. *Id.* ¶¶ 118–19. Scott, it turns out, allowed Michael to retain possession of the vehicle. *Id.* ¶ 120. Michael also contemptuously retained possession of the sale proceeds. *Id.* ¶¶ 123–24. The bankruptcy court found that these actions constituted a transfer, removal, or concealment of Michael's property, perpetuated or permitted by Michael with the "intent to hinder, delay, or defraud a creditor"—namely, Elizabeth.

Michael argues that he did not intend to defraud a creditor through the sham Aston Martin sale because Elizabeth is not a "creditor" within the meaning of section 727(a)(2). But under the Bankruptcy Code, a "creditor" is simply any "entity that has a claim against the debtor . . . ." 11 U.S.C. § 101(10). A "claim" means "any right to payment, whether or not such right is . . . disputed . . . ." *Id.* § 101(5). In bankruptcy, Elizabeth filed a claim against the estate. R. at 1–4, No. 18-cv-07952, ECF No. 14 (Proof of Claim). Thus, regardless of whether this claim is meritorious, Elizabeth is a "creditor." *See Sears v. Sears*, 863 F.3d 980, 984 (8th Cir. 2017) ("Whether the [claimants'] claims should have been allowed is distinct from whether the [claimants] were creditors."); *In re Holstein*, 299 B.R. 211, 224–25 (Bankr. N.D. Ill. 2003) ("Since the holder of a disputed claim is a 'creditor,' . . . the creditor has standing to seek denial of the debtor's discharge notwithstanding the dispute.").

A bankruptcy debtor's debt will also not be discharged if "the debtor knowingly and fraudulently, in or in connection with the case, made a false oath or account . . . ." 11

**[Srt App SA-40]**

U.S.C. § 727(a)(4)(A). The bankruptcy court denied Michael's discharge on this ground as well,

highlighting that Michael "testified . . . under oath in the[] bankruptcy proceedings that he **never**

owned more than 49% of the shares of ZZC, Inc. . . . ." FAC ¶ 62 (emphasis in original). Michael

made this statement when, at the outset of his bankruptcy case in 2014, he filed a schedule of

personal property indicating he owned only 49% of the shares in ZZC, Inc. This statement

contradicts ZZC, Inc.'s 2012 tax return, which identifies Michael as its sole owner. So, the

Trustee concluded, either Michael's 2014 bankruptcy schedule or ZZC, Inc.'s 2012 tax return is

false. *See id*.

Michael counters that this contradiction cannot justify denial of discharge because **his**

schedule was true and it was **ZZC, Inc.**'s tax return that was false. Section 727(a)(4), he points

out, only operates if the **debtor** makes a false oath or account. *See Stamat v. Neary*, 635 F.3d 974,

978 (7th Cir. 2011) (For a section 727(a)(4) denial, "the Trustee must prove by a preponderance

of the evidence that: (1) the debtor made a statement under oath; (2) the statement was false; (3)

the debtor knew the statement was false; (4) the debtor made the statement with fraudulent

intent; and (5) the statement related materially to the bankruptcy case.").

Michael's argument might have potency if he were simply defending against denial of

discharge; but here, he is defending against a motion for default judgment. In that context, as

discussed in part I, he has lost his right to contest the factual assertions of the operative

complaint. *VLM Food*, 811 F.3d at 255. The complaint, in turn, adequately alleges that Michael

"owned 100% of the shares of stock of ZZC, then claimed that he was not actually the 100%

owner of ZZC . . . ." FAC ¶ 60. Hence, regardless of the veracity of ZZC, Inc.'s 2012 tax return,

Michael's statement before the bankruptcy court that he never owned more than 49% of ZZC,

Inc. is—in light of the complaint and as a matter of law—false.

**[Srt App SA-41]**

The two independent justifications just upheld are one more than is necessary to deny Michael's discharge. This Court will not belabor the issue any further by examining the bankruptcy court's additional justifications. The denial of Michael's discharge is affirmed.

**E. Dismissal of the Third-Party Complaint with Prejudice**

Michael also appeals the dismissal of his third-party complaint. The bankruptcy court dismissed his complaint because it was not "a short and plain statement" of his claims for relief. *See* Fed. R. Civ. P. 8(a)(2). It also issued the dismissal with prejudice after finding that no amendment could cure the complaint of its failings under the *Barton* doctrine and a host of statutory bars. Michael is joined in this appeal by his second adult son, Peter Wolf.

To this point, it has not been necessary to chronicle Peter's involvement in this litigation. Suffice to say, Peter joined in his father's third-party complaint, alleging that the Trustee violated his Constitutional rights and caused him severe emotional distress when—pursuant to a bankruptcy court removal order—the Trustee disposed of personal property left in one of Michael's houses. The Trustee, for his part, needed to remove property that Peter left on the premises in order to sell the house. Peter did not object to the removal order. Nor, despite the order, did he remove any of the property himself.

Peter is particularly relevant now because he is the only one with standing to appeal the dismissal of the third-party complaint. "Standing relates to who may pursue a claim[] . . . [and] there is a 'general prohibition on a litigant's raising another person's legal rights . . . .'" *In re Blasingame*, 585 B.R. 850, 864 (B.A.P. 6th Cir. 2018), *aff'd*, 920 F.3d 384 (6th Cir. 2019) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citations omitted)). In this regard, "[a]n unequivocal and complete assignment [of claims] extinguishes the assignor's rights . . . and leaves the assignor without standing . . . ." *Matter of*

**[Srt App SA-42]**

*Motors Liquidation Co.*, 689 F. App'x 95, 96 (2d Cir. 2017) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984)). Here, pursuant to their judgment for dissolution of marriage, Michael assigned his claims to Elizabeth.[16] *Cf. In re XMH Corp.*, 647 F.3d 690, 693 (7th Cir. 2011) ("A party can lose its case in the lower court, and then assign the claim on which its case is based to someone else, and the assignee can take the case up on appeal."). Michael therefore has no standing to appeal the dismissal of his complaint.

Turning back to Peter, he argues that the Wolf complaint was not, as the bankruptcy court characterized it, "nearly impossible to follow or analyze." *See* Dismissal Order 3, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Dec. 16, 2016), ECF No. 407. As proof, he contends that "the Trustee's counsel seemingly had no problem following or analyzing the [complaint]" because, in filing a motion to dismiss, the Trustee attached "two charts that clearly illustrate each . . . claim presented" and "who would be liable." Michael Br. 23, No. 18-cv-07952, ECF No. 28. But just because a defendant can serviceably arrange a plaintiff's mess does not relieve the plaintiff of its duty to not make one. *See U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("[E]ven if it were possible to navigate through these papers . . . , why should the court be obliged to try?"). Those charts, by the way, merely list the name of each claim, the associated defendant(s), and the relevant paragraphs within the complaint, yet they still span twelve pages. *See* Exs. A & B to Mot. to Dismiss, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. Nov. 14, 2016), ECF No. 282-2.

---

[16] In relevant part, the judgment states: "[Michael] assigns [various property interests and] . . . any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter-claim on file) to [Elizabeth]. Based upon [Michael's] offer, the Court will . . . award those properties to [Elizabeth] . . . ." Findings & Rulings 3, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (dated Nov. 13, 2017). *See also* part IV.A.

**[Srt App SA-43]**

"Some complaints are windy but understandable. Surplusage can and should be ignored." *Garst*, 328 F.3d at 378. Nonetheless, "[l]ength may make a complaint unintelligible, by scattering and concealing in a morass of irrelevancies the few allegations that matter." *Id*. In that case, "length and complexity may doom a complaint by obfuscating the claim's essence." *Id.*; *see, e.g.*, *id.* at 379 (155 pages, 400 paragraphs); *In re Westinghouse Sec. Litig.*, 90 F.3d 696, 702–03 (3d Cir. 1996) (240 pages, 600 paragraphs); *Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 775–76 (7th Cir. 1994) (119 pages, 385 paragraphs); *Rocha v. FedEx Corp.*, 15 F. Supp. 3d 796, 806 (N.D. Ill. 2014) (127 pages, 745 paragraphs). At 374 pages, 108 counts, and 1,928 paragraphs, Michael and Peter's complaint not only joins that ignominious class, it transcends it.

Peter correctly notes that "[p]ro se complaints are construed more forgivingly than a pleading prepared by a lawyer." *Schillinger v. Kiley*, 954 F.3d 990, 994 (7th Cir. 2020). However, the essence of this relaxed standard "is to give a pro se plaintiff a break when, although he stumbles on a technicality, his pleading is otherwise understandable." *Greer v. Bd. of Educ. of City of Chi.*, 267 F.3d 723, 727 (7th Cir. 2001) (quoting *Hudson v. McHugh*, 148 F.3d 859, 864 (7th Cir. 1998)). "Otherwise understandable" is the key phrase, and that is not the case here. The bankruptcy court was therefore not out of bounds in dismissing the complaint on Rule 8 grounds.

The more potent issue is whether it was correct to dismiss the complaint with prejudice. Courts are instructed to "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). However, "the grant or denial of an opportunity to amend is within the discretion of the [court]." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Here, neither Michael nor Peter sought leave to amend after the dismissal of their complaint. Hence, the bankruptcy court could not have

**[Srt App SA-44]**

abused its discretion. *See James Cape & Sons Co. v. PCC Const. Co.*, 453 F.3d 396, 401 (7th Cir. 2006) (The district judge "did not abuse his discretion in denying leave to amend the complaint, because such leave was never sought." (quoting *Coates v. Ill. State Bd. of Ed.*, 559 F.2d 445, 451 (7th Cir. 1977)). The dismissal of their complaint is affirmed.

**F. Denial of Costs**

Finally, Michael and Scott appeal from the denial of costs in the voluntarily dismissed adversarial proceedings. Their request before the bankruptcy court was made pursuant to both Federal Rule of Civil Procedure 54(d) and 28 U.S.C. § 1927.

Rule 54(d) provides that "[u]nless a federal statute, these rules, or a court order provides otherwise, costs—other than attorney's fees—should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(1). Michael and Scott argue they were "prevailing parties" and thus an award of costs was deserved. True, a voluntary dismissal without prejudice may render the opposing party a "prevailing party" within the meaning of Rule 54. *Gwin v. Am. River Transp. Co.*, 482 F.3d 969, 975 (7th Cir. 2007) (citing *First Commodity Traders, Inc. v. Heinold Commodities, Inc.*, 766 F.2d 1007, 1015 (7th Cir. 1985)). That is, however, only if the voluntary dismissal terminates a "substantial part of the litigation." *See First Commodity Traders*, 766 F.2d at 1015 (quotation omitted). Consider also that "[a]dversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case . . . ." *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990). In view of the overall bankruptcy case, not just the dismissed adversarial proceedings, and given the default judgment rendered against Michael and Scott, it stands to reason that Michael and Scott have not prevailed on a substantial part of the litigation. They are therefore not "prevailing parties."

**[Srt App SA-45]**

Even if Michael and Scott could be considered "prevailing parties," Rule 54 is not a mandate. "[T]he decision whether to award costs ultimately lies within the sound discretion of the . . . court." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 377 (2013). Courts often deny costs to a prevailing party if, for example, "the prevailing party, through bad faith or dilatory tactics, has turned a relatively simple case into a complex morass." *In re Paoli R.R. Yard PCB Litig.*, 221 F.3d 449, 467 (3d Cir. 2000). Or, say, if the prevailing party has forced the court to endure "repeated and abusive hardball tactics," a "gun shot" litigating approach, or "obfuscatory defense strategies." *See Sheets v. Yamaha Motors Corp., U.S.A.*, 891 F.2d 533, 539–40 (5th Cir. 1990). Or if the prevailing party has "unjustifiably refused to produce documents in response to discovery, violating an order to compel" and "unnecessarily led [the] plaintiff on a 'wild goose chase.'" *See id*. According to the bankruptcy court, all of these examples aptly describe Michael and Scott's conduct throughout this case:

> [S]aying exactly what constitutes bad faith has been the subject of some uncertainty, courts have used phrases such as harassment, unnecessary delay, needless increase in the cost of litigation, willful disobedience, et cetera, every one of those phrases could be applied to either Scott Wolf or Michael Wolf in this case. There has been unnecessary delay. There have been voluminous pleadings without good cause, and the cost of litigation has been driven up by [their] actions. [They] have done everything [they] could to put impediment in the way of the trustee pursuing discovery.

Trustee Br. 6, No. 18-cv-08154, ECF No. 17 (quoting Dec. 3, 2019, Bankr. Hr'g Tr.). In short, the bankruptcy court did not abuse its discretion in denying costs pursuant to Rule 54(d).

As for section 1927, it states that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." The

**[Srt App SA-46]**

43

denial of these sanctions falls within a court's discretion. *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013).

Recall that early in this matter the bankruptcy court ordered the Trustee's initial adversarial proceeding split into seven different adversarial proceedings. The court felt Local Bankruptcy Rule 7020-1 compelled it, but afterwards reconsidered that interpretation. Nonetheless, several of these adversarial proceedings remained active after the bankruptcy court issued a final default judgment against Michael and Scott for the value of the MMQB business. The proceedings involved claims asserted by the Trustee to recover fraudulently transferred MMQB proceeds. The Trustee, however, could no longer afford the forensic investigation necessary to prove up these damages and chose to drop the claims.

Michael and Scott allege that the Trustee never intended on proving these claims and therefore deserves sanctions for needlessly multiplying the adversarial proceedings. They offer absolutely nothing, however, to substantiate their allegations of bad faith. They also conveniently overlook the fact that it was the bankruptcy court that originally ordered the Trustee to split his claims into multiple proceedings. The bankruptcy court's denial of section 1927 sanctions is therefore affirmed.

The Trustee counters that Michael and Scott should be sanctioned under Federal Rule of Appellate Procedure 38 for frivolously appealing the denial of their Rule 54(d) and section 1927 claims. The bankruptcy court would ostensibly agree. *See* Trustee Br. 5, No. 18-cv-08154, ECF No. 17 ("I think the fact that you even bring [this matter] up is very close to, if it is not, a Rule 11 sanctionable statement." (quoting Dec. 3, 2019, Bankr. Hr'g Tr.)). But "a request for Rule 38 sanctions must be made by separate motion." *In re Chi. Mgmt. Consulting Grp., Inc.*, 929 F.3d 803, 812 (7th Cir. 2019). Here, the Trustee merely requests sanctions in a section of his appellate

**[Srt App SA-47]**

brief, and a "brief-borne request is not a separately filed motion." *Id.* (quoting *McDonough v. Royal Caribbean Cruises, Ltd.*, 48 F.3d 256, 258 (7th Cir. 1995)). Accordingly, the Trustee's Rule 38 request is denied.

\*        \*        \*

In conclusion, this Court assigns error to only one of the bankruptcy court's rulings. Michael was not a ZZC, Inc. shareholder on the day he petitioned for bankruptcy, and thus, the bankruptcy court erred in finding Scott liable for corporate waste under section 541(a)(1). However, this error is harmless. The bankruptcy court did not err in finding Scott liable as the subsequent transferee of Transfer No. 1, and that liability independently supports the judgment against Scott for $2,100,000. *Cf. Jennings v. Stephens*, 574 U.S. 271, 277 (2015) (appellate courts review lower court judgments, not opinions). The bankruptcy court's final default judgment is therefore affirmed. Judgment will be entered for the appellees.

Date: September 30, 2022

John J. Tharp, Jr.
United States District Judge

**[Srt App SA-48]**

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re MICHAEL WOLF, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ------------------------------------------------- | ) | Nos. 18 C 07952, 18 C 07953, |
| | ) | 19 C 01978, 19 C 08154, and |
| N. NEVILLE REID, not individually, | ) | 19 C 08299 |
| but solely in his capacity as Chapter 7 | ) | |
| Trustee of the bankruptcy estate of | ) | Judge John J. Tharp, Jr. |
| Michael A. Wolf, et al., | ) | |
| | ) | (Bankr. No. 14 B 27066) |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL WOLF, SCOTT WOLF, et | ) | |
| al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## <u>AMENDED JUDGMENT ORDER</u>

This action having been decided by Judge John J. Tharp, Jr., on appeal from the United States Bankruptcy Court for the Northern District of Illinois following (1) a February 9, 2017 judgment order dismissing a joint third-party complaint in adversarial proceeding 16-00066; (2) a November 11, 2018 final default judgment (incorporating associated proposed findings of fact and conclusions of law) in adversarial proceeding 16-00066; (3) a December 3, 2019 order denying a motion to amend an order dismissing adversarial proceeding 16-00482; (4) a December 3, 2019 order denying a motion to amend an order dismissing adversarial proceeding 16-00485; and (5) two December 12, 2019 orders of civil contempt issued in adversarial proceeding 16-00066; it is hereby ORDERED:

**[Srt App SA-49]**

The Bankruptcy Court's orders are AFFIRMED.

Judgment is entered in favor of appellees N. Neville Reid, individually, N. Neville Reid, not individually but solely in his capacity as Chapter 7 Trustee for the bankruptcy Estate of Michael A. Wolf, the Bankruptcy Estate of Michael A. Wolf, Daniel Patrick Dawson, individually, Joseph Anthony Ptasinski, individually, Carly Vandewalle Gibbs, individually, Nisen & Elliott, LLC, Members of Nisen & Elliott, LLC, including Michael J. Daley, Helen M. Jensen, John K. Kneafsey, John F. Lesch, Thomas V. McCauley, Robert O. Middleton, Kenneth Rojc, William A. Walker, Mark F. Zaenger, Edward B. Mueller, Michael H. Moirano, William Raleigh, John C. Stiefel, and Paul F. Gerbosi, Fox Swibel Levin & Carroll, LLP, Ryan T. Schultz, individually, Anabelle D. Bouse, individually, Edward Russell Lewis, Elizabeth Greenberg Wolf, Egg Worldwide Inc., a Delaware corporation, Egg Worldwide Inc., an Illinois corporation, Design Network International, Ltd., an Illinois corporation, Barry B. White, Eleanor G. White, Foley Hoag LLP, Amy Lynn Gertler, individually, Michael Farr Koenigsberger, individually, Laura Marie Presto, individually, Grund & Leavitt, P.C., Denise Hughes, Michael J. Cummins, individually, the Law Offices of Michael J. Cummins, John Doe 1 and all other third-party complaint defendants and against appellants Michael Wolf, Scott Wolf, Peter Wolf, Zig-Zag, Corp., ZZC, Inc., MMQB, Inc., Hound Ventures, Inc., SHBM, Inc., and Ma Cherie LLC. This resolves all appeals including those related to all defendants named in the third-party complaint.

The Bankruptcy Court's Proposed Findings of Fact and Conclusions of Law are accepted as described more fully in this Court's Memorandum Opinion and Order entered on September 30, 2022, and final judgment is hereby entered in favor of N. Neville Reid, not individually but

**[Srt App SA-50]**

solely in his capacity as Chapter 7 Trustee for the bankruptcy Estate of Michael A. Wolf against

MMQB, Inc. in the amount of $2,100,000.

Costs are awarded to the appellees.

Date: October 27, 2022

John J. Tharp, Jr.
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| In re MICHAEL WOLF, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ----------------------------------------------- | ) | Nos. 18 C 07952, 18 C 07953, |
| | ) | 19 C 01978, 19 C 08154, and |
| N. NEVILLE REID, not individually, | ) | 19 C 08299 |
| but solely in his capacity as Chapter 7 | ) | |
| Trustee of the bankruptcy estate of | ) | Judge John J. Tharp, Jr. |
| Michael A. Wolf, et al., | ) | |
| | ) | (Bankr. No. 14 B 27066) |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL WOLF, SCOTT WOLF, et | ) | |
| al., | ) | |
| | ) | |
| Defendants-Appellants. | ) | |

## ORDER

For the reasons set forth in the Statement below, Defendants-Appellants Michael Wolf's and Scott Wolf's motions for rehearing and reconsideration in case numbers 18-cv-07952 [81], 18-cv-07953 [51], 19-cv-01978 [41], 19-cv-08154 [36], and 19-cv-08299 [36] are denied.

## STATEMENT

Defendants-Appellants Michael Wolf and Scott Wolf move separately under Federal Rule of Bankruptcy Procedure 8022 for rehearing following affirmance on appeal of a final default judgment entered against them by the bankruptcy court. Scott—on behalf of MMQB, Inc., his wholly-owned company and alter ego—also moves under Federal Rule of Civil Procedure 59(e) for reconsideration of this Court's final judgment against MMQB, Inc. following *de novo* review of the bankruptcy court's proposed findings of fact and conclusions of law. The various motions assert that this Court manifestly erred in denying Michael's discharge and in ruling that Plaintiff-Appellee Neville Reid—the Chapter 7 Trustee of Michael's bankruptcy estate—may avoid two prepetition fraudulent transfers pursuant to 11 U.S.C. § 544(b) and 11 U.S.C. § 548. Although the motions request distinct relief, they rely upon a single common proposition: that Michael's bankruptcy estate held no interests in property because all of Michael's interests in property either vested or would have vested in his martial estate and then either were or would have been awarded to his ex-wife through divorce prior to bankruptcy.

**[Srt App SA-52]**

Michael and Scott's argument only requires recounting a few basic facts. In 2011, Michael and his now-wife Elizabeth separated, and in 2013, Elizabeth petitioned for divorce. In the intervening period, Michael made two fraudulent transfers. First, on behalf of his wholly-owned company and alter ego, Zig-Zag Corp.—which nominally owned and distributed a trade publication entitled Monday Morning Quarterback (MMQB)—Michael transferred the MMQB business for no consideration and without written agreement to another shell company he wholly owned called ZZC, Inc. ("Transfer No. 1"). Then, Michael transferred 51% of ZZC, Inc.'s stock to his adult son, Scott—again for no consideration and without written agreement—leaving Michael with a 49% share of ZZC, Inc. ("Transfer No. 2"). Soon after Elizabeth petitioned for divorce, Michael petitioned for bankruptcy.

Four years after Michael petitioned for bankruptcy, the Illinois Circuit Court overseeing his divorce proceeding issued a judgment for dissolution of marriage. That judgment decreed what property comprised Michael and Elizabeth's marital estate and awarded the entire marital estate to Elizabeth. Included in the property of the marital estate that Elizabeth received was Michael's 100% shareholder interest in Zig-Zag Corp. and his 49% shareholder interest in ZZC, Inc.

Back in bankruptcy, the bankruptcy court sanctioned both Michael and Scott with default. It then held that Transfers Nos. 1 and 2 were fraudulent and avoidable by the Trustee pursuant to sections 544(b) and 548 of the Bankruptcy Code. And because Zig-Zag Corp., not Michael, originally held legal title to the MMQB business, and because a bankruptcy trustee's avoidance powers are generally limited to "transfer[s] of an interest of the debtor in property," *see* 11 U.S.C. §§ 544(b), 548, the bankruptcy court pierced Zig-Zag Corp.'s corporate veil to allow for avoidance of Transfer No. 1. The result was a final default judgment against Scott for the value of the MMQB business ($2,100,000; as the subsequent transferee of Transfer No. 1) and, noncumulatively, for the value of a 51% shareholder interest in ZZC, Inc. (51% of $2,100,000; as the initial transferee of Transfer No. 2). The final default judgment also denied Michael his discharge based on various fraudulent or deceitful misdeeds before the bankruptcy court and the Illinois Circuit Court.

On appeal, Michael and Scott claimed, among other things, that Transfers Nos. 1 and 2 were not avoidable under sections 544(b) and 548. They argued in support that there were no "interest[s] of the debtor in property" for the Trustee to avoid because Michael and Elizabeth's divorce judgment awarded Elizabeth the entire marital estate. This Court rejected that argument on two grounds. First, Michael's 51% shareholder interest in ZZC, Inc. (as distinguished from the 49% interest that was included in the marital estate) was never deemed to be marital property, therefore Elizabeth's receipt of the entire marital estate was irrelevant to Transfer No. 2. *In re Wolf*, 644 B.R. 725, 747 (N.D. Ill. 2022). Second, and more generally, this Court explained that fraudulent transfers are avoidable under sections 544(b) and 548 "so long as the transferred interest in question was 'an interest of the debtor in property' ***at the time of the transfer*** . . . ." *Id.* (emphasis in original). The fact that Michael's divorce judgment divested Michael of his interest in Zig-Zag Corp. (and by extension, the MMQB business) prior to the commencement of his bankruptcy case therefore did not prevent Transfer No. 1's avoidance. *Id.* This Court ultimately affirmed the bankruptcy court's final default judgment in its entirety. *Id.* at *22.

**[Srt App SA-53]**

Michael and Scott now move for rehearing and reconsideration pursuant to Rules 8022 and 59(e), claiming that this Court misapprehended their argument on appeal and failed to apply controlling precedent when affirming the bankruptcy court's judgment. The operative question with respect to sections 544(b) and 548, they now say, is not whether a transferred interest was "an interest of the debtor in property" at the time of the transfer, but whether the transferred interest would still have been "an interest of the debtor in property" by the time the bankruptcy case commenced, assuming hypothetically that the prepetition transfer had never occurred. For this, they point to *Begier v. I.R.S.*, wherein the Supreme Court defines "property of the debtor" as "that property that would have been part of the estate had it not been transferred before the commencement of bankruptcy proceedings." 496 U.S. 53, 58 (1990).[1] Accordingly, Michael and Scott argue that Transfers Nos. 1 and 2 cannot be avoided because the property at issue would not have been part of the bankruptcy estate even if the transfers had not occurred. If Transfers Nos. 1 and 2 had never occurred, they argue, the relevant property interests would have been allocated to Elizabeth along with the rest of the marital estate prior to the commencement of Michael's bankruptcy.

As a threshold matter, this argument is untimely. Because Michael and Scott did not properly include it within their original appellate brief, the argument is waived. Federal Rule of Bankruptcy Procedure 8022 "is the exclusive vehicle for seeking a rehearing when a district court has acted in its appellate capacity . . . ." 10 Collier on Bankruptcy ¶ 8022.01 (16th ed. 2022). The rule is derived from Federal Rule of Appellate Procedure 40. Fed. R. Bankr. P. 8022 advisory committee's note to 2014 amendment. In turn, Rule 40 requires petitioners to "state with particularity each point of law or fact that . . . the court has overlooked or misapprehended." Fed. R. App. P. 40(a)(2). But a court cannot "overlook[] or misapprehend[]" an issue that was not presented to it. *Easley v. Reuss*, 532 F.3d 592, 593 (7th Cir. 2008). "[R]ehearing is not a vehicle for presenting new arguments, and, absent extraordinary circumstances, [appellate courts] shall not entertain arguments raised for the first time in a petition for rehearing." *Id.* at 593–94. Similarly, "[t]he purpose of Federal Rule of Civil Procedure 59(e) is to allow a party to bring to the district court's attention a manifest error of fact or law so that it may correct, or at least address, the error in the first instance." *A&C Constr. & Installation, Co. WLL v. Zurich Am. Ins. Co.*, 963 F.3d 705, 709 (7th Cir. 2020). "A Rule 59(e) motion, however, 'does not allow a party to introduce new evidence or advance arguments that could and should have been presented to the district court prior to the judgment.'" *Id.* (quoting *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 529 (7th Cir. 2000)).

---

[1] The *Berger* Court provided this definition in the context of section 547. Nonetheless, Michael and Scott also rely on *In re French*. There, the Fourth Circuit extended *Berger* to explain that "§ 548 plainly allows a trustee to avoid any transfer of property that **would have been** 'property of the estate' prior to the transfer in question . . . even if that property is not 'property of the estate' **now**." 440 F.3d 145, 151 (4th Cir. 2006) (emphasis in original). Michael and Scott additionally cite *MacDonald v. Estate of Gayton*, 469 F.3d 1079 (7th Cir. 2006), and *In re Emerald Casino, Inc.*, 223 F. Supp. 3d 740 (N.D. Ill. 2016)—two cases which describe a similar principle in application of Illinois' Uniform Fraudulent Transfer Act (the state law incorporated by section 544(b) in this case).

**[Srt App SA-54]**

Here, no trace of the argument Michael and Scott now advance for rehearing and reconsideration may be found within their original brief. Tellingly, they do not cite their original brief once to identify with any particularity what this Court missed. Nor is *Beiger* or any other similar case they now rely upon formerly cited, despite the claim that this Court ignored precedent. The only implication is that their present argument is new. Scott himself even characterizes his argument as a "reacti[on]" to this Court's opinion. Reply 6 n.8, No. 18-cv-07952, ECF No. 79. Any supposed error of this Court, then, is not the result of judicial misapprehension of an argument made but of flawed advocacy. All motions for rehearing and reconsideration are accordingly denied.

Out of respect for the Trustee's substantive defense of these motions, the Court will nevertheless briefly address the merits of Michael and Scott's argument. The fatal flaw in their argument is not the legal principle they assert but the counterfactual to which they apply it. At base, Michael and Scott **presume** that had Transfers Nos. 1 and 2 not occurred, the relevant property interests would have been deemed marital property by the Illinois Circuit Court and awarded to Elizabeth via the divorce judgment. But this is sheer speculation. Had Transfers Nos. 1 and 2 not occurred, the Circuit Court's property division—not to mention Michael and Elizabeth's legal fight over it—could have (more likely **would have**) taken a different form. Notably, Michael and Scott's current presumption that the relevant property interests would have hypothetically been deemed marital property runs counter to the actual position Michael took before the Circuit Court. In his divorce proceeding, Michael "assert[ed] that MMQB and Zig Zag are not marital assets . . . ." J. for Dissolution of Marriage - Findings & Rulings 2, *In re Wolf*, No. 16-ap-00066 (Bankr. N.D. Ill. July 13, 2018), ECF No. 597-1 (dated Nov. 13, 2017). It therefore cannot be assumed that the Circuit Court would have deemed the MMQB business and Michael's 100% shareholder interest in ZZC, Inc. to be marital property, and even if it could be, it is yet further speculation that the Circuit Court would have then still awarded the entire marital estate to Elizabeth.

The operation of sections 544(b) and 548 may not be thwarted by a speculative outcome, especially one of many possible counterfactuals selected by the debtor.[2] Michael and Scott concede that "[w]e can't speculate how the Circuit Court would have awarded [the relevant property interests]," but then proceed, in the same breath, to contend it is impermissible to presume the Circuit Court would **not** have deemed the relevant property interests to be a part of the marital estate. Reply 6, No. 18-cv-07952, ECF No. 79. But why should Michael and Scott's preferred counterfactual receive deference over the other possibilities? Deference, if any is warranted in this context, should be given to the Trustee's preferred counterfactual (*i.e.*, that the relevant property interests would have remained outside the marital estate and vested in the bankruptcy estate unencumbered). This is because "property of the debtor," as that phrase informs sections 544(b) and 548, is construed broadly. As this Court noted in its opinion affirming the judgment, *In re Wolf*, 644 B.R. at 743, it includes "every conceivable interest of the

---

[2] Consider, for example, whether Michael would even have petitioned for bankruptcy had he not fraudulently divested his interests via Transfers Nos. 1 and 2, since doing so would have effectively surrendered control of the MMQB business to the Trustee during the intervening four years between his bankruptcy petition and his judgment for dissolution of marriage.

**[Srt App SA-55]**

4

debtor, future, nonpossessory, contingent, ***speculative***, and derivative . . . ." *Matter of Yonikus*, 996 F.2d 866, 869 (7th Cir. 1993), *abrogated on other grounds by Law v. Siegel*, 571 U.S. 415 (2014) (emphasis added).

The only non-speculative outcome is how the Circuit Court actually ruled, and it held by omission that neither the MMQB business nor Michael's 51% shareholder interest in ZZC, Inc. were a part of Michael and Elizabeth's marital estate. There is no sound basis to speculate how the Circuit Court might have ruled differently had Transfers Nos. 1 and 2 not occurred. This Court therefore did not err by affirming the bankruptcy court's final default judgment based on the facts as they actually occurred.

Date: December 8, 2022

John J. Tharp, Jr.
United States District Judge

**[Srt App SA-56]**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | |
|---|---|
| In Re: <br> Michael Wolf | ) BK No.:   14-27066 <br> ) <br> ) Chapter: 7 <br> ) <br> ) Honorable Deborah L. Thorne <br> ) |
| Debtor(s) <br> N. Neville Reid, not individually, but solely in his <br> capacity as trustee | ) <br> ) <br> ) Adv. No.: 16-00066 <br> ) |
| Plaintiff(s) <br> Zig Zag Corp., ZZC, Inc., Michael Wolf, Scott Wolf, Peter <br> Wolf, SHBM, Inc., Hound Ventures, Inc., MMQB, Inc. | ) <br> ) <br> ) |
| Defendant(s) | ) |

**Final Judgment Against Zig Zag Corp., ZZC, Inc., Michael Wolf and Scott Wolf**

Pursuant to Federal Rules of Civil Procedure 54, 55, and 58, as incorporated by the Federal
Rules of Bankruptcy Procedure, and in accordance with this court's memorandum opinion, it is hereby
ORDERED, ADJUDGED, and DECREED that:

(1) This judgment is final, and there is no just reason for delay;

(2) As to the transfer of the MMQB Business from Zig Zag Corporation to ZZC, Inc., and
pursuant to section 550(a)(2), the court finds in favor of the trustee and against Scott Wolf
on Counts 1, 7, 8, and 9;

(3) As to the transfer of the ZZC, Inc. stock from Michael Wolf to Scott Wolf, and pursuant to
section 550(a)(1), the court finds in favor of the trustee and against Scott Wolf on Counts 5,
6, 7, 8, and 9;

(4) The court finds in favor of the trustee and against Scott Wolf on Count 12;

(5) The court finds in favor of the trustee and against Michael Wolf on Counts 15, 16, 17, and
18;

(6) As to the transfer of the MMQB Business from Zig Zag Corporation to ZZC, Inc., and
pursuant to section 550(a)(1), the court finds in favor of the trustee and against ZZC, Inc. on
Counts 1, 7, 8, and 9;

(7) As to the preferential transfers made by Michael Wolf to ZZC, Inc., and pursuant to section
550(a)(1), the court finds in favor of the trustee and against ZZC, Inc. on Count 10;

(8) Judgment is not entered against MMQB, Inc. on Counts 1, 7, 8, and 9 for the sole reason
that MMQB, Inc. has not consented to this court's final adjudication of Count 1;

(9) On all other counts not mentioned, the court finds against the trustee, but only with respect
to the Defendants named in the caption above;

(10) The trustee is hereby awarded, and Scott Wolf shall pay to the trustee, the sum of
$2,100,000;

(11) The trustee is hereby awarded, and ZZC, Inc. shall pay to the trustee, the sum of
$2,100,000;

(12) The trustee is hereby awarded, and ZZC, Inc. shall pay to the trustee, the sum of
$234,395.68;

**[Srt App SA-57]**

(13) As to paragraphs 10 and 11 of this judgment order, the trustee is entitled to a single satisfaction only; AND

(14) Michael Wolf's bankruptcy discharge is hereby denied.

Enter:

*Deborah A. Thorne*

United States Bankruptcy Judge

Dated: 11/19/2018

**[Srt App SA-58]**

Rev: 20170308_apo

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | | |
|---|---|---|
| In Re:<br>Michael Wolf | ) | BK No.:    14-27066 |
| | ) | |
| | ) | Chapter: 7 |
| | ) | |
| | ) | Honorable Deborah L. Thorne |
| | ) | |
| Debtor(s) | ) | |
| N. Neville Reid, not individually, but solely in his<br>capacity as trustee | ) | Adv. No.: 16-00066 |
| | ) | |
| Plaintiff(s) | ) | |
| Zig Zag Corp., ZZC, Inc., Michael Wolf, Scott Wolf, Peter<br>Wolf, SHBM, Inc., Hound Ventures, Inc., MMQB, Inc. | ) | |
| | ) | |
| Defendant(s) | ) | |

**Final Judgment Against Zig Zag Corp., ZZC, Inc., Michael Wolf and Scott Wolf**

Pursuant to Federal Rules of Civil Procedure 54, 55, and 58, as incorporated by the Federal Rules of Bankruptcy Procedure, and in accordance with this court's memorandum opinion, it is hereby ORDERED, ADJUDGED, and DECREED that:

(1) This judgment is final, and there is no just reason for delay;

(2) As to the transfer of the MMQB Business from Zig Zag Corporation to ZZC, Inc., and pursuant to section 550(a)(2), the court finds in favor of the trustee and against Scott Wolf on Counts 1, 7, 8, and 9;

(3) As to the transfer of the ZZC, Inc. stock from Michael Wolf to Scott Wolf, and pursuant to section 550(a)(1), the court finds in favor of the trustee and against Scott Wolf on Counts 5, 6, 7, 8, and 9;

(4) The court finds in favor of the trustee and against Scott Wolf on Count 12;

(5) The court finds in favor of the trustee and against Michael Wolf on Counts 15, 16, 17, and 18;

(6) As to the transfer of the MMQB Business from Zig Zag Corporation to ZZC, Inc., and pursuant to section 550(a)(1), the court finds in favor of the trustee and against ZZC, Inc. on Counts 1, 7, 8, and 9;

(7) As to the preferential transfers made by Michael Wolf to ZZC, Inc., and pursuant to section 550(a)(1), the court finds in favor of the trustee and against ZZC, Inc. on Count 10;

(8) Judgment is not entered against MMQB, Inc. on Counts 1, 7, 8, and 9 for the sole reason that MMQB, Inc. has not consented to this court's final adjudication of Count 1;

(9) On all other counts not mentioned, the court finds against the trustee, but only with respect to the Defendants named in the caption above;

(10) The trustee is hereby awarded, and Scott Wolf shall pay to the trustee, the sum of $2,100,000;

(11) The trustee is hereby awarded, and ZZC, Inc. shall pay to the trustee, the sum of $2,100,000;

(12) The trustee is hereby awarded, and ZZC, Inc. shall pay to the trustee, the sum of $234,395.68;

**[Srt App SA-59]**

(13) As to paragraphs 10 and 11 of this judgment order, the trustee is entitled to a single satisfaction only; AND

(14) Michael Wolf's bankruptcy discharge is hereby denied.

Enter:

United States Bankruptcy Judge

Dated: 11/19/2018

**[Srt App SA-60]**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | |
|---|---|
| In Re:<br>Michael Wolf | ) BK No.:   14-27066<br>)<br>) Chapter: 7<br>)<br>) Honorable Deborah L. Thorne<br>) |
| Debtor(s)<br>N. Neville Reid, not individually, but solely in his<br>capacity as trustee | ) Adv. No.: 16-00066<br>) |
| Plaintiff(s)<br>Zig Zag Corp., ZZC, Inc., Michael Wolf, Scott Wolf, Peter<br>Wolf, SHBM, Inc., Hound Ventures, Inc., MMQB, Inc. | )<br>) |
| Defendant(s) | ) |

**Proposed Findings of Fact and Conclusions of Law as to MMQB, Inc. on Counts 1, 7, 8, and 9**

This court, not having the constitutional authority to enter a final judgment against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint, hereby offers Parts II, III, IV, VI.a, VI.g.1, VI.h.1, VI.i.1, and VI.r.2 of this court's memorandum opinion as this court's proposed findings of fact and conclusions of law as to MMQB, Inc.'s liability, with this court's ultimate proposed conclusions of law being that (1) judgment be entered against MMQB, Inc. on the above mentioned counts and that (2) MMQB, Inc. be ordered to pay the sum of $2,100,000 to the trustee, N. Neville Reid.

Enter:

Honorable Deborah L. Thorne
United States Bankruptcy Judge

Dated: 11/19/2018

**[Srt App SA-61]**

Rev: 20170308_apo

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | |
| Michael A. Wolf, | ) | Case No. 14 B 27066 |
| | ) | |
| Debtor. | ) | Hon. Deborah L. Thorne |
| | ) | |
| _____ | ) | |
| | ) | |
| N. Neville Reid, not individually but | ) | Adversary No. 16 A 00066 |
| solely in his capacity as Chapter 7 | ) | |
| Trustee for bankruptcy estate of | ) | |
| Michael A. Wolf | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| Michael Wolf, Scott Wolf, Peter Wolf, | ) | |
| Zig-Zag, Corp., ZZC, Inc. MMQB, Inc., | ) | |
| Hound Ventures, Inc., SHBM, Inc. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

### Introduction & Background

This matter comes before the court upon the motion of the trustee to have default

judgments entered against various defaulted Defendants in these proceedings. Namely, the

trustee seeks the entry of a default judgment against Zig Zag Corporation (Zig Zag), ZZC, Inc.,[1]

Michael Wolf, Scott Wolf, Peter Wolf, SHBM, Inc. (SHBM), Hound Ventures, Inc. (Hound

Ventures), and MMQB, Inc (referred to throughout as MMQB, Inc. so as not to confuse the

entity with the underlying "MMQB business" allegedly held by this entity and others). All have

---

[1] There is both a Delaware and an Illinois ZZC, Inc. The court refers to them collectively as "ZZC, Inc."
or simply "ZZC."

**[Srt App SA-62]**

been defaulted either for failing to answer or for having disregarded this court's discovery

orders.

For reasons given more fully below, the court finds for the trustee and against Scott Wolf

on Counts 1, 5, 6, 7, 8, 9, and 12 of the complaint. The court also finds for the trustee and against

ZZC, Inc. on Counts 1, 7, 8, 9, and 10 of the complaint. The court further finds for the trustee

and against Michael Wolf on Counts 15, 16, 17, and 18 of the complaint. The court would find

for the trustee and against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint but for

constitutional concerns, so the court will issue a separate order delineating Parts II, III, IV, VI.a,

VI.g.1, VI.h.1, VI.i.1, and VI.r.2 of this opinion as its proposed findings of fact and conclusions

law, with one of the court's ultimate proposed conclusions of law being that judgment be entered

in favor of the trustee and against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint.

The trustee's theory, in the main, concerns the alleged transfer of a family publishing

business, the Monday Morning Quarterback (MMQB business), in late 2011 or early 2012 from

one corporation (Zig Zag) wholly owned and controlled by the Debtor, Michael Wolf, to another

corporation (ZZC) initially wholly owned and controlled by the Debtor. Allegedly, 51% of the

stock in ZZC was, at the time that ZZC still owned the MMQB business, transferred from

Michael to Scott Wolf, Michael's son, as well. The MMQB business was then transferred to

another corporation (MMQB, Inc.) wholly owned and controlled by Scott Wolf.

Then, as alleged,[2] MMQB, Inc. funneled income from the business to various other

related entities, including Hound Ventures and SHBM, Inc.,[3] as well as to Scott Wolf and

---

[2] The court, upon a review of the main complaint and the separate complaints against SHBM, Inc.,
MMQB, Inc., and Hound Ventures, Inc., treats SHBM, Inc. and Hound Ventures Inc. as potential
subsequent transferees of profits/proceeds/products of the MMQB business under section 550(a)(2) of the
Code. The court otherwise proceeds count-by-count in the main complaint only.
[3] Both wholly owned and controlled by Scott Wolf.

**[Srt App SA-63]**

Michael Wolf. This type of income-transferring happened when the MMQB publishing business was earlier held by the ZZC entity, as well.

Allegedly, the Debtor's marital problems precipitated these transfers. He wanted the value of the business kept out of the hands of his then-existing and potential future creditors, most prominently his then-wife Elizabeth Wolf.

In December of 2013, divorce proceedings commenced. In July of 2014, the Debtor filed for bankruptcy. In early 2016, the trustee filed the present adversary proceeding seeking, in substance, to recover the value of the MMQB business for the benefit of the Debtor's estate.[4]

Some Defendants failed to answer; others failed to comply with discovery orders. These Defendants were then held in default. The trustee's request for default judgment against these Defendants has now followed. This opinion concerns that request.

## Discussion

### I.      Jurisdiction and Authority

### a.   Jurisdiction

The District Court has jurisdiction over all proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). Most of the counts in this case – those based on turnover, fraudulent conveyance, preference, and post-petition transfer theories – arise under title 11, namely sections 542, 544, 547, and 548, and 549 of the Bankruptcy Code. The

---

[4] There are other theories, such as the tortious interference theories, discharge-denial theories, and preference/fraudulent transfer theories (regarding payments made to ZZC), that do not concern the value of the MMQB business or the entities allegedly holding or having held that business. Nothing has been presented to the court, however, indicating that the Plaintiff does not want the entire complaint adjudicated by the court in entering default judgment against the defaulted Defendants. In the interest of finality, this court will adjudicate every count in the main complaint as against the defaulted Defendants. This opinion and any related orders/judgments issued in relation to this opinion leave nothing further to be adjudicated by this court regarding the defaulted Defendants in these proceedings.

**[Srt App SA-64]**

same is true of the counts relating to the Debtor's discharge, which arise under section 727 of the Bankruptcy Code.

Some of the remaining counts – those based on state law alter ego,[5] constructive trust, resulting trust, and breach of fiduciary duty / corporate waste theories, which could exist outside of the bankruptcy and which do not in and of themselves arise under any provision of title 11 – are *at least* "related to" the underlying bankruptcy case because their outcome affects the amount of property in the bankruptcy estate. *See Zerand-Bernal Grp., Inc. v. Cox*, 23 F.3d 159, 161–62 (7th Cir. 1994).

The remaining state law counts – those based on the injury to the estate caused by the Debtor's alleged tortious interference with the estate's post-petition contracts and business relations – "arise in a case under title 11" because, while based on state law tortious interference theories, the causes of action could not exist outside of this bankruptcy proceeding due to the fact that they arise out of an alleged post-petition injury practiced upon the estate, its business relations, and its contract rights vis-a-vis the attempted liquidation (sale) of property of the estate. *See Matter of Wood*, 825 F.2d 90, 97 (5th Cir. 1987) ("In other words, 'arising in' proceedings are those that are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy.").[6]

"Each district court *may provide* that any or all cases under title 11 and any or all *proceedings arising under title 11* or *arising in* or *related to a case under title 11* shall be referred to the bankruptcy judges for the district." 28 U.S.C. § 157(a) (emphasis added). All of

---

[5] There is some confusion as to whether or not the alter ego claim, as asserted in this case, is a standalone action or really a mere adjunct to the trustee's other theories of relief. The court, out of an abundance of caution, treats the alter ego claim as a standalone action supplying the necessary predicate for most of the other relief that the trustee seeks in the complaint.

[6] Even if these particular counts did not "arise in" the bankruptcy case, they would still be "related to" the bankruptcy case.

4      **[Srt App SA-65]**

the proceedings created by the assertion of these causes of action may therefore be referred by the District Court to the Bankruptcy Court. All of the proceedings created by these causes of action have, in fact, been referred to this Bankruptcy Court by the District Court for the Northern District of Illinois. *See* N.D. Ill. L.R. 40.3.1(a).

Jurisdiction therefore exists over all of these causes of action.

**b.  Statutory Authority**

"Bankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11, referred under subsection (a) of this section, and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1). The statute then goes on to give examples of core proceedings. *See* 28 U.S.C. § 157(b)(2).

Here, the fraudulent transfer counts, both those based directly on section 548 and those based on the UFTA/section 544(b), are core. *See* 28 U.S.C. § 157(b)(2)(H). On the facts of this case, the constructive/resulting trust counts are also statutorily core,[7] since these trust counts both concern an alleged transfer of property for no consideration (or consideration supplied by the Debtor) in fraud of creditors' rights giving rise to an equitable ownership interest in favor of creditors the *enforcement* of which would effectively unwind (avoid and recover) the fraudulent transfer; that is, the trust counts' strong substantive resemblance in this case to true statutory UFTA/548 fraudulent conveyance actions makes them statutorily core. *Cf. Republic Credit Corp.*

---

[7] A good argument can be made that the resulting trust count is not statutorily core due to the theory inherently having nothing to do with remedying fraud, whether practiced on creditors or anyone else. In that event, *see In re Guy F. Atkinson Co. of California*, No. C 98-4577 SI, 2000 WL 52317, at *2 (N.D. Cal. Jan. 18, 2000), judgment on the count is effectively being entered against the trustee, as seen below, and the trustee has consented to this court's authority to enter final judgments, *see* 28 U.S.C. § 157(c)(2).

*I v. George K. Boyer (In re Boyer)*, 372 B.R. 102, 105 (D. Conn. 2007), *aff'd*, 328 F. App'x 711

(2d Cir. 2009).[8]

Both the preference count, *see* 28 U.S.C. § 157(b)(2)(G), and the section 549 count, *see*

*In re Auxano, Inc.*, 96 B.R. 957, 960 (Bankr. W.D. Mo. 1989), are core. There is also no doubt

that the objection to the Debtor's discharge is core. 28 U.S.C. § 157(b)(2)(J). Likewise, the

turnover count is core. 28 U.S.C. § 157(b)(2)(E). The tortious interference counts are also core

because they arose post-petition in favor of the estate based on a post-petition contract entered

into for the purpose of liquidating estate property (one of the pieces of real property owned by

the estate). *See* 28 U.S.C. § 157(b)(2)(A), (O).

For the remaining counts, each is core if "it invokes a substantive right provided by title

11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy

case." *Barnett v. Stern*, 909 F.2d 973, 981 (7th Cir. 1990) (internal quotations and citations

omitted). A state law alter ego action would not seem to fit this definition, and nowhere is such

an action listed in section 157(b)(2). Nevertheless, perhaps because this type of action normally

seeks a declaration that certain property only nominally held by third-parties is really property of

the estate, it has been said that such an action is statutorily "core." *See Matrix IV, Inc. v. Am. Nat.*

*Bank & Tr. Co. of Chicago*, 649 F.3d 539, 550 (7th Cir. 2011) (noting that the action before the

bankruptcy court in the *Barnett* case, an action to declare a trust to be the alter ego of the debtor

and the assets of the trust to be property of the estate, *was* a core proceeding); *but see Barnett*,

909 F.2d at 981 (declining to adopt the broader formulation of core proceedings as those that

---

[8] That being said, there is a at least a formal difference between "avoiding" a transfer outright as to certain parties and granting remedies based on that avoidance, as happens under the fraudulent conveyance statutes, and declaring that the transferee of property holds the property in trust for some other entity (who, in equity, owns the asset), as apparently happens with non-statutory constructive/resulting trust actions.

6          **[Srt App SA-67]**

have the effect of bringing property into the estate); *Matter of U.S. Brass Corp.*, 110 F.3d 1261,

1268 (7th Cir. 1997). As such, the court will treat the alter ego / reverse-veil piercing claim in

this case as statutorily core.

Finally, what of the cause of action asserted against officer/director-of-ZZC Scott Wolf

for allegedly breaching a fiduciary duty and/or wasting ZZC's corporate assets? Such a cause of

action is statutorily non-core. *See In re Integrated Health Servs., Inc.*, 291 B.R. 615, 618 (Bankr.

D. Del. 2003).

Thus, this court has statutory authority to enter a final judgment on each claim except for

the claim asserting a breach of fiduciary duty / corporate waste.

c.   **Constitutional Authority**

The court must also, however, satisfy itself that it has the constitutional authority to enter

a final judgment. *Stern v. Marshall*, 564 U.S. 462, 482 (2011) ("Although we conclude that §

157(b)(2)(C) permits the Bankruptcy Court to enter final judgment . . . Article III of the

Constitution does not.").

This court has the constitutional authority to enter a final judgment concerning the

fraudulent transfer claims. *See In re Peregrine Fin. Grp., Inc.*, 589 B.R. 360, 364–65 (Bankr.

N.D. Ill. 2018); *In re Kimball Hill, Inc.*, 480 B.R. 894, 906–07 (Bankr. N.D. Ill. 2012); *see also*

*In re Millennium Lab Holdings II, LLC*, 575 B.R. 252, 268–69 (Bankr. D. Del. 2017). Due to

their substantive resemblance in this case to fraudulent conveyance actions, the same is true of

the non-statutory resulting/constructive trust claims based on fraud and unjust enrichment.

There is also no *Stern* issue with the preference claim, *see, e.g.*, *In re Pantazelos*, 543

B.R. 864, 872-73 (Bankr. N.D. Ill. 2016), nor with the section 549 claim, *In re Felice*, 480 B.R.

401, 427–28 (Bankr. D. Mass. 2012). The objection to the Debtor's discharge obviously does not

run afoul of *Stern* in any respect, and the court may enter final judgment on those counts. *See*

7        **[Srt App SA-68]**

*Stern*, 564 U.S. at 499. While based on state law, the tortious interference counts stem from the bankruptcy itself since they are post-petition causes of action based on the alleged tortious interference with post-petition estate contracts and business relations arising out of the sale and liquidation of estate property. *See id.* Therefore, the court may enter final judgment on the tortious interference counts.

The alter ego claim is different. Though statutorily core, the Seventh Circuit ruled in *Wellness* that the bankruptcy court could not constitutionally enter a final order in such an action, at least where the allegations are that the debtor's *trust*[9] is the alter ego of the debtor. *Wellness Int'l Network, Ltd. v. Sharif*, 727 F.3d 751, 773–76 (7th Cir. 2013), *rev'd on other grounds*, 135 S. Ct. 1932 (2015). The Supreme Court did not reverse the Seventh Circuit on the basis that this conclusion was incorrect, but rather on the basis that, regardless of whether the alter ego claim in *Wellness* was a *Stern* claim or not, the parties could have consented to the bankruptcy court's authority to enter a final order on the claim. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942 n.7 (2015); *Wellness*, 135 S. Ct. at 1954 (Roberts, C.J., dissenting) (describing the majority's holding). In light of the pertinent part of the Seventh Circuit's opinion in *Wellness*, which was not disapproved of by a majority of the Supreme Court, this court will treat the alter ego claim in this case as one on which it may not constitutionally enter final judgment.

Thus, even though it is statutorily core, the court cannot constitutionally enter a final judgment on the alter ego claim in this case. It may constitutionally enter a final judgment on every other statutorily core claim, however. Considered together, the court may not, without litigant consent, enter a final judgment on either the corporate waste / breach of fiduciary claim or the alter ego claim.

---

[9] The case at bar involves no trusts, only corporations.

**[Srt App SA-69]**

### d. **Consent**

The bankruptcy court's lack of authority may be cured by litigant consent, express or implied. This is true for proceedings that are statutorily non-core. 28 U.S.C. § 157(c)(2). It is also true for proceedings that are statutorily core but that lie outside of the constitutional authority of the bankruptcy court. *Wellness*, 135 S. Ct. at 1948–49. The trustee has expressly consented to the entry of final judgments. In their initial answers, it can fairly be said that Michael and Scott Wolf expressly withheld consent to the bankruptcy court's entry of final judgments, as have MMQB, Inc., Hound Ventures, and SHBM. Zig Zag and ZZC have never filed an answer and, to this court's knowledge, have never been represented by counsel in this proceeding, thereby necessarily precluding these entities from having taken a legal position on this court's authority. "A corporation may appear in federal courts only through licensed counsel." *Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 202 (1993).

Scott Wolf, however, filed a motion for summary judgment, asking this court to enter an order dismissing with prejudice certain counts of the complaint for failing to state a claim upon which relief could be granted, based in part on a divorce ruling that was issued during the pendency of these adversary proceedings.

He argues that Counts I–IX[10] should be dismissed with prejudice because a transfer of corporate property is not a transfer of shareholder property,[11] and the trustee's alter ego theory, which, if legally sound, would accomplish the required linkage between shareholder and corporate property in this case, is impermissible as a matter of Illinois law; further, he argues that Rule 9(b) is not met with respect to the fraudulent transfer counts, and, in any event, any possible

---

[10] Both Roman and Arabic numerals are used interchangeably below in reference to the numbered counts in the complaint.

[11] As a general principle, this is undoubtedly true.

**[Srt App SA-70]**

recovery on *any* count belongs to Elizabeth Wolf, not the estate, due to the final divorce court

ruling. Hence Counts I-IX, those dealing with alter ego, constructive and resulting trust, and

fraudulent transfers, should, according to Scott, be dismissed with prejudice. Similarly, the

tortious interference counts (XIII–XIV) should be dismissed with prejudice due to the fact that

the marital home (and/or the proceeds of its sale) is no longer estate property, and the claims

arise out of the interference with the estate's contract to sell that property. Likewise, the

fiduciary duty / corporate waste claim (Count XII) should be dismissed because, according to

Scott, the stock in ZZC out of which such claim arises has been awarded entirely to Elizabeth

Wolf, rendering the trustee without standing to assert a claim based on the estate's ownership of

that stock, which is derivative of Michael Wolf's ownership on the petition date. Scott then also

argues that counts XIX–XXIV should be dismissed for essentially the same reason as the other

fraudulent transfer counts: the property that was transferred was not property of the Debtor

(either because it was corporate property or because any recovery would now inure to the benefit

of Elizabeth Wolf due to the marital division), and in the case of section 549 count (Count

XXIV), the property transferred post-petition (if any) was not, as a matter of law, estate property.

Thus, Scott Wolf has asked this court for a final judgment as a matter of law in his favor

on Counts 1–9, 12–14, and 19–24. Scott Wolf has therefore consented to the entry of final

judgment on those counts. *In re Clean Burn Fuels, LLC*, 540 B.R. 195, 199 n.2 (Bankr.

M.D.N.C. 2015); *In re Carter*, 506 B.R. 83, 88–89 (Bankr. D. Ariz. 2014); *In re Pearlman*, 515

B.R. 887, 892 n.21 (Bankr. M.D. Fla. 2014). This court may statutorily and constitutionally enter

final judgment on all counts as against Scott Wolf.[12]

---

[12] Counts 10–11 and 15–18 (dealing with Michael Wolf's discharge) do not implicate Scott Wolf. In any event, those counts are statutorily and constitutionally core irrespective of litigant consent.

Michael Wolf filed a motion for summary judgment arguing substantially the same things as Scott Wolf, in addition to arguing that the counts aimed at denying him his discharge fail to state a claim as a matter of law. *See* Michael Wolf's Mot. Summ. J., Docket No. 589. Thus, he is deemed to have consented to final judgment on all counts except for Counts 10–11.[13] *Clean Burn*, 540 B.R. at 199 n.2; *Carter*, 506 B.R. at 88–89; *Pearlman*, 515 B.R. at 892 n.21.

Zig Zag and ZZC were served with summons indicating in clear terms that a failure to respond would result in their implied consent to this court entering final orders; they never filed an answer in this case and are not represented by legal counsel. A final judgment may be entered against them. *See In re Oldco M Corp.*, 484 B.R. 598, 614–15 (Bankr. S.D.N.Y. 2012); *In re Hoku Corp.*, 2015 WL 8488949, at *2-3 (Bankr. D. Idaho Dec. 10, 2015).

MMQB, Inc., Hound Ventures, and SHBM first filed an answer indicating their lack of consent to bankruptcy court adjudication. To this court's knowledge, they never filed a motion for summary judgment or any other dispositive motion asking for a final judgment that would repudiate that initial withholding of consent. They are not now represented by counsel. No final judgment will be entered *against* Hound Ventures and SHBM at any rate; the business was never transferred to them (per the complaint), and the factual material in the record is not sufficient to allow a judgment to be liquidated against them based upon their receipt under section 550(a)(2) of the proceeds/products/profits of the MMQB business.

MMQB, Inc., owing to the trustee's alter ego theory and his fraudulent transfer theories, however, would be held liable by this court as a subsequent transferee of the business. Given MMQB, Inc.'s lack of consent, however, the alter ego *Stern* claim (which is absolutely vital to

---

[13] In any event, Counts 10–11 run against ZZC only and are core irrespective of litigant consent.

**[Srt App SA-72]**

the success of the trustee's fraudulent transfer theory pinning liability on MMQB, Inc.) cannot be

finally adjudicated as against it so as to support a final judgment.

Hence, final judgment will be entered on all counts. The only exception to this is with

respect to Count I and Counts VII–IX *as to* MMQB, Inc. (which withheld consent and then did

not file any motion for entry of a final judgment in its favor), for which the court will issue

proposed findings of fact and conclusions of law per Fed. R. Bankr. P. 9033. *See Exec. Benefits*

*Ins. Agency v. Arkison*, 134 S. Ct. 2165, 2172–74 (2014); 28 U.S.C. § 157(c)(1).

## II.   Legal Standard

There is a two step process for obtaining a default judgment. *VLM Food Trading Int'l,*

*Inc. v. Illinois Trading Co.*, 811 F.3d 247, 255 (7th Cir. 2016); *In re Catt*, 368 F.3d 789, 793 (7th

Cir. 2004). First, the party against whom default judgment is sought must be held in default.

*Catt*, 368 F.3d at 793. Certain of the Defendants in these cases have been held in default as a

sanction for having failed to comply with discovery orders. *See* Order, Docket No. 566; Opinion,

Docket No. 574; Order, Docket No. 575; Fed. R. Civ. P. 37(b)(2)(A)(vi); Fed. R. Bankr. P. 7037.

"The basic effect of an entry of default (step one) is that [u]pon default, the well-pleaded

allegations of a complaint relating to liability are taken as true." *VLM Food*, 811 F.3d at 255

(quoting *Dundee Cement Co. v. Howard Pipe & Concrete Prods., Inc.*, 722 F.2d 1319, 1323 (7th

Cir. 1983)).

Next, an actual default judgment must be entered. The entry of default alone does not

establish an entitlement to relief. *VLM Food*, 811 F.3d at 255 (noting that the entry of default

does not determine rights). It merely denies the party held in default the opportunity to contest

any of the facts properly alleged in the complaint. *See In re Fundakowski*, 557 B.R. 268, 269

(Bankr. D.R.I. 2016). The Plaintiff must, however, establish that the well-pleaded facts found in

the complaint, if taken as true, amount to a legally cognizable claim for relief upon which a

judgment may be entered. *See Nishimatsu Const. Co. v. Houston Nat. Bank*, 515 F.2d 1200, 1206

(5th Cir. 1975) (citing and discussing *Thomson v. Wooster*, 114 U.S. 104 (1884)). Thus, even

after entry of a default, the defaulted Defendant may attack the sufficiency of the complaint.

*Matter of Hunt's Health Care, Inc.*, 161 B.R. 971, 979 (Bankr. N.D. Ind. 1993).[14]

The standard to be applied is essentially the same as that employed when evaluating a

complaint based on a motion to dismiss under Rule 12(b)(6). *See Surtain v. Hamlin Terrace

Found.*, 789 F.3d 1239, 1245 (11th Cir. 2015). Unlike in the pleading stage of litigation,

however, a judgment may not be entered based on inconsistent theories of relief. *See, e.g.,

Lawson v. Life of the S. Ins. Co.*, No. 4:06-CV-42 (WLS), 2008 WL 11342635, at *3 (M.D. Ga.

June 19, 2008); *see also Fredonia Broad. Corp. v. RCA Corp.*, 481 F.2d 781, 801 (5th Cir.

1973); *In re Stangel*, 2018 WL 4945692, at *1 (Bankr. E.D. Wis. Oct. 10, 2018). These

principles apply with equal weight even where a default judgment is sought as a discovery

sanction under Rule 37 and not for failure to defend. *See Microsoft Corp. v. Computer Care Ctr.,

Inc.*, No. 06-CV-1429 SLT, 2008 WL 9359718, at *5 (E.D.N.Y. Apr. 8, 2008); *see also Parlier

v. Casteen*, No. 514CV00085RLVDCK, 2016 WL 3032692, at *1 (W.D.N.C. May 26, 2016).

Additionally, where, as here, the damages sought are not for a sum certain, the Plaintiff

must provide evidence as to the appropriate amount of damages. *Catt*, 368 F.3d at 793. A hearing

is not always necessary, and, in light of the detailed evidence presented in support of the

damages sought in this case, the court determines that a hearing on damages is not required in

this case, since the evidence submitted allows for a definite computation of damages to be made.

*See Domanus v. Lewicki*, 742 F.3d 290, 304 (7th Cir. 2014); *Dundee Cement*, 722 F.2d at 1323;

---

[14] Some of the defaulted Defendants have, of course, vigorously contested the legal sufficiency of the
trustee's complaint in these proceedings, as well as the trustee's standing and authority to bring the causes
of action being brought.

*Fustok v. ContiCommodity Servs., Inc.*, 873 F.2d 38, 40 (2d Cir. 1989) ("While it is true . . . that

the damages in this case were neither liquidated nor capable of mathematical calculation, it was

not necessary for the [lower court] to hold a hearing, as long as it ensured that there was a *basis*

for the damages specified in a default judgment.") (emphasis added); Fed. R. Civ. P. 55(b)(2). In

any event, no defaulted Defendant has formally requested a hearing on the damages amount, and

the court therefore deems any argument to the effect that a hearing is required to have been

forfeited and/or waived.

In sum, it follows that if the judgment sought is supported by a legally sufficient

complaint and if the damages sought are supported by appropriate evidence, a default judgment

may be entered for the amount(s) requested.

**III.     The Trustee's Standing/Authority**

**a.   The Family Court Property Division**

The trustee's standing and/or authority to bring these causes of action is at the heart of

this case. The Wolfs (Scott and Michael) first argue that the issuance of a divorce ruling dividing

the marital property of Elizabeth and Michael Wolf precludes the trustee from maintaining these

causes of action. It does not.

Illinois is a common law property state. *See In re Marriage of Evans*, 426 N.E.2d 854,

857 (Ill. 1981). During the marriage, each spouse has the legal right to deal with his/her own

property in whatever manner he/she deems fit. 750 ILCS § 65/9; *Kujawinski v. Kujawinski*, 376

N.E.2d 1382, 1387 (Ill. 1978); *People v. One 1990 Chevrolet Suburban, VIN*

*1GNER16K7LF1628*, 605 N.E.2d 92, 94 (Ill. App. Ct. 1992). That is, for example, if one spouse

owns stock in a corporation, the other spouse has no interest, legal or equitable, in the stock

merely by virtue of being the stock owner's spouse.

Upon the filing of a divorce petition, however, the concept of marital property becomes key. *See* 750 ILCS § 5/503(a) (defining marital property). If, at the time of the divorce petition, one spouse owns property that is also marital property, then his/her independent ownership ceases, and each spouse acquires a contingent interest in the property. *See* 750 ILCS § 5/503(e); *In re Thorpe*, 881 F.3d 536, 539–40 (7th Cir. 2018). "When the divorce court eventually divides marital property, the obtaining spouse's contingent interest in that property ripens into a full ownership interest. Conversely, the spouse who is not awarded the property sees his contingent interest vanish." *Thorpe*, 881 F.3d at 540.

In this case, Elizabeth Wolf (Michael Wolf's then-wife) filed a divorce petition in December of 2013. In July of 2014, Michael Wolf filed for bankruptcy. In late 2017, the family court judge divided the marital property 100% in favor of Elizabeth Wolf.[15] Hence, it follows that any marital property Michael Wolf owned on the divorce-petition date that was divided in favor of Elizabeth Wolf no longer belongs to the bankruptcy estate.[16]

This court does not know exactly which marital property was owned by Michael and Elizabeth Wolf in late 2013 that would have been subject to the family court's property division award. Helpfully, however, the family court has provided a description in its final judgment dissolving the Wolf marriage:

> [Elizabeth Wolf] is awarded the marital estate, comprised of Respondent's 49% interest in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in in New Mexico, the Fiat automobile, the Mercedes Benz [Elizabeth Wolf] drives.

---

[15] The automatic stay was lifted to allow the family court to do this. *See* 11 U.S.C. § 362(b)(2)(iv); Order Granting Mot. Relief from Stay, Docket No. 53, 14bk27066, at 2.

[16] This is because the bankruptcy estate succeeded only to whatever property interests the Debtor had on the petition date, which, as concerns marital property, would have been only his contingent interest in the marital property. *See Thorpe*, 881 F.3d at 539.

**[Srt App SA-76]**

*See* Michael Wolf's Mot. Summ. J., Docket No. 597, Ex. A, at 3.

The family court's pertinent findings and rulings, which preceded the entry of final judgment, do not contradict this language:

> Mr. Wolf asserts no interest in any marital assets and assigns any interest that he might have in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in New Mexico, a Fiat automobile, the Mercedes Benz that Mrs. Wolf drives, his forty-nine per cent (49%) interest in Zig Zag Corporation and any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter claim on file) to Mrs. Wolf.

*See* Michael Wolf's Mot. Summ. J., Docket No. 597, Ex. B, at 8.[17]

The court then goes on to say, more or less, that it will indeed award those properties to Mrs. Wolf to the extent that it can do so given the pending bankruptcy case. *Id.* Of course, Michael Wolf had no ability to "assign" anything to Elizabeth Wolf; he simply had no property to transfer (his property, including his contingent interests in the marital property, had long since become property of the estate under section 541). But the stay had been lifted to allow the *family court* to make a property division, which it did. That the family court made the division based on Michael Wolf's offer is of no moment in these proceedings.[18]

As pertinent to this proceeding, then, the estate owns 51% of the equity in Zig Zag Corporation and 49% of the equity in ZZC. This court does not see how the estate's loss of 49% of the equity in Zig Zag Corporation to Elizabeth Wolf affects the trustee's ability to bring any of

---

[17] True, the court first begins by saying that Mr. Wolf "assigns *any* interest that he might have in Zig Zag Corporation," but then goes on to say "his forty-nine per cent (49%) interest in Zig Zag Corporation." This potentially creates an ambiguity, but the language is unambiguous when reconciled with the language of the final judgment, which clearly states "49% interest in Zig Zag Corporation."

[18] If there were other marital property that could or should have been divided by the family court, that is an issue to be raised by the parties in state court. Since this court lifted the stay to allow the family court to divide the marital property, it is not in a position to decide *what the marital property was or is* under 750 ILCS § 5/503(a) and must proceed solely based on the description given by the family court in its final judgment and preceding findings/rulings. This deference to the state court is especially appropriate in the family law context. *See, e.g., Barber v. Barber*, 62 U.S. 582, 584 (1858).

the causes of action he is currently bringing. As seen below, many if not most of the trustee's

causes of action are not strictly derivative of the Debtor's pre-petition property rights in any

event. If Elizabeth Wolf believes that the marital property division in her favor allows her to

assert an ownership interest or other property interest in any recovery gained by the trustee on

any cause of action asserted in these proceedings, she is free to make that argument to this court.

Otherwise, any proceeds actually recovered from these causes of action will be distributed to the

estate's creditors, with any surplus going to the Debtor. *See* 11 U.S.C. §§ 541(a)(1), (3), (7),

726(a).[19]

### b. The Trustee's Statutory Authority to Bring these Causes of Action

The question raised by the Wolfs in these proceedings is not so much one of "standing"

or justiciability as one of the trustee's authority under the Bankruptcy Code to bring the causes of

action that he asserts. *See Grede v. Bank of New York Mellon*, 598 F.3d 899, 900 (7th Cir. 2010)

("Whether a given action is within the scope of the Code is a question on the merits rather than

one of justiciability."). This court will therefore discuss the trustee's statutory authority.

The trustee must look to the Bankruptcy Code alone for his authority to bring a cause of

action. First, and most easily, certain sections of the Code, such as sections 547, and 548, give

the trustee direct authority to prosecute the causes of action described in those sections. *See* 11

U.S.C. §§ 547, 548.

---

[19] Of course, it is to be remembered that there is a fundamental legal distinction between having a proprietary interest in an asset and having a claim or right to payment against or from the legal person who owns that asset. Whether Elizabeth Wolf has a proprietary interest in any recovery realized by the trustee (and to what extent), and/or whether she has a "claim" against this bankruptcy estate (and to what extent), are questions that have not yet been ruled upon with any finality by this court, except to say that the award of 51% of Zig Zag Corporation to Elizabeth Wolf, or the award of any of the other property actually awarded by the family court, does not undercut the trustee's standing or authority to bring the causes of action asserted in this adversary proceeding.

**[Srt App SA-78]**

Second, sections 541(a)(1) and 323 allow the trustee to assert pre-petition causes of action belonging to the debtor on the petition date. *See Matter of Geise*, 992 F.2d 651, 655 (7th Cir. 1993) (noting that section 541(a)(1) includes causes of action owned by the Debtor). The trustee's rights under section 541(a)(1) are by definition no greater than the debtor's; thus, for instance, the trustee cannot succeed on a section 541(a)(1) cause of action where the debtor would necessarily have failed. *See Bank of Marin v. England*, 385 U.S. 99, 101 (1966); *Zartman v. First Nat. Bank of Waterloo*, 216 U.S. 134, 135 (1910); *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012); *In re Graham Square, Inc.*, 126 F.3d 823, 831 (6th Cir. 1997); *Matter of Sanders*, 969 F.2d 591, 593 (7th Cir. 1992); *In re Cent. Illinois Energy Coop.*, 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) ("A trustee's rights under section 541 are derivative of those held by the debtor."), *aff'd*, No. 15-1118, 2016 WL 299007 (C.D. Ill. 2016); *In re Marston*, 417 B.R. 766, 770 (Bankr. N.D. Ill. 2009) ("Thus, under 11 U.S.C. § 541, the trustee of a bankrupt debtor may bring any cause of action that the debtor could have brought under state law as of the commencement of the case."). This is important because, as seen below, if the trustee's only basis for disregarding Zig Zag Corporation's corporate form is section 541(a)(1) and the Debtor's right to do so, then his alter ego claim will fail as regards Zig Zag. *See In re Rehab. of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018–19 (Ill. 1994) (repudiating the notion that under Illinois law the corporate form may be disregarded at the behest of the corporation or its shareholder(s); noting that the right to do so under Illinois law belongs to third-party creditors (which would include the bankruptcy trustee *when the trustee is imbued with creditor status and not merely debtor-derivative status* under the Bankruptcy Code)).

Third, section 544(b) allows the trustee to assert any state law avoidance action that is exercisable or that could have been exercised by a creditor holding an allowable unsecured

**[Srt App SA-79]**

claim. *See* 11 U.S.C. § 544(b). Under section 544(b), the trustee's rights are derivative not of the

debtor, but rather of the debtor's creditors. *Hays & Co. v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 885 F.2d 1149, 1155 (3d Cir. 1989) ("Claims asserted by the trustee under section

544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the

trustee to assert on their behalf."). If those creditors would succeed under state law on the

avoidance cause of action, so may the trustee.

Fourth, section 544 authorizes the trustee to assert any cause of action based on a general

injury to the debtor's creditors; that is, the trustee may assert a cause of action derivatively of

creditors' rights to do so if the allegations "could be asserted by any creditor." *See Fisher v.*

*Apostolou*, 155 F.3d 876, 879 (7th Cir. 1998) (quoting *Koch Refining v. Farmers Union Central*

*Exchange, Inc.*, 831 F.2d 1339, 1348 (7th Cir. 1987)).

> If the liability is to all creditors of the corporation without regard to the personal
> dealings between such officers and such creditors, it is a general claim....
>
> A trustee may maintain only a general claim. His right to bring a claim depends on
> whether the action vests in the trustee as an assignee for the benefit of creditors or,
> on the other hand, accrues to specific creditors.

*Id.* at 879–880 (quoting *Koch*, 831 F.3d at 1348–49).

A claim is personal and not general where "the claimant is harmed and no other claimant

or creditor has an interest in the cause." *Id.* at 879. Thus, if a creditor claim is *not* personal, it

may be brought by the trustee for the benefit of the entire creditor body.

This fourth basis of trustee authority has been strongly criticized. See *In re Greater*

*Southeast. Cmty. Hosp. Corp.*, 333 B.R. 506, 517–21 (Bankr. D.D.C. 2005); *In re Miller*, 197

B.R. 810, 814–15 (W.D.N.C. 1996). The courts in both *Greater Southeast* and *Miller* opined that

the Seventh Circuit's decision in *Steinberg v. Buczynski*[20] effectively overruled *Koch Refining*'s

---

[20] 40 F.3d 890 (7th Cir. 1994).

**[Srt App SA-80]**

holding that claims belonging to creditors generally may be brought by the trustee in bankruptcy. *Greater Southeast*, 333 B.R. at 519; *Miller*, 197 B.R. at 813 n.4.

Nevertheless, because the holding and reasoning of *Koch Refining* was cited and quoted with approval both in *Apostolou* and more recently in *In re Teknek, LLC*,[21] this court will apply it in this case. This point is important because the trustee's abstract legal ability to recover the allegedly fraudulent transfers in this case depends on his ability to treat Zig Zag Corporation as the alter ego of Michael Wolf under Illinois law at the time of the transfers from Zig Zag Corporation to ZZC. Illinois law apparently does not allow the corporate form to be disregarded by a shareholder of the corporation;[22] thus, if the trustee's right to disregard Zig Zag's corporate form is derivative *only of* the Debtor-shareholder's right to do so under Illinois law based on section 541(a)(1), the trustee must lose. *See, e.g., In re Howland*, 579 B.R. 411, 416–17 (E.D. Ky. 2016) (noting the distinction between asserting a reverse-piercing or alter ego claim based on the *rights of the debtor* under section 541 and asserting such a claim based on the *rights of creditors* under section 544).

If, on the other hand, he can step into the shoes of Michael Wolf's general creditors under section 544 and the rationale of *Koch Refining*, he may disregard the corporate form of Zig Zag Corporation under Illinois law based on *the creditors'* right to do so and thus treat Zig Zag's property as Michael Wolf's for the purposes of asserting fraudulent transfer Counts V–IX and recovering the value of the MMQB business.[23]

---

[21] 563 F.3d 639, 645–47 (7th Cir. 2009).

[22] *See In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994) ("[T]he general law mandates that the piercing of a corporate veil must never be made for the benefit of the corporation *or its shareholders*.") (internal quotations and citations omitted) (emphasis added).

[23] As seen below in Part VI.a, the court's focus on Zig Zag Corporation is due to the very uncertain state of Illinois and Delaware law in this area and the close resemblance of the trustee's "alter ego" claim to a "reverse veil-piercing" claim, with some courts, most prominently the court in *In re Glick*, noting that reverse piercing is not generally accepted at all, whether based on the piercing claim of a shareholder of

## IV.    The Complaint – Factual Background

The court now turns to the well-pleaded allegations in the complaint, which are central to

the analysis, and which it will describe largely in its original order to the extent possible. The

story generally is one of a web of artificial legal entities, all alleged to have been used as part of

an elaborate scheme to defraud Michael Wolf's creditors, most prominently his then-wife

Elizabeth Wolf, by transferring the family business out of a corporation owned and controlled by

Michael Wolf to an entity (or entities) owned and controlled by his sons, most prominently Scott

Wolf. According to the allegations in the complaint, the family business was transferred from an

entity known as Zig Zag to one by the name of ZZC and then ultimately came to rest in an entity

known as MMQB, Inc. (owned and controlled by Scott Wolf), with the proceeds of the business

then being funneled to various persons, including the Debtor, through the use of other, separate

corporate entities. The court first begins with a general description of the parties, and then it

moves into the narrative provided by the complaint.

Michael, Scott, and Peter Wolf all allegedly reside with one another in Washington state.

Trustee's Amended Complaint, Docket No. 95, at ¶¶ 15–17. Zig Zag is an Illinois corporation

---

the corporation ("insider" reverse piercing) or of the shareholder's creditors ("outsider" reverse piercing).
Due to that uncertainty in state law, the court finds it appropriate to err on the side of caution and treat
*only* Zig Zag Corporation as Michael Wolf's alter ego under Count I of the complaint due to the fact that
there is no doubt in the allegations that Michael Wolf owned 100% of the stock in Zig Zag Corporation at
all relevant times and, as is especially important, at the time of the allegedly fraudulent transfer of the
corporation's assets to ZZC. The same cannot be said of ZZC, especially at the time of the alleged
transfer of ZZC's assets to MMQB, Inc. As for MMQB, Inc., that corporation was *never* owned by
Michael Wolf, and this court can discover no Delaware cases (MMQB, Inc. is a Delaware corporation)
indicating that a corporation may be treated as the alter ego of someone who owns no shares in that
corporation in the manner in which the trustee seeks to use the doctrine (*i.e.*, to collapse the separate legal
personalities such that the property of one is simply the property of another). Thus, of the three entities
that at one time allegedly owned the MMQB business (and which were either transferors or transferees of
that business), which business is at the heart of these proceedings, only Zig Zag corporation has its
corporate form disregarded below in Count I. The rest of the corporations, for the purposes of resolving
this action, are deemed to enjoy their separate existence under state law.

incorporated in 1987, and at all relevant times Zig Zag was 100% owned by Michael Wolf (the Debtor). *Id.* at ¶ 18.

Illinois ZZC, Inc. (ZZC IL) "is an Illinois corporation incorporated on December of 2011." *Id.* at ¶ 19. It was 100% owned by Michael Wolf during the relevant time periods in this case. *Id.* Delaware ZZC, Inc. (ZZC DE) "is a Delaware corporation also incorporated in December of 2011." *Id.* at ¶ 20. It was also 100% owned by Michael Wolf during the relevant time periods in this case. *Id.*

MMQB, Inc. "is a Delaware corporation incorporated in 2014." *Id.* at ¶ 21. Scott Wolf, not Michael, was and is the sole officer, director, and shareholder. *Id.*

Hound Ventures, Inc. (Hound Ventures) is also a Delaware corporation, having been incorporated in 2014 (shortly after MMQB, Inc.). *Id.* at ¶ 22. Scott Wolf is also the sole officer, director, and shareholder of this corporation. *Id.*

SHBM, Inc. (SHBM) "is a Delaware corporation incorporated in 2009." *Id.* at ¶ 23. This corporation is also solely owned and managed by Scott Wolf. *Id.*

Melissa Skolnick[24] is Scott Wolf's girlfriend and allegedly resides with Scott Wolf in Washington state. *Id.* at ¶ 24. Melissa Skolnick received, in 2014, $250,000 or more (all attributable to the MMQB business) from an entity called "Four Legs, Inc." (Four Legs), a Delaware corporation incorporated in 2010. *Id.* at ¶ 25.

Finally, Ma Cherie LLC (Ma Cherie) is a business entity organized under the laws of Montana in 2014. *Id.* at ¶ 26. It was formed by Michael and Scott Wolf "in order to purchase a custom Aston Martin owned by the Debtor." *Id.* Scott Wolf is the sole member of Ma Cherie, and the entity's existence has been based entirely around the Aston Martin. *Id.*

---

[24] This description of the complaint does not in any way bind parties, such as Melissa Skolnick, who have not been held in default.

**[Srt App SA-83]**

As alleged, this adversary proceeding primarily concerns Michael Wolf's (the Debtor) fraudulent transfer of a business prior to the petition date to his sons, Scott and Peter Wolf. *Id.* at ¶ 1. "The purpose of the transfer was to remove the Debtor's interest in the business from the reach of his creditors including, but not limited to, his wife, in anticipation of their impending divorce." *Id.*

This business is a "trade publication for the commercial furniture industry," named the Monday Morning Quarterback (MMQB), published by facsimile, e-mail, and the internet to varying degrees as technology advanced. *Id.* at ¶ 2. Michael Wolf started MMQB in the 1980s. *Id.* at ¶¶ 27–29. From 1987 to 2011, the business's income was attributed to one of the Defendants, Zig Zag Corp. (Zig Zag), "an Illinois corporation wholly owned by the Debtor." *Id.* at ¶¶ 3, 18, 33–34. MMQB had income of over $1,000,000 by 2010–11. *Id.* at ¶¶ 3, 37.

Though the income belonged (at least for tax purposes) to Zig Zag, Michael Wolf used that income to pay his and his family's personal creditors hundreds of thousands of dollars, in addition to paying himself a "lavish salary," *id.* at ¶¶ 4, 35, and in addition to paying his sons a salary for work performed on behalf of the business, *id.* at ¶ 36. The expenses paid on behalf of his family included the Debtor's credit card bills as well as those of Elizabeth, Scott, and Peter Wolf. *Id.* at ¶ 38. This income was not reported on the Debtor's or his sons' tax returns. *Id.* at ¶ 39. The business remained very profitable and, up through late 2011, the entire Wolf family "benefitted handsomely from the income it generated." *Id.* at ¶ 5.

This changed in 2011 when Michael and Elizabeth Wolf's marriage "began to fall apart," with Michael Wolf moving out of the marital residence. *Id.* at ¶ 6. Around this time, Michael Wolf began taking action to transfer his interest in the MMQB business to others, the design

**[Srt App SA-84]**

being to prevent Elizabeth Wolf and other creditors from reaching it and its value. *Id.* at ¶¶ 7, 43–44.

Specifically and importantly, Michael Wolf caused the transfer of the MMQB business from his wholly owned and controlled entity (Zig Zag) to entities owned and/or controlled by Scott Wolf, including two defaulted Defendants in this proceeding, MMQB, Inc. (not to be confused with the underlying MMQB "business," which has allegedly changed hands between corporate entities multiple times) and Hound Ventures, Inc. *Id.* at ¶ 8. The Debtor still enjoys the fruits of MMQB's income, as it continues to fund his living and legal expenses. *Id.* at ¶ 9.

Michael Wolf and/or his sons created two entities named ZZC, one an Illinois Corporation and the other a Delaware Corporation. *Id.* at ¶¶ 45–46. In 2012, income from the MMQB business (presumably derived from accounts receivable owed on account of subscription agreements and/or advertising agreements) ceased being attributed to Zig Zag and began to be attributed to, and deposited into the accounts of, ZZC. *Id.* at ¶ 47. The court takes this to mean that there was an effective, if perhaps informal, assignment of Zig Zag's receivables (intangible rights to payment arising from the subscription/advertising agreements) to ZZC in 2012.

No consideration was ever received by Zig Zag for this transfer. *Id.* at ¶ 48. The Debtor, according to ZZC's 2012 tax return, owned 100% of the stock of ZZC. *Id.* at ¶ 49. The substance of the business did not change; Michael, Elizabeth, Scott, and Peter Wolf all continued to perform in their former roles. *Id.* at ¶ 50. Just as with Zig Zag, Michael Wolf disregarded the corporate formalities and used ZZC's income to pay his and his family's personal creditors. *Id.* at ¶ 51.

As discussed above, Michael and Elizabeth's marriage began breaking down in 2011. On December 5, 2013, Elizabeth Wolf filed a petition for divorce in Lake County, Illinois. *Id.* at ¶

**[Srt App SA-85]**

52. Shortly thereafter, ZZC's Board of Directors (Michael and Scott) fired Elizabeth from ZZC (she had previously handled advertising for the business). *Id.* at ¶ 54. Michael Wolf was then also fired by ZZC, *id.* at ¶ 55–56, in an attempt to make it appear as though he had no income to pay to Elizabeth Wolf for temporary support and maintenance, *id.* at ¶ 55–57. Around that time, Michael Wolf also issued a promissory note to ZZC in the amount of $128,781.73. *Id.* at ¶ 58.

As noted above, the Debtor claimed to own 100% of ZZC's stock on his 2012 tax return. During the divorce proceedings, and in his bankruptcy schedules (and in testimony to the bankruptcy court), he claimed, however, to own only 49% of ZZC's shares, the other 51% belonging to Scott Wolf. *Id.* at ¶ 60–61. To the court, one of four plausible things may have happened. Scott Wolf could have owned 51% of the stock from the beginning, and Michael lied on his tax return. Second, Michael could still own 100% of ZZC, and he simply lied to the family court and to the bankruptcy court. Third, Michael could have transferred 51% of the stock to Scott at sometime between 2012 and the date that he filed his bankruptcy petition. Fourth, Michael (and/or Scott) could have caused ZZC to issue new shares to Scott such that Scott would own 51% of the company. Scott Wolf, at any rate, never paid anything for his interest in the company, to the extent that he in fact does have an interest in the company. *Id.* at ¶ 63. Moreover, the income of the business, regardless of ownership, continued to go to Michael Wolf either directly or indirectly, such as when ZZC paid for Michael Wolf's apartment in Chicago. *Id.* at ¶ 65–66.

In January of 2014, around the time of the divorce petition, Michael and/or his sons formed and incorporated MMQB, Inc. *Id.* at ¶¶ 67–68. Scott Wolf is listed as the sole director of MMQB, Inc., and Scott Wolf has claimed that he elected himself as all of the officers of MMQB, Inc. *Id.* at ¶¶ 69–70. Scott Wolf owns all of the shares of MMQB, Inc., which he purchased for

**[Srt App SA-86]**

$7.51. *Id.* at ¶ 71. Around January of 2014, ZZC transferred its receivables to MMQB, Inc. *Id.* at

¶ 73. No purchase agreement exists for either the assets of ZZC or its stock. *Id.* at ¶¶ 74–75.

The Wolfs incorporated another entity in February of 2014: "Hound Ventures." *Id.* at ¶

77. Scott Wolf claims to be the sole director, officer, and shareholder of the entity. *Id.* at ¶ 78.

Peter Wolf claims to be an employee of Hound and receives a salary many times larger than that

which he received at Zig Zag or ZZC. *Id.* at ¶¶ 80–81. Nominally at least, Hound Ventures has

provided services to MMQB, Inc., for which it has received hundreds of thousands of dollars in

compensation from MMQB, Inc. *Id.* at ¶¶ 82–84. The facts alleged, such as that MMQB, Inc.

had an "infinite amount of time" to pay Hound Ventures, tend to show that this arrangement did

not reflect the economic substance of the two entities' commercial relationship with one another

(*i.e.*, MMQB, Inc. was funneling money to Hound Ventures). *Id.* at ¶¶ 84-89. In 2014, MMQB,

Inc. transferred approximately $300,000 of income attributable to the underlying MMQB

business to Hound Ventures. *Id.* at ¶ 90. Part of that money went to Scott Wolf. *Id.* at ¶¶ 91–92.

MMQB, Inc. was Hound Ventures' sole source of income. *Id.* at ¶ 93.

Going back in time, Michael Wolf and his sons incorporated another entity in September

of 2009: "SHBM." *Id.* at ¶¶ 94–95. Scott Wolf is allegedly the sole director, officer, shareholder,

and employee of SHBM. *Id.* at ¶ 96. Much in the same fashion as with Hound Ventures, Scott

Wolf arranged for MMQB, Inc., to pay SHBM "whatever was necessary to be charged" in order

to publish the MMQB publication, and through such arrangement caused the transfer of hundreds

of thousands of dollars from MMQB, Inc. to SHBM, which was then largely transferred to Scott

Wolf's girlfriend, Melissa Skolnick. *Id.* at ¶¶ 98–104. These transfers to Melissa Skolnick were

carried out through an intermediary entity known as "Four Legs." *Id.* at ¶¶ 105–112.

**[Srt App SA-87]**

During the divorce proceedings, Michael Wolf was ordered to sell his Aston Martin to pay Elizabeth Wolf's attorneys' fees. *Id.* at ¶ 115. Scott Wolf created an entity, "Ma Cherie," which then purchased the car and in turn sold it to a car-dealership and then re-purchased it from the same. *Id.* at ¶¶ 116–121. Michael Wolf never turned over the proceeds of the sale and was held in contempt by the family court. *Id.* at ¶¶ 123–124. Michael Wolf then filed for bankruptcy rather than face jailing for his contempt. *Id.* at ¶¶ 124–126.

As of the filing of the bankruptcy, The Debtor owed and owes the IRS, credit card companies, and Elizabeth Wolf over $1,000,000, and the largest creditor is Elizabeth Wolf.[25] *Id.* at ¶ 127. During the bankruptcy, Michael Wolf hindered the trustee's attempts to sell the marital home by disseminating and publishing defamatory, derogatory, and threatening e-mails and flyers. *Id.* at ¶ 132.

Michael Wolf's sons and/or the entities described above have provided Michael Wolf with funds to pay for legal expenses, for which Michael has created and signed promissory notes. *Id.* at ¶¶ 133–37. Those funds are attributable to the MMQB publication/business. *Id.* at ¶¶ 138–40.

With the complaint's general allegations having been laid out, the court now turns to the legal sufficiency of those allegations. Do they, in conjunction with the specifically pleaded material in each count, suffice to support the entry of default judgments against the named Defendants?

## V.      The Rule 9(b) Arguments

The Wolfs make arguments premised on Civil Rule 9(b), which generally requires fraud to be pleaded with particularity. As a default judgment may only be entered based upon well-

---

[25] As noted above, there is a lingering question as to whether Elizabeth Wolf is a creditor of the estate and to what extent.

**[Srt App SA-88]**

pleaded facts, it stands to reason that a judgment may not be entered upon a fraud-based count if

the pleading runs afoul of Rule 9(b).

In the context of fraudulent transfers, the Rule applies to constructive and actual fraud. *In

re Glick*, 568 B.R. 634, 657 (Bankr. N.D. Ill. 2017) (citing *General Elec. Capital Corp. v. Lease

Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir. 1997)).

> To plead an actual or constructive fraud with the necessary particularity, the
> complaint must allege what (or how much) was transferred, when the transfer was
> made, how it was made, who made it, who received it, and under what
> circumstances.

*Glick*, 568 B.R. at 657 (internal quotations omitted).

It is to be remembered that the rule is relaxed where a bankruptcy trustee is the plaintiff.

*Allegaert v. Perot*, 78 F.R.D. 427, 430 (S.D.N.Y. 1978); *In re DBSI, Inc.*, 445 B.R. 351, 355

(Bankr. D. Del. 2011); *In re Hearthside Baking Co., Inc.*, 402 B.R. 233, 255 (Bankr. N.D. Ill.

2009); *In re 1031 Tax Grp., LLC*, 420 B.R. 178, 190–91 (Bankr. S.D.N.Y. 2009). The same is

true where specific information is peculiarly within the adverse parties' knowledge. *In re Potter*,

88 B.R. 843, 847 (Bankr. N.D. Ill. 1988); *In re First Merchants Acceptance Corp. Sec. Litig.*,

No. 97 C 2715, 1998 WL 781118, at *8 (N.D. Ill. Nov. 4, 1998).

Here, the plaintiff is a bankruptcy trustee, asserting claims based on violations of third

parties' legal rights (rights either of the Debtor or of his creditors). Also, all of the alleged

transfers took place between family members and those family members' closely held

corporations (thus indicating that specific knowledge regarding the particulars of the transfers

would neither be generally known nor readily discoverable by outsiders). Those defendants' lack

of cooperation in discovery has been at the heart of these proceedings. Thus, the court will not

strain to apply Rule 9(b) rigorously against the trustee.

**[Srt App SA-89]**

With those qualifications in mind, Rule 9(b) is met in this case. There are essentially three transfers alleged. First, there is the allegation that the MMQB business was transferred from Zig Zag Corporation to ZZC at a time when both corporations were wholly owned by the Debtor. The MMQB business has been described in the complaint in some detail. This transfer was allegedly made sometime in early 2012. Again, it was made by Zig Zag corporation to ZZC. The circumstances, as alleged, were essentially that the Debtor was attempting to transfer assets between corporations so as to shield them from his then-wife, Elizabeth.

Second, there is the allegation that 51% of the stock in ZZC was transferred by Michael to Scott Wolf no earlier than in 2013, at a time when ZZC still held the MMQB business. The circumstances are the same as for the transfer from Zig Zag Corporation to ZZC (attempting to shield property from the Debtor's then-wife Elizabeth).

Third, the trustee alleges that the MMQB business was transferred from ZZC to MMQB, Inc. roughly in January of 2014. At that time, as alleged, Scott Wolf owned 51% of ZZC and 100% of MMQB, Inc. The circumstances surrounding the transfer were the same: Michael and Scott Wolf were attempting to prevent the business from falling into the hands of Elizabeth.

Finally, and apart from the main transfers of the business itself, there is the multitude of secondary "income" transfers detailed in the complaint. These transfers of income through closely held corporations were, according to the complaint, made in order to allow Michael and Scott Wolf to clandestinely enjoy the fruits of the business.

The complaint alleges fraud with the requisite particularity. The Wolfs' argument to the contrary is rejected.

## VI.   The Legal Theories

### a.   Count I: Alter Ego / Reverse-Piercing

The first count is for declaratory relief. It asks for the court to declare that the assets and income of the "Monday Morning Quarterback" (the business) are property of the estate, no matter which legal personality actually owns the assets of the business, because maintaining the fiction of separate legal personalities for the "sham corporations" described above would sanction a fraud and promote injustice.

Based on a review of the balance of the complaint, the court takes this count to be asking for relief in the form of treating the entity-Defendants as the alter egos of Michael Wolf, and thus disregarding their separate existence apart from him, for the purposes of asserting the substantive legal theories to follow in the complaint (including turnover, constructive/resulting trust, and fraudulent transfer theories); it does not take this count to be asking to hold those entity-Defendants vicariously liable for Michael Wolf's (or the estate's) debts, such as, for example, Michael Wolf's (or the estate's) credit card debt, tax debt, or any debt owed to Elizabeth Wolf. The court finds that the allegations establish that Zig Zag may properly be treated as Michael Wolf's alter ego under Illinois law for the purposes of asserting the substantive legal theories found in the complaint.

State law, pertinently both Illinois and Delaware law,[26] governs the trustee's alter ego theory. This is because the source of substantive law for the trustee's request must, by definition, be either state or federal law, *cf. Bd. of Trustees, Sheet Metal Workers' Nat. Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1038 (7th Cir. 2000) (noting that the source of law must, by definition, be either state or federal), and the trustee has *not* asserted any substantive consolidation theory under substantive federal bankruptcy law, *see In re Owens Corning*, 419

---

[26] All alleged transferors/transferees of the MMQB business (Zig Zag, ZZC, and MMQB, Inc.) were Illinois and Delaware corporations.

**[Srt App SA-91]**

F.3d 195, 205 (3d Cir. 2005); *In re Clark*, 692 F. App'x 946, 948 (9th Cir. 2017) (noting that substantive federal law governs a substantive consolidation request).[27]

As a general and fundamental principle, corporations and other artificial legal entities enjoy a legal personality separate and distinct from that of the equity owners; if an individual owns even all of the shares of a corporation, that individual does *not*, without more, have an interest in the property owned by the corporation. *See, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474–75 (2003); *Bird v. Wilmington Soc. of Fine Arts*, 43 A.2d 476, 483 (Del. 1945); *Bevelheimer v. Gierach*, 339 N.E.2d 299, 303 (Ill. App. Ct. 1975). Under state law, in exceptional circumstances this rule may be disregarded "where it otherwise would present an obstacle to the due protection or enforcement of public or private rights." *Bevelheimer*, 339 N.E.2d at 303. This is sometimes known as veil-piercing. *See Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004).

There is, however, a substantive legal distinction between veil-piercing and what is known as the "alter-ego rule," the latter of which is "the doctrine that *shareholders* will be treated as the *owners of a corporation's property*, or as the real parties in interest, *whenever* it is necessary to do so to prevent fraud, illegality, or injustice." *See Alter-Ego Rule*, BLACK'S LAW DICTIONARY 94 (10th ed. 2014) (emphasis added). As the Seventh Circuit has noted, "[e]fforts to pierce the corporate veil ask a court to hold A vicariously liable for B's debt . . . . But a contention that A is B's 'alter ego' asserts that A and B are the *same entity* . . . ." *Elite Erectors, Inc.*, 212 F.3d at 1038 (emphasis added).

---

[27] Even if the trustee were asserting a substantive consolidation theory under substantive federal bankruptcy law, the Seventh Circuit has never formally endorsed the concept, and, importantly, there are grave issues associated with using the doctrine to draw *non-debtor* entities involuntarily into a bankruptcy proceeding. *See In re Concepts Am., Inc.*, No. 14 B 34232, 2018 WL 2085615 (Bankr. N.D. Ill. May 3, 2018).

**[Srt App SA-92]**

The court begins first with Zig Zag, an Illinois corporation (so Illinois law applies). *Van Dorn Co. v. Future Chem. & Oil Corp.*, 753 F.2d 565, 570 (7th Cir. 1985); *cf. Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996) (noting that the substantive law of the state of incorporation governs a veil-piercing case). Illinois courts have noted that "a corporation with only *one stockholder* will be treated as his alter ego. In such cases, the courts will deal with the *substance of the transaction* involved as if the corporate agency *did not exist*," *People ex rel. Hartigan v. Org. Servs. Corp.*, 498 N.E.2d 597, 600 (Ill. App. Ct. 1986) (emphasis added), at least where the corporate fiction has been "used as a protection to fraud or other illegal transactions," *Chicago-Crawford Currency Exch., Inc. v. Thillens, Inc.*, 199 N.E.2d 295, 299 (Ill. App. Ct. 1964); *see also Illinois Interior Finish Co. v. Poenie*, 277 Ill. App. 554, 566 (1934). "[I]f the . . . corporation is merely a dummy or sham, the distinct corporate entity will be disregarded and the [shareholder and corporation] will be treated *as one*." *Dregne v. Five Cent Cab Co.*, 46 N.E.2d 386, 391 (Ill. 1943) (emphasis added).

Importantly, however, the corporate form cannot be disregarded for the benefit of a shareholder. *See In re Rehabilitation of Centaur Ins. Co.*, 632 N.E.2d 1015, 1018 (Ill. 1994) ("[T]he general law mandates that the piercing of a corporate veil *must never be made* for the benefit of the corporation or its shareholders.") (internal quotations and citations omitted) (emphasis added). There is no similar prohibition on disregarding the corporate form at the behest of third-party creditors, however. *See id.* at 1018 (noting that the corporate form is properly disregarded in order to remedy fraud practiced upon third-parties). In other words, under Illinois law, a corporation cannot disregard its own corporate form to reach shareholder assets, and the same logic works in reverse: a shareholder cannot disregard the corporate form of the shareholder's own corporation to reach the corporation's assets.

**[Srt App SA-93]**

It is therefore vital in this case to examine into whose shoes the trustee is stepping to assert the alter ego or reverse veil-piercing claim under state law. For example, in *In re Howland*, the court was considering the same problem, namely whether the trustee of an individual equity owner's bankruptcy estate could avoid and recover a fraudulent transfer made by that individual's wholly owned LLC. *In re Howland*, 579 B.R. 411 (E.D. Ky. 2016). It framed the issue as one of reverse-piercing, an issue on which it noted courts are "deeply split." *Id.* at 416 (quoting *In re ALT Hotel, LLC*, 479 B.R. 781, 801 (Bankr. N.D. Ill. 2012)).

> There are two recognized types of reverse veil piercing—insider and outsider. Insider reverse veil piercing allows a shareholder to disregard the corporation of which he is a part for his own benefit. On the other hand, outsider veil piercing occurs where a third-party creditor seeks to reach the assets of a corporation to satisfy the debts of a corporate insider.
>
> In this matter, the Trustee could potentially use both insider and outsider reverse piercing, each of which are dependent on Kentucky law. First, the Trustee stands in the shoes of the Debtors, assuming any causes of action belonging to them. In this position, the Trustee can pursue an insider reverse piercing approach if it is allowed under Kentucky law. *Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Whether a particular cause of action is available to the debtor, and thus constitutes 'property of the estate,' is determined by state law."). Furthermore, under § 544, the Trustee also stands in the shoes of the Debtors' judgment creditors and may bring claims available to them. If Kentucky law allows such creditors to use outsider reverse piercing, then the Trustee may also use that approach. 11 U.S.C. § 544. Since Kentucky has not adopted or rejected reverse veil piercing generally, this distinction is not vital to the Court's decision, but it is helpful to note in order to interpret the statements of Kentucky courts regarding reverse veil piercing.

*Id.* at 416–17 (some internal citations omitted).

Unlike Kentucky law, and as indicated in the discussion above, there is a clear distinction in Illinois between "insider" alter ego claims and "outsider" alter ego claims. The former are seemingly impermissible, while the latter *may* be permissible. As the court in *Howland* noted, however, the trustee can use section 544 to make out an "outsider" alter ego or revere-piercing claim. And as indicated in Part III.b. above, this court does not believe that the state of the law in the Seventh Circuit forbids this approach to trustee standing/authority using section 544. There is

nothing to indicate that Michael Wolf's alleged misuse and abuse of the corporate form to

engage in fraudulent transfers with actual intent to hinder, delay, and defraud his creditors would

have, if true, resulted in anything but a general injury to all of his creditors, not a special or

specific injury to any particular creditor or class of creditors. *See Apostolou*, 155 F.3d at 879–880

(quoting *Koch*, 831 F.3d at 1348–49).

      With the corporate form capable of being disregarded under Illinois law by the trustee

standing in the shoes of the creditors of Michael Wolf, the only question is whether it may be

disregarded in this case and, if so, disregarded in the manner in which the trustee seeks to

disregard it.

      The alter-ego rule as the trustee seeks to apply it, *i.e.*, not to impose vicarious personal

liability but rather to treat the assets of one legal personality as the assets of another at a given

point in time, has found application in bankruptcy cases similar to the one at bar. For example, in

*In re Fisher*,[28] an unpublished decision from the Sixth Circuit, the court had to consider the same

question as that faced by the court here.

      In *Fisher*, the debtor was the sole shareholder of a closely held corporation. *Fisher*, 296

F. App'x at 497. The corporation owned inventory. *Id.* at 498. Prior to the petition, the debtor

caused the corporation to transfer its inventory to the debtor's girlfriend, who then sold it on for a

much higher price to a third-party. *Id.* at 497–98. The bankruptcy court, relying on an alter-ego

theory under Ohio law, avoided the transfer from the debtor's closely held corporation to the

debtor's girlfriend under section 548 of the Code. *Id.* at 499. The defendants-appellants argued

that the bankruptcy court had impermissibly reverse-pierced the corporate veil in avoiding the

transfer, since Ohio law did not recognize reverse-piercing, and the bankruptcy court could not

---

[28] 296 F. App'x 494 (6th Cir. 2008).

**[Srt App SA-95]**

have found that the transfer of the inventory was a transfer of an interest of the *debtor* in property

without having first reverse-pierced the veil of the debtor's wholly owned corporation, which

actually had owned the inventory transferred. *See id.* at 506. As noted by the Sixth Circuit,

relying on one of its own prior cases, which in turn had relied on the Seventh Circuit's *Elite*

*Erectors* case,

> [t]his court, has explained, however, that veil piercing and *alter ego* concepts are
> distinct. The former asks a court to hold A vicariously liable for B's debts, while
> the latter asserts that A and B are the same entity and therefore liability is direct.
> Here, the bankruptcy court found that because [the debtor] and [the corporation]
> were the same entity, [the corporation's] inventory belonged to [the debtor] such
> that the transfer to [the debtor's girlfriend] was a transfer of an interest in property
> of the debtor.

*Id.* (emphasis in original) (internal citations omitted).

In applying the alter ego doctrine as articulated by it above, the court relied on a

statement of substantive Ohio law that "where the stock of a corporation is owned *entirely by one*

*party*, and the party in interest is the stockholder, the fiction of the separate entity of the

corporation may be disregarded where the ends of justice require it." *Fisher*, 296 F. App'x at

505–06 (quoting *Knight v. Burns*, 154 N.E. 345, 346 (Ohio Ct. App. 1926)) (emphasis added).

The Sixth Circuit then affirmed the bankruptcy court's decision that the corporation was

merely the debtor's alter ego under Ohio law and that it therefore did not enjoy a legal

personality separate and distinct from that of the debtor. *Id.* at 507 ("Nor are we persuaded that

the bankruptcy court erred in finding that [the corporation] was [the debtor's] *alter ego*.")

(emphasis in original). As such, the bankruptcy court had properly concluded that the transfer of

corporate inventory had been a transfer of an interest of the debtor-shareholder in property.

Because of the uncertainty in the law in this area, and because this is an area of state and

not federal law, this court will attempt to hew closely to the approach taken by the court in

*Fisher*, even though it is an unpublished decision, since the decision in *Fisher* is the only

**[Srt App SA-96]**

decision of a federal Court of Appeals (that this court has found) at least tacitly approving the

use of the alter ego doctrine in the manner in which the trustee seeks to use it in this case.

There, again, the court focused on substantive state law allowing the corporate form to

simply be disregarded (in reverse) where the stock of the corporation was owned *entirely* by one

person. Then, it applied the alter ego concept as that concept had been articulated in the Seventh

Circuit's *Elite Erectors* case to treat the transfer of corporate property as the transfer of an

interest of the debtor in property.

As far as substantive state law is concerned, the statement of Ohio law that the court in

*Fisher* relied on (see above) is nearly identical to statements of Illinois law in this area where the

corporate form is being disregarded generally and not to impose vicarious personal liability on

another legal personality, so adherence to the "wholly owned" approach in *Fisher* makes just as

much sense under Illinois law in this case as it did under Ohio law in *Fisher*. *See Fisher*, 296 F.

App'x at 505–06 (quoting *Knight v. Burns*, 154 N.E. 345, 346 (Ohio Ct. App. 1926); *Hartigan*,

498 N.E.2d at 600 ("[A] corporation with *only one stockholder* will be treated as his alter ego. In

such cases, the courts will deal with the substance of the transaction involved as if the corporate

agency did not exist.") (emphasis added); *Chicago-Crawford*, 199 N.E.2d at 299 ("It has been

frequently held that the *owner of all of the stock of a corporation* will be treated as its alter ego,

and these cases have refuted the fiction of separate legal entities in cases where used as a

protection to fraud or other illegal transactions.") (emphasis added).

This court will therefore limit the application of the alter ego doctrine to corporations

where the Debtor, Michael Wolf, owned 100% of the stock in the corporation during the relevant

time-periods. With respect to those corporations, then, any transfers of their property *may* be

**[Srt App SA-97]**

treated as transfers of the Debtor's property prior to the bankruptcy filing under the alter ego

doctrine as articulated by the courts in *Fisher* and *Elite Erectors*.

     The court begins first with Zig Zag. Under Illinois law, the decision as to whether to

collapse two legal personalities into one pursuant to the alter ego doctrine is left to the discretion

of the trial court. *See In re Kreisler*, 331 B.R. 364, 379 (Bankr. N.D. Ill. 2005), *aff'd*, 352 B.R.

671 (N.D. Ill. 2006), *rev'd and remanded on other grounds*, 546 F.3d 863 (7th Cir. 2008).

> Generally, before the separate corporate identity of one corporation will be
> disregarded and treated as the alter ego of another, it must be shown that it is so
> controlled and its affairs so conducted that it is a mere instrumentality of another,
> and it must further appear that observance of the fiction of separate existence
> would, under the circumstances, sanction a fraud or promote injustice.

*Main Bank of Chicago v. Baker*, 427 N.E.2d 94, 101 (Ill. 1981).

     Here, again, the court, in applying the alter ego doctrine, finds it crucial that Michael

Wolf was Zig Zag's sole shareholder at all relevant times. *See Dep't of Transp. v. Heritage-*

*Pullman Bank & Tr. Co.*, 826, 627 N.E.2d 191, 193 (Ill. App. Ct. 1993); *Hartigan*, 498 N.E.2d at

600; *cf. Fisher*, 296 F. App'x at 505–06 (relying on a nearly identical statement of Ohio alter ego

law requiring the stock of the entity to be solely owned by one person). An application of the

traditional factors for determining when to disregard a separate legal personality is appropriate as

well, however. *See Fisher*, 296 F. App'x at 506 (considering the traditional factors in

determining whether the disregard of the corporate form was appropriate); *see also Melko v.*

*Dionisio*, 580 N.E.2d 586, 595 (Ill. App. Ct. 1991) ("[T]he mere allegation that he was a

dominant or sole shareholder is insufficient to enable a court to disregard the separate corporate

existence.").

     Here, of the many factors able to be considered, the court finds that the allegations

establish that Michael Wolf failed to observe corporate formalities and commingled funds by

paying personal and family expenses (such as personal and family credit card debts) directly with

corporate funds, diverted assets from Zig Zag to a closely related entity (ZZC) to the detriment

of creditors, and, in transferring the MMQB business assets for no consideration to ZZC, failed

to maintain *arms-length* relationships among related entities. *Bank of Am. v. WS Mgmt., Inc.*, 33

N.E.3d 696, 727 (Ill. App. Ct. 2015) (listing the factors to be considered). Also, the fact that

Michael Wolf, as alleged, continues to run the MMQB business and continues to receive income

from it, along with the fact that he built and ran the business for nearly three decades, points to

Zig Zag having been used as a mere façade for the operation of its *sole* stockholder, Michael

Wolf. *See id.*

Thus, because Michael Wolf was Zig Zag's sole stockholder, because funds were

commingled and used for personal expenses, because Zig Zag's business assets were diverted to

related entities for no consideration, and because Michael Wolf is the dominant personality

behind the MMQB business originally held by Zig Zag, there is such unity and interest of

ownership that Zig Zag and Michael Wolf should be treated as the same legal personality.

The allegations, taken as true, also show that Zig Zag's assets (the MMQB business)

were drained from Zig Zag for no consideration and as part of an actually fraudulent scheme to

hinder Michael Wolf's creditors. *See Chicago-Crawford*, 199 N.E.2d at 299. Thus, as alleged, it

can be seen that the sole stockholder (Michael Wolf) has used Zig Zag to promote fraud by

draining its assets in an intentional attempt to prevent his creditors from reaching the value of the

business, and thus the separate personality of Zig Zag should be disregarded. *See Main Bank*,

427 N.E.2d at 101 (noting that, in order to disregard the separate corporate personality, the

personality must have been used to sanction a fraud or promote an injustice).

**[Srt App SA-99]**

Zig Zag will therefore be treated as the alter ego of Michael Wolf; the two will, for the

rest of the analysis, be treated as having had the same legal personality during the period of time

over which the corporation was used to further Michael Wolf's allegedly fraudulent scheme.

What about the rest of the entities? Due to the strong resemblance of the alter ego

doctrine as used in this case to reverse veil-piercing, *see In re Teleservices Grp., Inc.*, 469 B.R.

713, 728 n.45 (Bankr. W.D. Mich. 2012) (questioning the distinction between the two concepts

drawn by the court in *Fisher* and suggesting that the court in *Fisher* was really substantively

consolidating the debtor and the closely held corporation under substantive federal bankruptcy

law, not substantive Ohio law, in order to reach the result that the corporation's transfer of its

inventory was a transfer of an interest of the debtor in property), and due to the highly uncertain

nature of state law in this area, *see In re Glick*, 568 B.R. 634, 661–64 (Bankr. N.D. Ill. 2017)

(discussing both Illinois and Delaware law), the court will respect their separate existence. *See

Glick*, 568 B.R. at 664 (noting that where state law is unclear, federal courts should adopt an

interpretation of state law that restricts liability rather than expands it); *In re Duckworth*, No. 10-

83603, 2012 WL 4434681, at \*8 (Bankr. C.D. Ill. Sept. 24, 2012) (noting that extreme caution in

this area is warranted).

The allegations regarding ZZC, for instance, are not clear on whether the ZZC that

allegedly received the MMQB business was the Illinois or the Delaware ZZC. Moreover, by the

time the business was allegedly fraudulently transferred *from* ZZC, Michael Wolf was only a

49% shareholder in the corporation. For MMQB, Inc. and the rest of the entities named in the

complaint, Michael Wolf has never owned *any* of the stock in those companies. While this fact

might not hold as much water in a traditional veil-piercing case, this court has chosen to take a

conservative approach in light of the uncertainty in state law in this area and to respect the

separate existence of the corporate entities named in the complaint except where the allegations

clearly show that Michael Wolf was the sole shareholder of the entity during the relevant time-

periods, including, most importantly, during the time when the MMQB business was allegedly

fraudulently transferred *out of* the entity.

### b.   Count II: Turnover

The trustee, in Count II, asks for turnover of the MMQB business. As alleged in the

complaint, however, the MMQB business has been transferred to MMQB, Inc., and the income

of the business is being funneled through several other entities. If the Debtor (personally) or Zig

Zag (the Debtor's alter ego) owned the property comprising the MMQB business (including its

equipment, any inventory, any intellectual property, any goodwill, and any receivables) as of the

petition date, then turnover under section 542 might be appropriate. *See In re Roti*, 271 B.R. 281,

291–92 (Bankr. N.D. Ill. 2002), *aff'd sub nom. Nelmark v. Helms*, No. 02 C 0925, 2003 WL

1089363 (N.D. Ill. Mar. 11, 2003).

As it stands, however, the business components have allegedly been transferred to

various third-party entities, including MMQB, Inc., in a scheme to defraud Michael Wolf's

creditors, and all of this happened pre-petition. The alleged ultimate transferee of the business,

namely MMQB, Inc., is not being treated by this court as the alter ego of the Debtor, Michael

Wolf, nor are any other entities other than Zig Zag. On these alleged facts, the MMQB business

(or its value) cannot be recovered by the trustee from any of the defaulted Defendants based on

this count as a matter of law. *See Bank of America v. Veluchamy (In re Veluchamy)*, 879 F.3d

808, 816 (7th Cir. 2018) (noting that a turnover action cannot be used where the property in

question was transferred to someone else prior to the petition date; also noting that a turnover

**[Srt App SA-101]**

action "generally cannot substitute for a fraudulent-transfer action"). No default judgment will be entered based on this count.

### c. Count III: Constructive Trust

In Count III, the trustee asks the court to hold that the MMQB business is being held in trust in favor of the trustee for the benefit of the estate (creditors). The trustee, in the allegations, alleges that property (the MMQB business) was transferred, causing the transferees to become unjustly enriched in fraud of Michael Wolf's creditors' rights as creditors.

First, to the extent this count merely seeks the imposition of a constructive trust as a *remedy*, it cannot be set out in a separate count because it is not an independent cause of action. *See Arvest Bank v. Byrd*, 814 F. Supp. 2d 775, 798 n.7 (W.D. Tenn. 2011); *Goldstein v. F.D.I.C.*, No. CIV.A. ELH-11-1604, 2012 WL 1819284, at *12 (D. Md. May 16, 2012). Accordingly, no default judgment may be entered on the count; if the constructive trust is being requested as a remedy under the UFTA, the merits of that request can be considered under the trustee's UFTA counts (considered in the context of section 544(b) and section 550).

If the count is attempting to invoke substantive principles of fraud and unjust enrichment independently of any statutory cause of action for the conduct described in the count (transferring the business in fraud of creditors' rights and causing the transferees to thereby become unjustly enriched), the count still may not serve as a basis for default judgment as a matter of law.

First, if the trustee is attempting to assert the cause of action under section 541(a)(1), he can only succeed if Michael Wolf could have succeeded. *Bank of Marin v. England*, 385 U.S. 99, 101 (1966); *Zartman v. First Nat. Bank of Waterloo*, 216 U.S. 134, 135 (1910); *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 596 (7th Cir. 2012); *In re Graham Square, Inc.*, 126

**[Srt App SA-102]**

F.3d 823, 831 (6th Cir. 1997); *Matter of Sanders*, 969 F.2d 591, 593 (7th Cir. 1992); *In re Cent.*

*Illinois Energy Coop.*, 526 B.R. 786, 792 (Bankr. C.D. Ill. 2015) ("A trustee's rights under

section 541 are derivative of those held by the debtor."), *aff'd*, No. 15-1118, 2016 WL 299007

(C.D. Ill. 2016); *In re Marston*, 417 B.R. 766, 770 (Bankr. N.D. Ill. 2009) ("Thus, under 11

U.S.C. § 541, the trustee of a bankrupt debtor may bring any cause of action that the debtor could

have brought under state law as of the commencement of the case."). Michael Wolf quite clearly

could not have succeeded under Illinois law.[29]

Under Illinois law, Michael Wolf cannot petition a court of equity to impose a

constructive trust in his favor over property that he admittedly fraudulently conveyed. *See*

*Schultz v. Schultz*, 113 N.E. 638, 641 (Ill. 1916) ("If [the constructive trust claimant's] version is

true he had the property deeded to [the transferee] in *fraud of his creditors*, and such action *does*

*not commend itself to a court of equity*.") (emphasis added); *Songer v. Partridge*, 107 Ill. 529,

533 (1883) ("Where one person conveys property to another for the purpose and with the intent

to defraud creditors, courts of equity will not aid such persons to regain the property thus

fraudulently placed beyond control, but as a general rule courts of equity will leave parties to a

fraudulent transaction in the position they have voluntarily placed themselves."); *see also Illinois*

*State Tr. Co. v. Jones*, 184 N.E. 623, 627 (Ill. 1933); *Pratt v. Watson*, 559 N.E.2d 280, 282 (Ill.

App. Ct. 1990). This is not so much the result of any affirmative defense that needed to be raised

by the Defendants as it is the result of a built-in limitation on the assertion of the *equitable*

---

[29] Since there is no general federal common law, this count necessarily rests on substantive state law. *See, e.g.*, *Briggs v. Goodyear Tire & Rubber Co.*, 79 F. Supp. 2d 228, 237 (W.D.N.Y. 1999). The parties have not argued the issue as to which state's law applies. Of all the states, Illinois quite clearly has the most significant relationship both to the MMQB business (the allegedly transferred asset or aggregation of assets) and to the parties to this proceeding. *Cf.* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 222 (1971). Substantive Illinois law will therefore be applied. This holds for all counts below regarding the transfer of the MMQB business and/or the stock in ZZC where those counts are based on state law (such as the UFTA) and not on substantive federal law (such as section 548 of the Code).

*ownership* of an asset through the substantive constructive trust theory where the legal ownership

of the asset has been divested in the first instance by way of the claimant's own admitted fraud.

Since Michael Wolf would necessarily have failed on this count, so must the trustee.

To the extent the trustee is asserting creditors' rights under section 544 (perhaps

generally or under section 544(b) as a quasi-avoidance action), he similarly must lose, but for

different reasons. Simply put, creditors' remedy for a debtor's transfer of property in fraud of

their rights as creditors lies under the fraudulent conveyance laws, here the Illinois UFTA.

> A constructive trust is the formula through which the conscience of equity finds
> expression. When property has been acquired in such circumstances that the holder
> of the legal title may not in good conscience retain the beneficial interest, equity
> converts him into a trustee.

*Cohon v. Oscar L. Paris Co.*, 149 N.E.2d 472, 476 (Ill. App. Ct. 1958) (quoting *Beatty v.*

*Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919)).

> An application for constructive trust does not require the court to determine *a priori*
> what 'equity and good conscience' require in a particular case. Constructive trust
> is the principal device for *vindicating equitable ownership* against conflicting legal
> title; the rules by which equitable property rights are recognized are among the most
> predictable of equity jurisprudence.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 cmt. a (2011) (emphasis

added).

> A constructive trust is one raised by operation of law and imposed by a court
> exercising its equitable powers where the legal title to money or property was
> obtained by a person in violation of some duty owing to him who is equitably
> entitled to the money or property. A constructive trust may be used to compel a
> party who unfairly holds a property interest or money to convey that property or
> money to the one to whom it justly belongs where the person holding the property
> or money would be unjustly enriched if he were permitted to retain the property or
> money.

*Volini v. Dubas*, 613 N.E.2d 1295, 1303 (Ill. App. Ct. 1993) (internal citations omitted).

**[Srt App SA-104]**

A constructive trust is therefore appropriate as a remedial device if the claimant can

establish that the defendant has legal title to property in which the claimant also has an equitable

proprietary interest (equitable title to the property). *See also Schwass By & Through Postillion v.*

*Schwass*, 467 N.E.2d 957, 960 (Ill. App. Ct. 1984) (deciding whether to impose a constructive

trust on insurance proceeds based on whether each claimant had been able to establish that they

had an equitable interest in the proceeds). The claimant will have an equitable proprietary

interest in the property capable of vindication by use of the constructive trust where the property

in question has been acquired by way of

> a transaction in which the defendant (i) has been unjustly enriched (ii) by acquiring
> legal title to specifically identifiable property (iii) at the expense of the claimant or
> in violation of the claimant's rights.

RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 cmt. a (2011); *see also*

*Emerson v. Maples (In re Mark Benskin & Co., Inc.)*, 161 B.R. 644, 651–52 (Bankr. W.D. Tenn.

1993) (requiring "(1) a wrongful act; (2) specific property acquired by the wrongdoer which is

traceable to the wrongful behavior; and (3) an equitable reason why the party holding the

property should not be allowed to keep it").

Here, the trustee would have the court hold that at least some of the defaulted Defendants

have been unjustly enriched by their receipt of legal title to the MMQB "business" (so really the

components of the business – the goodwill, intellectual property, inventory, equipment,

receivables (intangibles), bank accounts, cash, etc. – and the identifiable proceeds, products, or

profits of those business components (actual received income)) at the expense of the Michael

Wolf's general creditors then-in-existence and/or in violation of those creditors' rights. These

general creditors, according to the trustee, obtained an equitable proprietary interest in the

**[Srt App SA-105]**

business at the time of its fraudulent transfer[30] (since such a transfer would have been a

fraudulent violation of their rights as creditors and would have resulted in the unjust enrichment

of the transferee(s)) and so should be able to obtain an order specifically compelling the current

legal owner of the business to convey the business (and/or its identifiable proceeds) to their

representative – the trustee in bankruptcy (unless the current legal owner is a *bona fide* purchaser

of the business or any identifiable proceeds thereof).

The Illinois Supreme Court, however, has said that the distinction between legal and

equitable title that so vitally underpins a substantive constructive trust theory has no application

in cases of fraudulent conveyances, ostensibly because the creditors defrauded by the transfer

have ample ability to reach the property conveyed by voiding the transfer under the fraudulent

conveyance statutes without resort to general substantive principles of unjust enrichment and

fraud standing independently of those statutes. *See Rappleye v. Int'l Bank*, 93 Ill. 396, 403 (1879)

(speaking in the context of land that "[t]he deed is *voidable* by creditors, and the estate conveyed

is subject to be divested by their action. There is *no such distinction* as that of equitable and legal

estate *applicable to the subject* [of fraudulent conveyances]") (emphasis added); *accord Cavadi

v. DeYeso*, 941 N.E.2d 23, 36 (Mass. 2011) ("[In] cases where a constructive trust is implied for

the benefit of creditors in order to set aside a fraudulent conveyance . . . UFTA necessarily takes

precedence . . . ."); *Moore v. Browning*, 50 P.3d 852, 858 (Ariz. Ct. App. 2002) ("Considering

the legal history and the . . . authorities, we conclude that UFTA has displaced any common law

cause of action for fraudulent conveyance . . . ."); RESTATEMENT (THIRD) OF RESTITUTION AND

UNJUST ENRICHMENT §§ 1 cmt. g, 48 cmt. a (2011).

---

[30] The trustee alleges no facts supporting the idea that the MMQB business was held in trust for Michael
Wolf's creditors *prior* to its allegedly having been fraudulently conveyed in fraud of those creditors'
rights.

**[Srt App SA-106]**

In sum, this count cannot serve as the basis for a default judgment as a matter of law. The Debtor necessarily could not have succeeded on such a claim under state law based on the allegations in this count. The Debtor's creditors could not have succeeded, either. Hence the trustee may not succeed.

### d. Count IV: Resulting Trust

The trustee in Count IV attempts to assert that a resulting trust exists over the business in favor of the Debtor (or, based on the analysis above, Zig Zag as the Debtor's alter ego). He asserts in substance that *if* consideration was supplied for the transfer of the MMQB business, it was supplied by Michael Wolf (apparently to Scott Wolf and/or ZZC and MMQB, Inc.), and Michael Wolf's intention was to retain ownership and control over the business. Essentially, instead of intending an outright gift of the business, Michael Wolf intended that it be held in trust for him, and the fact that he caused its gratuitous conveyance (by causing himself or his alter ego to be paid with his own money) is evidence of this (because if he had really wanted to relinquish ownership and control of the MMQB business, he would only have done so for a valuable consideration, *not* for free). Again, it is to be remembered that, per the trustee's allegations, the transfer of the business was made as part of a scheme to defraud Michael Wolf's creditors.

Just as with the constructive trust theory asserted above, Illinois law applies. Under pertinent Illinois law,

> A resulting trust is an 'intent enforcing' trust; it arises by operation of law and the presumed intent of the parties. Generally, a resulting trust arises when one person pays the consideration for property which is taken in the name of another. The resulting trust is based upon the 'natural equity' that the one who pays for the property should enjoy it. A resulting trust arises at the time of the conveyance, and the payor's intention at that time determines whether a resulting trust may be found.

**[Srt App SA-107]**

*In re Estate of Koch*, 697 N.E.2d 931, 933 (Ill. App. Ct. 1998). As an "intent enforcing" trust, the resulting trust is to be distinguished from the fraud-remedying constructive trust discussed above.

Much as with the constructive trust considered above, if the trustee is stepping into the Debtor's shoes, the law is quite clear that one may not convey one's property in fraud of one's creditors and then petition a court of equity for a resulting trust in one's favor over that same property. *Hanley v. Hanley*, 152 N.E.2d 879, 883–84 (Ill. 1958); *Rosenbaum v. Huebner*, 115 N.E. 558, 560–61 (Ill. 1917); *Dorman v. Dorman*, 58 N.E. 235, 237 (Ill. 1900); *Am. Nat. Bank & Tr. Co. of Chicago v. Vinson*, 653 N.E.2d 13, 15–16 (Ill. App. Ct. 1995); *Peric v. Chicago Title & Tr. Co.*, 411 N.E.2d 934, 935 (Ill. App. Ct. 1980).

Michael Wolf therefore has no claim for a resulting trust under Illinois law based on his own fraudulent conveyance. Neither does the trustee under section 541(a)(1). *See Grede v. McGladrey & Pullen LLP*, 421 B.R. 879, 885 (N.D. Ill. 2009) ("The essential principle of bankruptcy law is that the trustee stands in the exact place of the debtor.").

· If the trustee is stepping into the shoes of creditors, the action again fails as a matter of law. This is because, by definition, the resulting trust, if it exists at all, does *not* exist in favor of Michael Wolf's creditors, since it would be absurd to presume that the unmanifested intention of Michael and any of the defaulted transferees was for Michael Wolf's creditors to "enjoy" the MMQB business by way of the allegedly fraudulent conveyance of the business to those transferees. *See Estate of Koch*, 697 N.E. 2d at 933. The resulting trust is only ever raised in favor of the person who furnished the consideration for the property conveyed, and here that would be Michael Wolf (if the allegations in this count are taken as true). *See* RESTATEMENT (SECOND) OF TRUSTS § 440 (1959); *see also Prassa v. Corcoran*, 181 N.E.2d 138, 140–41 (Ill.

1962). Thus, Michael Wolf's creditors have no claim for a resulting trust under Illinois law in this case, and so neither does the trustee under any theory of creditor-standing/authority he could possibly assert.

In sum, this count fails to state a claim as a matter of law and therefore may not be used to support the entry of a default judgment.

### e.  Count V: Actually Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 548(a)(1)(A)

The trustee asserts essentially two causes of action Count V. First, he asserts that the transfer of the MMQB business from Zig Zag to ZZC is avoidable as a fraudulent transfer under section 548(a)(1)(A) of the Code. Second, he asserts that the transfer of Michael Wolf's stock in ZZC to Scott Wolf is avoidable as a fraudulent transfer under section 548(a)(1)(A). As seen below, the transfer of stock is avoidable based on the allegations; the transfer of the business is not. The court begins first with the transfer of the business.

#### 1.  Transfer of the MMQB Business from Zig Zag to ZZC

The Code provides in pertinent part that

[t]he trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— made such transfer . . . with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made . . ., indebted . . . .

11 U.S.C. § 548(a)(1)(A).

There must first be a "transfer." Here, that alleged transfer was of the MMQB business. It must have been of an "interest of the debtor in property." Here, because Zig Zag was, at the time of the transfer, merely the Debtor's alter ego, the property of Zig Zag was the property of the Debtor under Illinois law. *See supra* Part VI.a (discussing Illinois law). When it transferred the MMQB business, the transfer therefore was "of an interest of the debtor in property." *See In re*

**[Srt App SA-109]**

*Am. Int'l Refinery*, 402 B.R. 728, 744–48 (Bankr. W.D. La. 2008) (applying Nevada law within the framework of the Bankruptcy Code).

The Debtor filed his bankruptcy petition on July 23, 2014. The transfer of the business must have been made on or following July 23, 2012 in order for it to be avoidable under section 548. Here, "sometime in early 2012, the Debtor transferred the Monday Morning Quarterback business to ZZC." Trustee's Amended Complaint, Docket No. 95, at ¶ 171. This is consistent with the trustee's allegation that ZZC was formed in late *2011* with the intent that the business would be transferred to it. *See id.* at ¶ 170. July falls in the second half of the year; no reasonable person would say that something done in July of 2012 was done in "early 2012." *See Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177, 188 (E.D.N.Y. 2009) (noting that a party moving for default judgment is entitled to *reasonable* inferences).

This alleged transfer therefore falls outside of the two year window provided for in section 548. This portion of Count V therefore fails to state a claim as a matter of law and cannot be used as a basis upon which to grant a default judgment in this case.

### 2.  Transfer of ZZC Stock from Michael to Scott Wolf

Here, the transfer alleged is of Michael Wolf's stock in ZZC. The trustee's theory is that Michael Wolf owned 100% of the stock in ZZC at one point in time and then caused a direct or indirect transfer of 51% that stock to Scott Wolf. This theory is supported by the well-pleaded facts in the complaint, including that Michael Wolf recorded on his tax return that he owned 100% of ZZC in 2012 and then later told two courts, including this court, that he only owned 49% of that same company. Based on the Debtor's tax return showing full ownership in 2012, the trustee alleges that 51% of the stock was transferred to Scott Wolf no earlier than in 2013.

**[Srt App SA-110]**

Stock is undoubtedly considered the property of the stockholder; thus, the transfer of it is a transfer of an "interest of the debtor in property." *See Reddy v. MBKS Co.*, 945 A.2d 1080, 1087 (Del. 2008); *Wuller v. Chuse Grocery Co.*, 89 N.E. 796, 798 (Ill. 1909).[31] The well-pleaded facts, based on Michael Wolf's 2012 tax return, demonstrate that such a transfer happened at the earliest in 2013 and thus falls within the two year window in section 548.

When considering whether such a transfer was made with actual intent to hinder, delay, or defraud the Debtor's then-existing or future creditors, courts typically look to the badges of fraud. *Frierdich v. Mottaz*, 294 F.3d 864, 869–70 (7th Cir. 2002).

> These 'badges' include: whether the debtor retained possession or control of the property after the transfer, whether the transferee shared a familial or other close relationship with the debtor, whether the debtor received consideration for the transfer, whether the transfer was disclosed or concealed, whether the debtor made the transfer before or after being threatened with suit by creditors, whether the transfer involved substantially all of the debtor's assets, whether the debtor absconded, and whether the debtor was or became [in]solvent at the time of the transfer.

*Id.* at 870.

Some badges are present. Here, the transferee was Scott Wolf, Michael Wolf's son. Michael Wolf received no consideration for the stock. The transfer had and has been concealed – as evidenced by the factual conflict between the Debtor's tax return and the Debtor's and Scott Wolf's later contradictory assertions, as alleged in the complaint.

The rest of the badges generally are not supported by any well-pleaded facts. First, there is nothing indicating that the Debtor, at the time, retained possession or control of the 51% of stock transferred. That he continued to receive business income is not necessarily relevant; he may have been receiving it on account of his position as employee or officer rather than on

---

[31] If 51% of the company was transferred by way of stock issuance rather than by way of an actual transfer of shares from Michael to Scott Wolf, the result would be the same. *See Bank of America v. Veluchamy*, 535 B.R. 783, 793–95 (N.D. Ill. 2015), *aff'd*, 879 F.3d 808 (7th Cir. 2018).

account of his equity holdings, or on account of gifts from his family members. Further, the

transfer was not of *substantially all* of the debtor's assets, since he retained at least 49% of his

equity in the ZZC entity, which at that time, according to the allegations, still owned the MMQB

business. There is nothing to indicate that Michael Wolf "absconded" in 2013 on or around when

the transfer happened. *See* Trustee's Amended Complaint, Docket No. 95, at ¶ 17 (noting that,

*more recently*, the Debtor had moved to Washington state) (filed in 2016).

As to being threatened with suit by creditors, Elizabeth Wolf filed a divorce petition in

December of 2013, and it might fairly be inferred that Michael was under at least some threat of

that suit throughout 2013 (due him allegedly moving out of the marital residence well before

2013, namely in 2011) or after December 2013 when the suit was actually commenced. Elizabeth

Wolf, however, was not a *creditor* of Michael's, at least not until she obtained an order for

temporary maintenance and support in the divorce court, if she obtained such an order. That is,

one spouse is not the creditor of another merely based on their status as spouses, and there is

nothing showing that they had a debtor-creditor relationship (*i.e.*, that Elizabeth Wolf had a

claim against Michael Wolf) based on some other body of law.

Even if spouses could be considered contingent creditors of one another once a divorce

petition is filed (due to the possibility of either (1) an alimony award or (2) a property division

order that establishes a debtor-creditor relationship between the ex-spouses rather than simply

making a proprietary determination as to their respective interests in marital property), that

petition was not filed until December of 2013. The transfer of stock allegedly happened *no

earlier* than 2013. It is possible, based on the trustee's theory, that the stock was transferred after

the divorce petition had been filed and therefore after Elizabeth Wolf could plausibly be said to

be a creditor of Michael. It is also possible that it was transferred earlier, sometime between

January and November of 2013.

This badge, therefore, rather than not being present, counts somewhat in favor of the

trustee. The same is true of the "insolvency" badge. The Debtor filed for bankruptcy in July of

2014. If the transfer happened in January of 2013, that bankruptcy filing (and his schedules

showing balance-sheet insolvency as of that date) is not good evidence of his insolvency at the

time of the transfer (over a year separates the two temporal events). Conversely, if the transfer

happened in June of 2014, the bankruptcy filing is rather good evidence of his insolvency at the

time of the transfer. *See In re Porter*, 50 B.R. 510, 517 (Bankr. E.D. Va. 1985); *Schutte v.

Rosenblum*, 172 N.Y.S.2d 337, 340 (Sup. Ct. 1958). At any rate, insolvency may be alleged

generally (and therefore taken as true upon the entry of a default). *See CF/SPC NGU v. Chase

Manhattan Bank USA, N.A.*, 322 B.R. 440, 451 (Bankr. N.D. Okla. 2003); *A. Clay Cox v.

Michael W. Smith (In re Cent. Illinois Energy Coop.)*, 561 B.R. 699, 714 (Bankr. C.D. Ill. 2016).

This badge, therefore, counts in favor of the trustee.

There are therefore four badges conclusively tending to show actual intent and one badge

(threat of suit) somewhat tending to show it. The presence of these badges based on the taken-as-

true allegations in the complaint is enough to allow an inference as to actual intent to be made.

*See Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008); *Brandon v. Anesthesia & Pain

Mgmt. Assocs., Ltd.*, 419 F.3d 594, 599–600 (7th Cir. 2005). This transfer was therefore actually

fraudulent, and a default judgment may be entered based upon it.

### f.  Count VI: Constructively Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 548(a)(1)(B)

Just as above, the trustee asserts two causes of action in Count VI, now arising under the

constructive fraud portion of section 548 rather than the actual fraud portion. The first concerns

the transfer of the MMQB business itself; the second concerns the transfer of stock from Michael

Wolf to Scott Wolf.

### 1. Transfer of the MMQB Business from Zig Zag to ZZC

The Code provides in pertinent part that

[t]he trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made . . . on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— received less than a reasonably equivalent value in exchange for such transfer . . .; and was insolvent on the date that such transfer was made . . . or became insolvent as a result of such transfer; [or] was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or] intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured . . . .

11 U.S.C. § 548(a)(1)(B)(i)–(ii)(I)–(II).

Just as above (see Part VI.e.1), this portion of Count VI fails to state a claim as a matter

of law because the business was allegedly transferred in "early" 2012, whereas the transfer needs

to have occurred no earlier than in July of 2012. This portion of Count VI therefore cannot

support the entry of a default judgment.

### 2. Transfer of ZZC Stock from Michael to Scott Wolf

See the statutory language immediately above (Part VI.f.1) and the description of the

transfer of stock in Part VI.e.2. The alleged transfer of ZZC stock qualifies as a transfer of an

interest of the debtor in property. The complaint also sufficiently alleges that no consideration

was received in exchange – which fits the complaint's well-pleaded allegations that the MMQB

business was transferred between corporate entities for the purpose of evading creditors. Thus,

Michael Wolf, as alleged, received less than a reasonably equivalent value in exchange for the

stock, because if the MMQB business was still being operated through the ZZC entity (as it was),

**[Srt App SA-114]**

then the value of Michael Wolf's stock would not have been $0 (due to the fact that the MMQB

business, as alleged, is and was profitable).

The complaint also sufficiently alleges insolvency (section 548(a)(1)(B)(ii)(I)), even

though it does so in general terms only. *See CF/SPC NGU v. Chase Manhattan Bank USA, N.A.*,

322 B.R. 440, 451 (Bankr. N.D. Okla. 2003); *A. Clay Cox v. Michael W. Smith (In re Cent.*

*Illinois Energy Coop.)*, 561 B.R. 699, 714 (Bankr. C.D. Ill. 2016).

This part of Count VI therefore supports the entry of a default judgment.

g. **Count VII: Actually Fraudulent Transfer of the MMQB Business from Zig Zag
to ZZC and of the Stock in ZZC to Scott Wolf: 11 U.S.C. § 544 & Illinois UFTA
§ 5(a)(1)**

Just as above, the trustee asserts two causes of action in Count VII, now arising under the

actual fraud portion of the Illinois UFTA,[32] as incorporated by 11 U.S.C. § 544. The first

concerns the transfer of the MMQB business itself; the second concerns the transfer of stock

from Michael Wolf to Scott Wolf.

1. **Transfer of the MMQB Business from Zig Zag to ZZC**

Except as provided in paragraph (2), the trustee may avoid any transfer of an
interest of the debtor in property . . . that is voidable under applicable law by a
creditor holding an unsecured claim that is allowable under section 502 of this title
or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

Applicable law here is the Illinois UFTA.[33]

A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's
claim arose before or after the transfer was made . . ., if the debtor made the transfer
. . .:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor;

---

[32] *See supra* note 29.

[33] There has been no argument on which state's law applies to the transfer at issue. Upon a review of both
Delaware's and Washington's fraudulent transfer legislation, there does not appear to be a material
difference between the bodies of law that could plausibly be applied in this proceeding. Illinois law will
therefore be applied. *See also supra* note 29.

**[Srt App SA-115]**

740 ILCS § 160/5(a)(1).

> A cause of action with respect to a fraudulent transfer . . . under this Act is
> extinguished unless action is brought:
>
>> (a) under paragraph (1) of subsection (a) of Section 5, within 4 years after
>> the transfer was made . . . or, if later, within one year after the transfer . . .
>> was or could reasonably have been discovered by the claimant;

740 ILCS § 160/10(a).

Here, the action was brought in this court on January 29, 2016. *See* Complaint, Docket

No. 1, at 24.[34] The transfer therefore cannot have been made earlier than on January 29, 2012

under section 10(a). The business was allegedly transferred in "early 2012." The court will draw

the reasonable inference in favor of the trustee that the business was not transferred prior to

January 29, 2012. *See Bravado Int'l Grp. Merch. Servs., Inc. v. Ninna, Inc.*, 655 F. Supp. 2d 177,

188 (E.D.N.Y. 2009) (noting that a party moving for default judgment is entitled to reasonable

inferences). This cause of action is not barred by the statute of limitations.

The trustee need not identify a specific creditor capable of bringing the action, and the

court may infer the existence of a creditor whose claim arose *at least after* the transfer, *see* 740

ILCS § 160/5(a)(1) (noting that qualifying creditors include creditors whose claims arose *after*

the transfer), by the fact that claims have been filed in this bankruptcy case. *See Matter of*

*Leonard*, 125 F.3d 543, 544 (7th Cir. 1997).

Has a transfer been properly alleged?

> 'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or
> involuntary, of disposing of or parting with an asset or an interest in an asset, and
> includes payment of money, release, lease, and creation of a lien or other encumbrance.

740 ILCS § 160/2(l).

---

[34] The amended complaint, at least as far as Count VII is concerned, relates back to this original date.
*Compare* Complaint, Docket No. 1, at ¶¶ 172–74, *with* Amended Complaint, Docket No. 95, at ¶¶ 195–
98; *see* Fed. R. Bankr. P. 7015; Fed. R. Civ. P. 15(c)(1)(B); *Neita v. City of Chicago*, 830 F.3d 494, 498
(7th Cir. 2016).

**[Srt App SA-116]**

"'Asset' means property of a debtor." 740 ILCS § 160/2(b). As seen above, since Zig Zag was the Debtor's alter ego under Illinois law, its property (the MMQB business) was the Debtor's property. When the MMQB business was transferred to ZZC, the Debtor (Michael Wolf) parted with an asset, namely the MMQB business, because Zig Zag enjoyed no separate legal personality apart from its sole shareholder (Michael Wolf) at that time. There was, therefore, a transfer under the Illinois UFTA.

What about actual intent? The badges of fraud under the Illinois UFTA are substantially the same as those discussed above under section 548(a)(1)(A) of the Bankruptcy Code. *See Frierdich*, 294 F.3d at 869–70.

> (b) In determining actual intent under paragraph (1) of subsection (a), consideration may be given, among other factors, to whether:
>
> > (1) the transfer or obligation was to an insider;
> >
> > (2) the debtor retained possession or control of the property transferred after the transfer;
> >
> > (3) the transfer or obligation was disclosed or concealed;
> >
> > (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> >
> > (5) the transfer was of substantially all the debtor's assets;
> >
> > (6) the debtor absconded;
> >
> > (7) the debtor removed or concealed assets;
> >
> > (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> >
> > (9) the debtor was insolvent or became insolvent shortly after the transfer was made or    the obligation was incurred;
> >
> > (10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> >
> > (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[Srt App SA-117]

740 ILCS § 160/5(b).

>    (g) "Insider" includes:

>>    (1) if the debtor is an individual,

>>>    (A) a relative of the debtor or of a general partner of the debtor;

>>>    (B) a partnership in which the debtor is a general partner;

>>>    (C) a general partner in a partnership described in clause (B); or

>>>    (D) a corporation of which the debtor is a director, officer, or person in control;

740 ILCS § 160/2(g)(1).

Michael Wolf was a person in control of ZZC at the time of the transfer from Zig Zag to ZZC; he was, at the very least, the owner of 100% of the stock in ZZC at that time. *See Zigmond Chiropractic, P.C. v. AAA Michigan Auto. Ins. Ass'n*, No. 300286, 2012 WL 3198465, at *5 (Mich. Ct. App. Aug. 7, 2012). ZZC was therefore an "insider."

The well-pleaded allegations, if taken as true, also tend to show that Michael Wolf retained control of the MMQB business no matter to which entity it had been transferred, including to ZZC. They also tend to show that the Debtor received no consideration for the transfer. As indicated above, insolvency may be alleged generally in the complaint.

There are, therefore, at least four badges of fraud sufficiently alleged/pleaded here. These are sufficient to adequately plead that a transfer of property was actually fraudulent. *See, e.g.*, *Kaibab Indus., Inc. v. Family Ready Homes, Inc.*, 372 N.E.2d 139, 142 (Ill. App. Ct. 1978); *Armada (Singapore) PTE Ltd. v. AMCOL Int'l Corp.*, No. 13 C 3455, 2013 WL 5781845, at *5 (N.D. Ill. Oct. 25, 2013); *Dollar Tree Stores Inc. v. Toyama Partners LLC*, No. C 10-0325 SI, 2011 WL 3295420, at *7 (N.D. Cal. Aug. 1, 2011) (discussing California law). A default judgment may therefore be entered on this portion of Count VII.

**[Srt App SA-118]**

**2.   Transfer of ZZC Stock from Michael to Scott Wolf**

This part of Count VII supports an entry of default judgment against Scott Wolf for

substantially the same reasons as those stated in Part VI.e.2 *supra*.

**h.   Count VIII: Constructively Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 544 & Illinois UFTA § 5(a)(2)**

This count alleges that the transfer of business from Zig Zag to ZZC and the transfer of

stock in ZZC from Michael to Scott Wolf are avoidable under 11 U.S.C. § 544 and the Illinois

UFTA as having been constructively fraudulent.

**1.   Transfer of the MMQB Business from Zig Zag to ZZC**

As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois

UFTA. The pertinent section here is as follows:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . ., if the debtor made the transfer . . .:
>
>> (2) without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor:
>>
>>> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>>
>>> (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS § 160/5(a)(2).

See Part VI.g.1 on how the transfer of the business from Zig Zag to ZZC qualifies as a

transfer made by the debtor under the UFTA and Illinois law. The well-pleaded allegations, if

taken as true, in the complaint support the application of UFTA section (5)(a)(2)(B) here, since,

at the time of the conveyance of the business to ZZC, Michael Wolf was planning on defrauding

a likely future creditor – Elizabeth Wolf. The whole idea, according to the complaint, was to

ensure that Michael Wolf could not satisfy any future obligation to Elizabeth and to ensure that

Elizabeth and/or any other creditors would have no recourse to any valuable assets in the hands

of Michael to satisfy any outstanding obligation.

This count therefore states a claim for relief upon which a judgment may be entered.

2.   **Transfer of ZZC Stock from Michael to Scott Wolf**

As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois
UFTA. The pertinent section here is as follows:

> A transfer made . . . by a debtor is fraudulent as to a creditor, whether the
> creditor's claim arose before or after the transfer was made . . ., if the debtor
> made the transfer . . .:
>
> > (2) without receiving a reasonably equivalent value in exchange for
> > the transfer . . . and the debtor:
> >
> > > (A) was engaged or was about to engage in a business or a
> > > transaction for which the remaining assets of the debtor were
> > > unreasonably small in relation to the business or transaction;
> > > or
> > >
> > > (B) intended to incur, or believed or reasonably should have
> > > believed that he would incur, debts beyond his ability to pay
> > > as they became due.

740 ILCS § 160/5(a)(2).

The well-pleaded allegations, if taken as true, in the complaint support the application of

UFTA section (5)(a)(2)(B) here, since, at the time of the conveyance of the ZZC stock to Scott

Wolf, Michael Wolf was planning on defrauding a likely future creditor – Elizabeth Wolf. The

whole idea, according to the complaint, was to ensure that Michael Wolf could not satisfy any

future obligation to Elizabeth and to ensure that Elizabeth and/or any other creditors would have

no recourse to any valuable assets in the hands of Michael to satisfy any outstanding obligation.

This count therefore states a claim for relief upon which a judgment may be entered.

**[Srt App SA-120]**

i. **Count IX: Constructively Fraudulent Transfer of the MMQB Business from Zig Zag to ZZC and of the stock in ZZC to Scott Wolf: 11 U.S.C. § 544 & Illinois UFTA § 6(a)**

This count alleges that the transfer of business from Zig Zag to ZZC and the transfer of stock in ZZC from Michael to Scott Wolf are avoidable under 11 U.S.C. § 544 and the Illinois UFTA as having been constructively fraudulent.

1. **Transfer of the MMQB Business from Zig Zag to ZZC**

As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois UFTA. The pertinent section here is as follows:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer . . .

740 ILCS § 160/6(a).

Even though the application of section 6(a) of the UFTA (considered in conjunction with 11 U.S.C. § 544) requires a creditor to exist at the time of the transfer and to still hold an allowable claim at the time of the petition, the actual identification of such a creditor is not a pleading requirement. *See In re Multi-Risk Management, Inc.*, 1998 WL 566044, at *2 (Bankr. N.D. Ill. Sept. 8, 1998). As indicated in the sections above, the well-pleaded allegations in the complaint support the idea that the business was transferred for no consideration. Insolvency may properly be alleged generally.

This count therefore states a claim for relief upon which a judgment may be entered. A default judgment may therefore be entered based on this portion of Count IX.

2. **Transfer of ZZC Stock from Michael to Scott Wolf**

As indicated above in Part VI.g.1, 11 U.S.C. § 544 allows the trustee to utilize the Illinois UFTA. The pertinent section here is as follows:

**[Srt App SA-121]**

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose
> before the transfer was made . . . if the debtor made the transfer . . . without
> receiving a reasonably equivalent value in exchange for the transfer . . . and the
> debtor was insolvent at that time or the debtor became insolvent as a result of the
> transfer . . .

740 ILCS § 160/6(a).

As indicated in the sections above, the well-pleaded allegations in the complaint support

the idea that the ZZC stock was transferred for no consideration. Insolvency may properly be

alleged generally.

This count therefore states a claim for relief upon which a judgment may be entered. A

default judgment may therefore be entered against Scott Wolf on this portion of Count IX for the

value of the ZZC stock at the time that it was transferred to Scott Wolf.

### j.  Count X: Preference – Payment from Michael Wolf to ZZC

In this count, the trustee seeks to recover $234,395.68 in payments made either to or for

the benefit of a creditor of Michael Wolf – ZZC – who was also an insider of the Debtor, *see* 11

U.S.C. § 101(31)(A)(iv). Because ZZC was an insider of the Debtor, the longer one year look-

back period applies. *See* 11 U.S.C. § 547(b)(4)(B).

$60,728.13 was paid by Michael Wolf on behalf of ZZC for payroll taxes, and that

payment occurred on March 10, 2014. *See* Michael Wolf's Statement of Financial Affairs,

Docket No. 67, at 2. It was paid as consideration for a reduction in the Debtor's loan obligation

to ZZC. *Id.* Another $173,667.55 was paid directly to ZZC from December of 2013 to July of

2014, with ZZC still being owed $10,903.52 at the time of the petition. *Id.*

The well-pleaded allegations, supported by the record in this case, show that ZZC was

and is a creditor of Michael Wolf's, all of the payments made were on account of an antecedent

debt, all of the payments made were made while Michael Wolf was insolvent, all of the

payments were made within 1 year of the petition date, and all payments enabled ZZC to receive

more than it would have in a chapter 7 case. *See* 11 U.S.C. § 547(b)(1)–(5).[35] Although

insolvency is not presumed for periods of time more than 90 days prior to the petition, *see* 11

U.S.C. § 547(f), insolvency may properly be alleged generally and taken as true upon the entry

of default. *See, e.g.*, *Danning v. Lavine*, 572 F.2d 1386, 1389 (9th Cir. 1978).

The trustee's preference count against ZZC states a claim upon which a default judgment

may be entered. Pursuant to 11 U.S.C. § 550(a)(1), the trustee is entitled to judgment against

ZZC in the amount of $234,395.68.

### k.   Count XI: Fraudulent Transfer – Payment from Michael Wolf to ZZC

While not naming the provision specifically, the substance of this count is clearly aimed

at making out a constructive, and not actual, fraudulent conveyance action based on the same

payments outlined immediately above in the preference count. *See* Trustee's Amended

Complaint, Docket No. 95, at ¶ 217 (discussing the elements of section 548(a)(1)(B)). This count

fails as a matter of law because the record in this case shows that ZZC was owed an antecedent

debt by Michael Wolf, and the payments were made in satisfaction of that antecedent debt, and

thus reasonably equivalent value was received in exchange for the payments. *See, e.g.*, *In re*

*Dewey & LeBoeuf, LLP*, 518 B.R. 766, 789 (Bankr. S.D.N.Y. 2014) (noting that payments made

on an antecedent liability are payments made in exchange for reasonably equivalent value

because past consideration is still good consideration in the context of fraudulent transfer law).[36]

---

[35] The trustee is entitled to the reasonable inference that these payments would cause ZZC to do better than in a chapter 7 liquidation because the assertion is made in the complaint and (1) there is no reason to believe that ZZC's debt was fully secured with a lien on any of Michael Wolf's property as of the petition date, and (2) there is no reason to believe that this estate will necessarily pay unsecured creditors 100% of their claims in this case. *See Palmer Clay Products Co. v. Brown*, 297 U.S. 227 (1936); I*n re Smith's Home Furnishings, Inc.*, 265 F.3d 959, 964 (9th Cir. 2001).

[36] That is not to say that a preference count and a fraudulent transfer count based on the same transfers are always mutually exclusive. Claims based on an *actually* fraudulent transfer, *see* 11 U.S.C. § 548(a)(1)(A), do not implicate the concept of "reasonably equivalent value" and thus could consistently stand alongside a preference claim based on the same transfer. *See In re Equip. Acquisition Res., Inc.*, 481 B.R. 422, 426–28 (Bankr. N.D. Ill. 2012).

To the extent that the trustee attempts to assert in the alternative that the payments were not

made on account of an existing antecedent debt, that allegation conflicts with the record in this

case, a record explicitly relied upon by the trustee in Count X, and is therefore not entitled to be

taken as true even after an entry of default. *See In re Indus. Diamonds Antitrust Litig.*, 119 F.

Supp. 2d 418, 420 (S.D.N.Y. 2000).

   In short, Count X asks for the court to find that the payments were made on account of an

antecedent debt, and Count XI necessarily asks for the court to find that the payments were *not*

made on account of antecedent debt. Judgment cannot be entered based on inconsistent and/or

mutually exclusive legal theories. *Laurence v. Atzenhoffer Chevrolet*, 281 F. Supp. 2d 898, 900

(S.D. Tex. 2003) ("*Until an action has actually reached the point of entering a judgment*, Rule 8

allows a plaintiff to explore alternative, mutually exclusive theories.") (emphasis added). Count

X has support in the record, and Count XI contradicts information in the record; importantly, the

trustee does not place that record material in controversy, but rather relies on it explicitly in

Count X and then pleads hypothetically and speculatively in the alternative in Count XI. *See*

*Trans World Airlines, Inc. v. Hughes*, 38 F.R.D. 499, 501 (S.D.N.Y. 1965) (discussing when

facts are deemed well-pleaded); *Woodmar Realty Co. v. McLean (In re Woodmar Realty Co.)*,

294 F.2d 785, 788 (7th Cir. 1961). The trustee will suffer no possible prejudice because the

amount of the judgment is the same on either count. No judgment will therefore be entered based

on Count XI.

### I.   Count XII: Corporate Waste

   This count alleges that Scott Wolf, as an officer and director of ZZC, owed Michael Wolf

a duty based on Michael Wolf's status as a shareholder of ZZC and breached that duty by

causing the transfer of ZZC's assets – the MMQB business – to MMQB, Inc. for no

consideration as part of Michael and Scott Wolf's overall fraudulent scheme to defraud Michael

Wolf's creditors. The court will treat this as a corporate waste claim. This transfer allegedly

happened in early 2014 and came after 51% of the stock in ZZC had been transferred from

Michael to Scott.

First, recall that ZZC was incorporated both in Delaware and Illinois, and the complaint

does not specify which ZZC is being discussed. The trustee succeeds on this theory under Illinois

law, however, so Delaware law will not be considered.

The trustee's rights on this cause of action are necessarily derivative of the Debtor's,

because the trustee has not argued (and this court's research has not found) that the

officers/directors of a corporation owe any duty whatsoever (fiduciary or otherwise) to the

creditors *of a shareholder* of that corporation. *Cf. Caulfield v. Packer Grp., Inc.*, 56 N.E.3d 509,

519 (Ill. App. Ct. 2016) (noting that corporate officers owe a fiduciary duty to the corporation,

the shareholders (like Michael Wolf in this case), and in some instances, the creditors *of the*

*corporation*). Hence, even if the trustee could step into creditors' shoes under section 544 and

assert this cause of action, it would fail on the merits.

The trustee's action for corporate waste provides a direct basis for recovery. Transferring

the assets of a corporation to another corporation for no consideration, as is plausibly alleged

here, can easily be considered corporate waste. *See* 3A FLETCHER CYCLOPEDIA OF THE LAW OF

CORPORATIONS § 1102 ("Corporate waste has been defined as an exchange of corporate assets

for consideration so disproportionately small as to lie beyond the range at which any reasonable

person might be willing to trade."). Under Illinois law, since ZZC is a non-public corporation,

Michael Wolf, and hence the trustee, may recover directly from Scott Wolf for any damages

caused by the waste:

> Section 12.56 [of the Illinois Business Corporation Act of 1983] gives a shareholder
> in a non-public corporation access to remedies when the corporation assets are

being misapplied or wasted. This language gives an individual shareholder a right
to individual relief for harm done by a corporation.

*Toscano v. Koopman*, 148 F. Supp. 3d 679, 687–88 (N.D. Ill. 2015).

The relief that may be ordered includes "[t]he award of damages to any aggrieved party."

805 ILCS § 5/12.56(b)(10).

True, since the trustee's rights are derivative of the Debtor's, the trustee is bound by

affirmative defenses that would be in play against the Debtor under state law on this cause of

action. *Peterson v. McGladrey & Pullen, LLP*, 676 F.3d 594, 598 (7th Cir. 2012). But this is an

action for damages, and the court has no duty to raise affirmative defenses *sua sponte*, though it

may raise them if they appear plainly and serve to make the action facially frivolous (such as,

perhaps, a clearly applicable statute of limitations). *See Walker v. Thompson*, 288 F.3d 1005,

1009 (7th Cir. 2002).

Here, doctrines like *in pari delicto* would appear to have room for application. "The

doctrine of *in pari delicto* embodies the principle that a plaintiff who has participated in

wrongdoing may not recover damages resulting from the wrongdoing." *King v. First Capital Fin.*

*Servs. Corp.*, 828 N.E.2d 1155, 1173 (Ill. 2005) (internal quotations omitted). But on this cause

of action, the application of the defense is far from clear.

For instance, while the overall, general scheme was allegedly to defraud Michael Wolf's

creditors, the transfer of *corporate property* from ZZC to Zig Zag (the basis for this cause of

action) was not itself a fraudulent transfer of the *Debtor's* property, because ZZC was not the

Debtor's mere alter ego at the time of the transfer. Hence the defense of *in pari delicto*, which

bars a plaintiff from recovering damages resulting from *wrongdoing* where the plaintiff

participated in *wrongdoing*, has no *clear* application to the facts of this transaction, since the

transfer of ZZC property was not itself wrongful as to Michael Wolf's creditors, who have no

conceivable interest in the property of a corporation not Michael Wolf's alter ego.[37]

Hence, there is no affirmative defense of clear application making the trustee's Debtor-

derivative corporate waste theory frivolous on its face. It would therefore be improper for this

court to consider any defenses *sua sponte*. Even if the court could consider them, they would not

readily apply to the facts of the particular transaction out of which the cause of action derives.

Thus, because Michael Wolf could recover directly under Illinois law for corporate waste

against Scott Wolf on the allegations here if taken as true, so can the trustee based on section

541(a)(1). A default judgment may be entered on this count.

### m. Count XIII: Tortious Interference with Contract

This count asserts a state law cause of action against the Debtor that allegedly accrued to

the trustee due to the Debtor's having tortiously interfered with a contract entered into by the

trustee on behalf of the estate to sell estate property (the marital home). The merits will not be

discussed, because the damages sought are not for a sum certain or otherwise capable of ready

ascertainment, and the trustee has offered no proof as to the proper amount of damages. *See In re

Catt*, 368 F.3d 789, 793 (7th Cir. 2004). No default judgment will be entered on this count.

---

[37] "Unclean hands," a separate doctrine, only applies where equitable relief is sought. *Thomson Learning, Inc. v. Olympia Properties, LLC*, 850 N.E.2d 314, 325 (Ill. App. Ct. 2006). Even if it could apply to an action for corporate waste, and *even if* the transfer of corporate property from ZZC to MMQB, Inc. *had been* a transfer of Michael Wolf's property (and hence wrongful and inequitable as to his creditors), the doctrine could not possibly be used under Illinois law by Scott Wolf (the Defendant) against Michael Wolf (the person into whose shoes the trustee-Plaintiff is stepping). *See Evangeloff v. Evangeloff*, 85 N.E.2d 709, 713–14 (Ill. 1949) (discussing the rule that for the doctrine of unclean hands to bar an equitable action, the plaintiff must have engaged in inequitable conduct respecting the transaction at issue <u>and</u> respecting the defendant in the instant action, not respecting third-parties).

**[Srt App SA-127]**

### n. Count XIV: Tortious Interference with Prospective Economic Advantage

For the same reasons as stated immediately above with respect to Count XIII, no default

judgment will be entered on this count.

### o. Counts XV–XVIII: Denial of Debtor's Discharge

These counts ask the court to deny the Debtor's discharge under various parts of section

727(a). The court finds that the Debtor's discharge should not be granted based on the operation

of section 727(a)(5). Pertinently,

> [t]he court shall grant the debtor a discharge, unless— (5) the debtor has failed to
> explain satisfactorily, before determination of denial of discharge under this
> paragraph, any loss of assets or deficiency of assets to meet the debtor's
> liabilities.

11 U.S.C. § 727(a)(5).

Here, the facts alleged in the complaint plausibly show, if taken as true, that the Debtor

caused a deficiency in his assets to meet his liabilities.[38] Since the alleged facts, if taken as true,

show that the deficiency was caused by a fraudulent design, it is difficult to conceptualize how

such a deficiency could ever be "explain[ed] satisfactorily." In any event, the court concludes

that it has not been. For that reason, the trustee is entitled to a default judgment stating that the

Debtor shall not receive a discharge in this case.

Additionally, the remaining counts operate to bar the Debtor's discharge. Under section

727(a)(2), the trustee has adequately pled that the Debtor, with intent to hinder, delay, and

defraud creditors, transferred his Aston Martin within one year of the petition (and was allegedly

sentenced to jail by the family court for having done so). Under section 727(a)(3), the trustee has

adequately pled that the Debtor failed to keep adequate records relating to business transactions.

---

[38] This does not depend on any alter ego theory. If the value of Michael Wolf's assets is or would be
comprised predominantly of the value of his equity in certain companies, and if he, as alleged in this case,
intentionally caused those companies to drain their assets and thereby destroy the value of his equity in
the companies, he can fairly be said to have caused a deficiency in his assets relative to his liabilities.

**[Srt App SA-128]**

Similarly, the trustee has adequately pled, based on the contradictory information in the Debtor's tax return, that the Debtor knowingly lied under oath in this proceeding regarding his ownership of ZZC. *See* 11 U.S.C. § 727(a)(4).

Hence a final judgment will be entered denying the Debtor his discharge in this case.

### p. Counts XIX–XXIII: Fraudulent Transfer of the MMQB Business from ZZC to MMQB, Inc.

As seen above, the court is not treating ZZC as the Debtor's alter ego. Thus, as it enjoys a separate legal existence, the transfer of its property (the MMQB business) to MMQB, Inc. is not remediable under either the Illinois UFTA and section 544(b) or section 548, because the application of either statute requires the transfer to have been of the Debtor's property. For that reason, no default judgment may be entered based on these counts.

### q. Count XXIV: Section 549 Post-Petition Transfers

This count asks for damages based on alleged transfers of property of the estate (the MMQB business and/or its proceeds) post-petition. No default judgment will be entered on this count because the MMQB business could not possibly have become property of the estate prior to its transfer having been avoided as fraudulent. *See, e.g., In re ABC-Naco, Inc.*, 331 B.R. 773, 780–81 (Bankr. N.D. Ill. 2005); *see also* 11 U.S.C. § 541(a)(3). Hence none of the transfers complained of in the complaint could possibly have been transfers of property of the estate.

### r. Remedies against Particular Defendants

### 1. ZZC's Preference Liability and the Debtor's Discharge

First, the trustee is entitled to a money judgment against ZZC for its preference liability discussed above. *See* 11 U.S.C. § 550(a)(1). He is also entitled to this court's order denying the Debtor his discharge. The court will enter final judgment against ZZC on Count 10 of the complaint and will enter final judgment against the Debtor on Counts 15–18 of the complaint.

**[Srt App SA-129]**

2. **ZZC's, MMQB, Inc.'s, and Scott Wolf's Liability under Section 550(a) for the Fraudulent Transfer of the MMQB Business under Counts 1, 7, 8, and 9 of the Complaint**

For the fraudulent transfer of the MMQB business in early 2012, the trustee has provided an expert forensic valuation report[39] determining the value of the business, in late 2011, to have been $2.1 million.[40] The trustee may properly elect a monetary recovery under section 550(a). *In re Erin Food Servs., Inc.*, 980 F.2d 792, 797 (1st Cir. 1992). He may recover the value of the business at the time that it was fraudulently transferred. *See Grochocinski v. Schlossberg*, 402 B.R. 825, 841 (N.D. Ill. 2009); *In re James B. Downing & Co.*, 74 B.R. 906, 911 (Bankr. N.D. Ill. 1987). Here, the alleged transfer happened in early 2012, so the trustee's late 2011 valuation is sufficient to provide a reliable basis on which judgment may be entered for the value of the MMQB business at the time of the transfer.

That value may be recovered from initial transferees and from subsequent transferees subject to exceptions not applicable here. *See* 11 U.S.C. § 550(a)(1)–(2). ZZC is an initial transferee of the business. MMQB, Inc. and Scott Wolf are subsequent transferees of the MMQB business.

---

[39] No defaulted Defendant has a right to a hearing on damages. *See Norfolk & W. Ry. Co. v. Cent. States Trucking Co.*, No. 97 C 3642, 1998 WL 26175, at *2–3 (N.D. Ill. Jan. 15, 1998). The report's veracity (and methodological soundness) is attested to by its preparers, admittedly not under penalty of perjury, and the report relies on definite figures, backed up in many cases by reference to exhibits, to arrive at its ultimate valuation figure. *See id.* (discussing Seventh Circuit precedent). In any event, no defaulted Defendant has formally requested a hearing on damages, and the court therefore deems any argument that a hearing is required to be waived and/or forfeited.

[40] Technically, the Debtor's 100% interest in Zig Zag was valued in the report; the Debtor never transferred that interest, fraudulently or otherwise. Nonetheless, the value of that interest is highly relevant evidence as to the value of the underlying business where, as here, the corporate entity did not substantially own any other property or run any other businesses. *See Jarvis v. Bell*, 146 A. 153, 155 (Pa. 1929) ("The stockholders own the corporation, and, in the absence of market value, the best evidence of the worth of the stock is the actual value of the corporate property."); *Gorham v. Massillon Iron & Steel Co.*, 120 N.E. 467, 471 (Ill. 1918); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1069 n.18 (3d Cir. 1992) ("[A]lthough ownership of [a corporation's] stock may not constitute ownership of its property, evidence of the value of a [corporation's] property is admissible to establish the value of its stock.").

**[Srt App SA-130]**

The trustee's valuation date (late 2011) is close in time to the initial transfer from Zig Zag (the Debtor's alter ego) to ZZC in early 2012 and so provides good evidence of the value of the MMQB business at the time that it was allegedly transferred in early 2012.

To the extent that MMQB, Inc.'s and Scott Wolf's liability under section 550(a)(2) as subsequent transferees of this business is limited to the amounts that they actually received (so the value of the business in early 2014 when the subsequent transfer allegedly happened), the court finds that the expert forensic report is good evidence as to the value of the business when transferred from ZZC to MMQB, Inc. in early 2014. Though two years out of date for that purpose, MMQB, Inc. and Scott Wolf have forfeited their right to introduce evidence to the effect that the value of the business as received by them at that later date was less than the value of the business when received by ZZC in early 2012. Given the blatant gamesmanship and disregard of discovery obligations in these proceedings, the trustee's late-2011 valuation report will suffice.

Scott Wolf, SHBM, Hound Ventures, and Michael Wolf, as alleged, are subsequent (mediate or immediate) transferees of the proceeds, products, or profits of the allegedly fraudulently transferred property (the MMQB business). The value of the MMQB business may be recovered from ZZC as an initial transferee and from Scott Wolf and MMQB, Inc. as subsequent transferees. Due to the lack of introduced expert forensic evidence, speculative or otherwise, as to the amounts of proceeds, products, or profits actually received by SHBM, Scott Wolf, Michael Wolf, and Hound Ventures, however, no default judgment may be entered against them under section 550(a)(2).[41]

---

[41] The expert report only purports to value the MMQB business (by valuing the Debtor's 100% interest in Zig Zag in late 2011); it does not *purport* to *establish* how much each defaulted Defendant received as dividends, distributions, salaries, etc., from the business substantially over the periods of time (for

70   **[Srt App SA-131]**

As seen above, the transfer of the MMQB business from Zig Zag to ZZC is avoidable as

a fraudulent transfer under section 544 (Counts 1, 7, 8, and 9) of the Code.

> (a) Except as otherwise provided in this section, to the extent that a transfer
> is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this
> title, the trustee may recover, for the benefit of the estate, the property
> transferred, or, if the court so orders, the value of such property, from—
>
>> (1) the initial transferee of such transfer or the entity for whose
>> benefit such transfer was made; or
>>
>> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).[42]

ZZC was the initial transferee of the transfer, so it may be held liable for the value of the

business at the time that it was transferred. The Debtor-transferor (Michael Wolf) may not be

held liable as a transferor, an initial transferee, or as the entity for whose benefit the transfer was

made. *In re Coggin*, 30 F.3d 1443, 1452–54 (11th Cir. 1994), *abrogated on other grounds by*

*Kontrick v. Ryan*, 540 U.S. 443 (2004); *In re Pocius*, 556 B.R. 658, 670 (Bankr. E.D. Pa. 2016);

*In re Fleming*, 424 B.R. 795, 800–01 (Bankr. W.D. Mich. 2010); *In re Big Apple Scenic Studio,*

*Inc.*, 63 B.R. 85, 88 (Bankr. S.D.N.Y. 1986).[43]

---

instance, during the existence of MMQB, Inc. (which began no earlier than early 2014)) alleged in the
trustee's complaint.

[42] To the extent the trustee seeks remedies for his fraudulent conveyance counts other than those given in
section 550, the trustee's request for those remedies is denied. *See In re Teligent, Inc.*, 307 B.R. 744, 750
(Bankr. S.D.N.Y. 2004).

[43] This makes sense. Even if the Debtor were treated as the alter ego of ZZC, the initial corporate
transferee (a traditional, non-reverse-piercing type of claim of the kind *not* considered in Part VI.a.
above), then he would be *both* the transferor and initial transferee of the fraudulent transfer. But one
clearly cannot transfer property to oneself. It is a conceptual absurdity. Similarly, the court in *Coggin*
considered the possibility that debtors might benefit in a real and substantial way from their fraudulent
transfers by retaining control of the assets transferred but keeping those assets out of the reach of the
bankruptcy process, as allegedly happened in this case. *See Coggin*, 30 F.3d at 1453 (citing this as one of
two ways in which a debtor might benefit from its own fraudulent transfer). Nonetheless, the court
concluded that "there is no cause of action created by section 550(a)(1) in a trustee to recover the value of
an avoidable conveyance from a transferring debtor." *Id.* at 1454. This reasoning seems to place debtor-
transferors beyond the reach of section 550(a)(1) even where they intend to receive and in fact achieve
real economic benefit from the transfer. Accordingly, neither Michael Wolf nor Zig Zag is liable under
section 550(a)(1).

**[Srt App SA-132]**

Based on the well-pleaded facts, MMQB, Inc. is a subsequent transferee under section

550(a)(2). Because, based on the facts in the complaint, MMQB, Inc. has no defense under

section 550(b), MMQB, Inc. is liable for the value of the business at the time of the initial

fraudulent transfer. *See* 11 U.S.C. § 550(a)(2).[44]

Moreover, the allegations show that Scott Wolf, the sole shareholder, Director, and

officer of MMQB, Inc., used MMQB, Inc. to aid Michael Wolf in hiding assets from his

creditors. The allegations recount with some detail how Scott Wolf disregarded corporate

formalities with respect to MMQB, Inc. and entered into one-sided, non-arms length transactions

with multiple related entities (these other entities were also wholly owned and controlled by

Scott) in order to siphon off value from the MMQB business being run through the MMQB, Inc.

legal entity. *See* Trustee's Amended Complaint, Docket No. 95, at ¶¶ 67–103.

These allegations are enough to sufficiently allege that MMQB, Inc. was Scott Wolf's

alter ego (or that MMQB, Inc.'s veil may be pierced) under Delaware law.[45] *Yu v. GSM Nation,*

*LLC*, No. CV 12293-VCMR, 2017 WL 2889515, at *3 (Del. Ch. July 7, 2017). As such, if

MMQB, Inc. is a subsequent transferee of the MMQB Business (which it is), so is Scott Wolf.[46]

*Cf. In re Stephen S. Meredith, CPA, P.C.*, 367 B.R. 558, 562 (E.D. Va. 2007) (noting that where

---

[44] The court can discover no cases dealing with whether, in the case of a recovery from a subsequent transferee, the measure of value is made at the time of the transfer to the subsequent transferee (here from ZZC to MMQB, Inc.) or at the time of the initial *fraudulent* transfer (here from Zig Zag to ZZC). This court opts for the latter date of measure in this case, which is closer in time to the trustee's forensic valuation report. In any event, as seen in the main text, if MMQB, Inc. is indeed liable as a subsequent transferee only for the value of the business at the time that it was transferred to MMQB, Inc., the court finds that, under the circumstances of this case, the trustee's valuation report suffices to reliably establish the value of the business at the time of that years-later transfer in early 2014.

[45] MMQB, Inc. is a Delaware corporation.

[46] There is no allegation that, and this court does not conclude that, either Scott Wolf or MMQB, Inc. was the intended beneficiary of, or actually received any benefit from, the *initial transfer* of the MMQB business from Zig Zag to ZZC (indeed MMQB, Inc. was not even in existence, per the allegations, at the time of that initial transfer). As such, both may properly be deemed subsequent transferees. *See Bonded Fin. Servs., Inc. v. European Am. Bank*, 838 F.2d 890, 895 (7th Cir. 1988) (noting that one may not be both the entity for whose benefit the initial transfer was made and a subsequent transferee).

**[Srt App SA-133]**

the corporate veil is pierced, the sole shareholder of a transferee may also be a transferee), *aff'd sub nom. In re Meredith*, 527 F.3d 372 (4th Cir. 2008). Scott Wolf is therefore liable for the value of the business to the same extent that MMQB, Inc. is.

Scott Wolf, Hound Ventures, and SHBM *could* be liable as subsequent transferees for a different reason, as well. To the extent the proceeds, products, or profits of the fraudulently transferred MMQB business have been plausibly alleged to have been transferred (whether formally by way of salaries, dividends, distributions, or otherwise) to other mediate or immediate transferees, those transferees are liable under section 550(a)(2). *Cf. In re Bruno Mach. Corp.*, 435 B.R. 819, 848 (Bankr. N.D.N.Y. 2010); *see also Bank of Am., N.A. v. Veluchamy*, 535 B.R. 783, 797 (N.D. Ill. 2015) (using an illustration), *aff'd sub nom. In re Veluchamy*, 879 F.3d 808 (7th Cir. 2018). To the extent the money paid out from MMQB, Inc. would need to have been traced (to establish that it really is or was the products, proceeds, or profits of the allegedly fraudulently transferred business) in the event of a trial, it is to be remembered that the only question here is whether the allegations have been properly pled. *Cf. In re Elscint, Ltd. Sec. Litig.*, 674 F. Supp. 374, 382–83 (D. Mass. 1987). Here, they have been. *See* Trustee's Amended Complaint, Docket No. 95, at ¶¶ 76–103 (discussing in some detail the various ways in which the profits of the MMQB business have been funneled to Hound Ventures, SHBM, and Scott Wolf). Accordingly, since there is no viable defense under section 550(b) for either Scott Wolf, Hound Ventures, or SHBM, all may properly be held liable as the recipients of the proceeds, products, or profits of the fraudulently transferred business under section 550(a)(2). *Cf. In re Norris*, No. 05-43551-7, 2007 WL 3275196, at *3 (Bankr. D. Kan. Oct. 29, 2007) (applying a different body of law, but noting generally that tracing property into money proceeds is proper where there is bad faith or notice of the fraud); *see also In re Bernard L. Madoff Inv. Sec. LLC*, 548 B.R. 13, 38

**[Srt App SA-134]**

(Bankr. S.D.N.Y. 2016) (discussing transferee knowledge in the context of the transferee of the proceeds of an avoidable transfer).

The same might hold true of Michael Wolf to the extent that he (as is alleged) received proceeds, products, or profits from the MMQB business, whether housed in ZZC or MMQB, Inc. *See In re Fehrs*, 391 B.R. 53, 76–77 (Bankr. D. Idaho 2008).

The trustee's issue, however, is that subsequent transferees are only liable under section 550(a)(2) up to the amounts that they actually receive from a prior transferee. *See In re First Fin. Assocs., Inc.*, 371 B.R. 877, 916 (Bankr. N.D. Ind. 2007) ("To the extent [the subsequent transferee] is derivatively liable at all under 11 U.S.C. § 550(a)(2), the [subsequent transferee] is only liable for amounts he received from [the initial transferee] which constituted a fraudulent transfer by the [Debtor-transferor] to [the initial transferee]."); *see also In re CNB Int'l, Inc.*, 393 B.R. 306, 333 (Bankr. W.D.N.Y. 2008), *aff'd on other grounds*, 440 B.R. 31 (W.D.N.Y. 2010); *In re Allegro Law LLC*, 545 B.R. 675, 762 (Bankr. M.D. Ala. 2016).

The problem is one of evidence as to the amounts. They are neither liquidated nor capable of *definite* ascertainment from materials already in the record. The allegations cannot suffice, because one does not admit damages on default. The trustee has offered no expert report, based on forensics or otherwise, to substantiate, even speculatively if necessary based on the evidence available in this case, how much it is likely that each subsequent transferee received as proceeds, profits, or products from the transferred MMQB business.[47] For that reason, despite the

---

[47] Such an expert report would need to have been prepared for that purpose. As it stands, the expert report provided clearly only vouches for the value of the MMQB business in late 2011. *See* Forensic Examination, Docket No. 583, at 86 ("This report was prepared only for the stated purpose and shall not be used for any other purpose."). To the extent that the trustee would rely on the exhibits showing bank transfers attached to his initially-separate complaints against Hound Ventures, SHBM, and MMQB, Inc., the court finds that those are an insufficient basis upon which to liquidate a judgment against any defaulted Defendant for receiving proceeds or profits from the fraudulently transferred MMQB business under section 550(a)(2). Just as one example, on several pages the transferee is listed as "Customer

well-pleaded allegations of income being transferred to various defaulted Defendants, no default

judgment may be entered on the basis that the recipients of that income are bad faith subsequent

transferees under section 550(a)(2) of fraudulently transferred property. *See In re Catt*, 368 F.3d

789, 793 (7th Cir. 2004).

Accordingly, final judgment will be entered against ZZC, Inc. (both Delaware and

Illinois) and Scott Wolf on Counts 1, 7, 8, and 9 of the complaint. [48] The judgment will be for

$2,100,000, the established value of the MMQB business in late 2011.

As to MMQB, Inc., which has not consented to this court's adjudication of the alter ego

claim/theory underlying its liability, this court will not enter final judgment but will instead, on

the basis of the foregoing opinion, recommend that the District Court enter final judgment

against MMQB, Inc. on Counts 1, 7, 8, and 9 of the complaint in the amount of $2,100,000. *See*

Fed. R. Bankr. P. 9033.

### 3. Scott Wolf's Liability under Section 550 for the Fraudulent Transfer of 51% of the Stock in ZZC under Counts 5–9 of the Complaint

As indicated in Counts 5–9, the transfer of stock to Scott Wolf is avoidable as a

fraudulent transfer under section 544(b) and 548 of the Code.[49] Scott Wolf was the initial

---

Wolf." *See, e.g.*, Trustee's Complaint, Docket No. 1, 16ap00483, Ex. A, at 12–17. Who is "Customer
Wolf"? Scott, Michael, Peter? The court cannot be left guessing, and even after the entry of a default, it is
incumbent upon the plaintiff to provide an adequate factual basis upon which to assess each defaulted
party's monetary liability.
[48] Though the court dealt with the trustee's general alter ego count (Count 1) only in relation to the
Debtor, not Scott Wolf, that count (Count 1) may fairly be construed as asking for the separateness of all
of the entities in this case to be disregarded. Hence this court's conclusion that Scott Wolf consented (by
filing a summary judgment motion) to this court's authority to enter final judgment on Count 1 applies to
this court's determination that MMQB, Inc. is merely Scott Wolf's alter ego under Delaware law such
that Scott Wolf is as much a subsequent transferee as MMQB, Inc. is.
[49] This is separate from his liability as a subsequent transferee of the MMQB business (because of
MMQB, Inc.'s alter ego status vis-à-vis Scott). The trustee's success on this theory (the stock transfer
theory to Scott Wolf) does not depend on the success of his alter ego/reverse-piercing claim regarding
Michael Wolf and Zig Zag. Hence Count 1 is not considered in relation to the trustee's recovery under
this theory.

**[Srt App SA-136]**

transferee of that stock. Hence, a judgment may be entered against him for its value under section 550(a)(1).

As indicated in the allegations, ZZC, like Zig Zag, was a corporate entity used to hold the MMQB business. It did not hold any other substantial property or house any other businesses. Hence the value of the non-publicly traded stock in ZZC should correspond to the value of the underlying MMQB business allegedly held by the entity. *See Jarvis v. Bell*, 146 A. 153, 155 (Pa. 1929) ("The stockholders own the corporation, and, in the absence of market value, the best evidence of the worth of the stock is the actual value of the corporate property."); *Gorham v. Massillon Iron & Steel Co.*, 120 N.E. 467, 471 (Ill. 1918); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1069 n.18 (3d Cir. 1992) ("[A]lthough ownership of [a corporation's] stock may not constitute ownership of its property, evidence of the value of a [corporation's] property is admissible to establish the value of its stock.").

The value of the underlying MMQB business is established in the trustee's expert report at $2,100,000 in late 2011 (again, this value is established by way of a valuation of the Debtor's 100% interest in Zig Zag Corporation, which at that time housed the MMQB business and did not engage in other business activities nor hold other substantial property). Due to the issues with discovery in this case, and due to the fact that Scott Wolf has forfeited his right to introduce evidence as to the depreciation of the business-value from 2011 to 2013,[50] this valuation report suffices to establish the value of the business in 2013 when the stock transfer allegedly happened.[51]

---

[50] And has not requested that he be allowed to introduce such evidence.
[51] Another way to look at it is to say that the valuation report established the value of the Zig Zag stock, and the Zig Zag stock can fairly be deemed to be equal in value to the ZZC stock because the two entities (Zig Zag and ZZC) only ever held and operated the underlying MMQB business, nothing else.

For that reason, the value of the property transferred (the stock) at the time of this transfer

is equal to 51% of the value of the MMQB business as established in the report, which is equal to

$1,071,000. Judgment will be entered against Scott Wolf in this amount.[52]

### 4. Scott Wolf's liability under the Corporate Waste Cause of Action

As seen above, under section 541(a)(1), the trustee brought and succeeded on a state law

corporate waste cause of action against Scott Wolf. As provided for by Illinois statute, he may

recover damages directly from Scott Wolf. Michael Wolf allegedly owned 49% of the stock in

ZZC at the time that Scott Wolf, as officer/director, caused ZZC to transfer its property for no

consideration to MMQB, Inc. in early 2014. As alleged, ZZC did not own, at the time,

substantially any other property or run any other businesses. Hence the value of the stock

corresponds to the value of the underlying MMQB business owned by ZZC. *See Jarvis*, 146 A.

at 155 ("The stockholders own the corporation, and, in the absence of market value, the best

evidence of the worth of the stock is the actual value of the corporate property."); *Gorham*, 120

N.E. at 471; *Moody*, 971 F.2d at 1069 n.18 ("[A]lthough ownership of [a corporation's] stock

may not constitute ownership of its property, evidence of the value of a [corporation's] property

is admissible to establish the value of its stock.").

The damages to Michael Wolf, as shareholder, caused by the corporate waste – the

transfer of corporate property for no consideration – quite clearly equal the difference between

the value his shares in ZZC would have had had the transfer never happened and the value that

his shares in fact had after the transfer happened. Since ZZC owned nothing but the MMQB

---

[52] The trustee, however, may not recover more than $2,100,000 in total, including from Scott Wolf, due to the fact that the prohibition on double recovery clearly applies in this case where the underlying injury to the estate is the loss of the value of the MMQB business, as that value was established in the trustee's report. That value may be recovered in different ways as a formal matter, but it may not be recovered more than once in substance.

**[Srt App SA-138]**

business, and since the MMQB business, as alleged, was transferred to MMQB, Inc. for no consideration, the value of his shares after the transfer happened would have been $0. The value they would have had in the absence of that transfer is equal to 49% of the value of the underlying MMQB business held by ZZC immediately before the transfer.

The transfer constituting corporate waste allegedly happened in early 2014. The trustee's valuation report values the business as of late 2011. Nonetheless, due to the many issues with discovery in this case, and due to the fact that Scott Wolf, by having been held in default, has forfeited his right to contest the valuation (and introduce evidence as to a depreciation in the value of the business by the time of the transfer in early 2014),[53] the court deems the trustee's report sufficient evidence of the value of the MMQB business (and hence of Michael Wolf's stock in ZZC) as of the time of the transfer from ZZC to MMQB, Inc. in early 2014. Hence a judgment will be entered against Scott Wolf for 49% of the value of that stock, or $1,029,000.

## Conclusion

A money judgment will be entered against Scott Wolf for $2,100,000 in the aggregate based on his liability under section 550(a)(2) as a subsequent transferee of the MMQB business, his liability under section 550(a)(1) as an initial transferee of 51% of the ZZC stock, and his liability under substantive Illinois corporate law for corporate waste.

The treatment of Zig Zag as Michael Wolf's alter ego, the avoidance of the transfer of the MMQB business from Zig Zag to ZZC, and the treatment of MMQB, Inc. as Scott Wolf's alter ego allow the trustee to recover $2,100,000 from Scott Wolf as a subsequent transferee under section 550(a)(2). The avoidance of the transfer of ZZC *stock* from Michael Wolf to Scott Wolf gives the trustee a second legal basis to recover $1,071,000 from Scott Wolf, this time under

---

[53] Even if such a right existed, no argument has been made that a hearing be held on damages in this case.

section 550(a)(1).[54] Finally, Scott Wolf's pre-bankruptcy state law liability to Michael Wolf (and

hence to the trustee – see section 541(a)(1)) for corporate waste gives the trustee a third legal

basis to recover $1,029,000 from Scott Wolf. But it is obvious that, in substance, no matter the

legal theory, the underlying injury precipitating each recovery is the loss, in each legal scenario,

of the value of the MMQB business (whether that value is represented directly or derivatively by

way of stock value). Hence the trustee may not recover more than $2,100,000 from Scott Wolf,

though Scott Wolf's liability to the trustee for that amount ultimately rests on three separate legal

grounds.[55]

A money judgment will be entered against ZZC, Inc. for $2,100,000 based on its status as

an initial transferee of the MMQB business under section 550(a)(1).

As regards MMQB, Inc., this opinion shall serve as this court's proposed findings of fact

and conclusions of law, with the court's recommendation and ultimate proposed conclusion of

law being that judgment be entered against MMQB, Inc. in the amount of $2,100,000 based on

its status as a subsequent transferee of the fraudulently transferred MMQB business under

section 550(a)(2).

A separate money judgment will be entered against ZZC, Inc. for $234,395.68 based on

its status as the initial transferee of preference payments in that amount. A final judgment will be

---

[54] The avoidance of the stock-transfer does not depend on the viability of the trustee's alter ego theory.

[55] It is unclear to what extent the second two bases for relief (stock transfer basis and corporate waste basis) are mutually exclusive, in law, of the trustee's first basis for relief (the transfer of the MMQB business from Zig Zag to ZZC). For instance, can the trustee "avoid" the first transfer of the MMQB business to ZZC and then also separately avoid and recover based on the transfer of stock in ZZC from Michael to Scott Wolf using values the stock would have had had the business actually been transferred from Zig Zag to ZZC (despite *that* transfer having been avoided under the trustee's first basis for relief)? The court does not answer this question because it need not. The first basis for relief, if it is legally mutually exclusive of the second and third bases for relief, alone provides the trustee with the basis for a $2,100,000 recovery from Scott Wolf. The second two theories, which are not legally mutually exclusive of *one another*, provide that same basis as well ($1,071,000 + $1,029,000 = $2,100,000). Hence the potential inconsistency of the trustee's theories does not, in the final analysis, affect his ability to have a money judgment entered against Scott Wolf in the amount of $2,100,000.

entered denying the Debtor, Michael Wolf, his discharge in this case based on sections

727(a)(2)–(a)(5).

Regarding the defaulted Defendants, namely Scott Wolf, Michael Wolf, Peter Wolf,

SHBM, Inc., Hound Ventures, Inc., MMQB, Inc., Zig Zag Corporation, and ZZC, Inc., these

proceedings are otherwise terminated in all respects.

There is no just reason for delay, and any final judgment entered based upon this opinion

shall be final and appealable. *See* Fed. R. Bankr. P. 7054; Fed. R. Civ. P. 54(b).


Dated: 11/19/2018                                Enter:  _____

                                                 Honorable Deborah L. Thorne
                                                 United States Bankruptcy Judge


**[Srt App SA-141]**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
Eastern Division

| | |
|---|---|
| In Re:<br>Michael Wolf | ) BK No.:   14-27066<br>)<br>)<br>) Chapter: 7<br>)<br>) Honorable Deborah L. Thorne<br>)<br>) |
| Debtor(s)<br>N. Neville Reid, not individually but solely in his capacity<br>as trustee | ) Adv. No.: 16-00066<br>)<br>) |
| Plaintiff(s)<br>Michael Wolf, Scott Wolf, Peter Wolf, Zig Zag Corp.,<br>ZZC, Inc., MMQB, Inc., Hound Ventures, Inc., et al. | )<br>)<br>) |
| Defendant(s) | ) |

**ORDER DENYING SCOTT WOLF'S MOTION FOR RECONSIDERATION**

This matter comes before the court upon the motion of Scott Wolf under Fed. R. Bankr. P. 9023 and Fed. R. Civ. P. 59(e) asking this court to reconsider various parts of its previous ruling in this adversary proceeding. Upon a review of the motion, the court concludes that the issues raised by Scott Wolf have already been considered and were addressed in the court's opinion. A motion for reconsideration under Rule 59(e) is not a vehicle for re-argument. Neal v. Newspaper Holdings, Inc., 349 F.3d 363, 368 (7th Cir. 2003). Further, Scott Wolf's conclusory attempt, in the final paragraph of the motion, to duplicate Michael Wolf's arguments regarding the court's Rule 54(b) certification will not be entertained by the court; those arguments will be considered in connection with Michael Wolf's motion only. Cf. Reible v. Illinois I.O.O.F. Old Folks Home, No. 04-2039, 2005 WL 3358869, at *7 (C. D. Ill. Dec. 9, 2005) (citing United States v. Giovannetti, 919 F.2d 1223, 1230 (7th Cir. 1990)). As such, it is hereby ORDERED, ADJUDGED, and DECREED that:

Scott Wolf's motion for reconsideration is DENIED.

Enter:

*Deborah D Thorne*

Honorable Deborah L. Thorne
United States Bankruptcy Judge

Dated: 12/21/2018

**Prepared by:**

**[Srt App SA-142]**

IN THE CIRCUIT COURT FOR THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS

IN RE THE MARRIAGE OF:            )
                                  )
ELIZABETH G. WOLF,                )
                                  )
        Petitioner/Counter-Respondent )
                                  )      No. 13 D 2176
        and                       )
                                  )
MICHAEL A. WOLF,                  )
                                  )
        Respondent/Counter-Petitioner. )

FILED

DEC 1 5 2017

Erin Cartwright Weinstein
CIRCUIT CLERK

## JUDGMENT FOR DISSOLUTION OF MARRIAGE

THIS CAUSE coming on to be heard for trial on the Petition For Dissolution of Marriage of the Petitioner in this Cause, namely ELIZABETH G. WOLF, represented by her attorneys, Ladden & Allen, P.C., and on the response thereto of the Respondent in this Cause, namely MICHAEL A. WOLF, represented by his attorneys, WHITE SCOTT & WHITE, and the Court having heard the testimony of the parties and reviewed the exhibits offered and admitted into evidence, NOW, THEREFORE, THE COURT FINDS AS FOLLOWS:

A.      Petitioner has been a continuous resident of the State of Illinois for at least 90 days preceding the entry of this Judgement and at least 90 days preceding the filing of her petition for dissolution of marriage;

B.      Petitioner lawfully married the Respondent, Michael Wolf, on or about October 5, 1975, in Chicago, Illinois, and said marriage is registered in Cook County Illinois.

C.      Two children were born of the marriage, and they are emancipated.  No other children were born to or adopted by the parties.  Petitioner is not now pregnant.

[Srt App SA-143]

1

D.     Irreconcilable differences have arisen between the parties, the marriage has irretrievably broken down, future attempts at reconciliation would be impractical and not in their best interests. The parties have lived separate and apart for in excess of six months.

E.     Following conclusion of the trial held on September 25 and 27, 2017 certain "Findings and Rulings" were entered and filed by the Court on November 13, 2017. Said "Findings and Rulings" are attached hereto and incorporated herein by reference as though set forth *verbatim* herein.

NOW, THEREFORE, IT IS ORDERED:

A.     The Petition For Dissolution of Marriage is granted and the bonds of matrimony existing between Petitioner and Respondent are hereby dissolved. To the extent the pleadings allege claims against individuals and entities other than Respondent, they are dismissed, and Respondent's Counter-Petition For Dissolution of Marriage is dismissed.

B.     Respondent is forever barred from receiving maintenance from Petitioner.

C.     Respondent shall pay permanent maintenance to Petitioner at the rate of $2,000 per month retroactive to February 25, 2015.

D.     Petitioner is awarded the marital estate, comprised of Respondent's 49% interest in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in New Mexico, the Fiat automobile, the Mercedes Benz Petitioner drives.

[Srt App SA-144]

E.   Each party shall be responsible for all of his or her own debts, including attorney's fees and other litigation expenses. Petitioner's claim for contribution to attorney fees against Respondent is denied.

F.   This Judgment is a final Judgment.

Dated: December 15, 2017

ENTER:

Judge Charles W. Smith

Judgment prepared by:
The Court

**[Srt App SA-145]**

3

STATE OF ILLINOIS      )
                  ) SS
COUNTY OF L A K E     )

**IN THE CIRCUIT COURT OF THE NINETEENTH
JUDICIAL CIRCUIT, LAKE COUNTY, ILLINOIS**

IN RE:  THE MARRIAGE OF           )
                            )
**ELIZABETH G. WOLF**            )
     Petitioner,               )
                   **and**       )      **CASE NO. 13 D 2176**
                            )
**MICHAEL A. WOLF,**             )
      Respondent.            )

**FILED**

NOV 1 3 2017

Erin Cartwright Weinstein
CIRCUIT CLERK

### FINDINGS AND RULINGS

The parties, ELIZABETH G. WOLF, Petitioner and MICHAEL A. WOLF, Respondent, have been married for 42 years but separated since 2013.  The parties have stipulated to: 1) the jurisdiction of this Court; 2) that venue is proper; and 3) that the grounds of irreconcilable differences have been proved by competent evidence.  The Court between September 25, 2017 and September 27, 2017 heard evidence as to the division of marital assets and ELIZABETH's request for maintenance.

Mr. Wolf has offered to Mrs. Wolf any and all marital property, including his Counter-Claim filed in the Bankruptcy Court of the Northern District of Illinois, case no. 14 B 27060 but asserts that Mrs. Wolf is not entitled to maintenance.

The settlement offer is complicated by Mr. Wolf's pending bankruptcy.  This Court's decision is not binding in bankruptcy court and merely sets forth the rights between the parties and does not in any way adjudicate the claims of the adversarial parties in the bankruptcy or the rights of the bankruptcy trustee to property claimed to be owned by Mr. Wolf.  Stated differently, if Mr. Wolf is found to have assets that were not part of his bankruptcy petition, this Court's Order only declares the rights to property between Mr. and Mrs. Wolf and does not adjudicate the rights of the Trustee to property.

In addition, stipulating to jurisdiction, grounds, venue;  the parties also agreed that they had two children, both of whom are emancipated;  petitioner is not pregnant, and no children were adopted by the parties.  The parties also stipulated to various exhibits that were presented at the Trial. The Court admitted Respondent's Exhibits 1-13, Petitioner's Exhibits 1-18, Exhibits 55, 56, 65-69, 74, 76 and 80 were not offered and not considered by the Court in rendering this Decision.  The Court refused Petitioner's Exhibits 19-23, 26, 28-30, 35, 38, 39, 43, 46.  The Court admitted either by stipulation or over Respondent's objection, Petitioner Exhibits 24, 25, 27, 31-34, 36, 37, 40-42, 44, 45, 48-54, 57-62, 70-72, 77-79, 81, 83, 84, 85, 86, 87.

**[Srt App SA-146]**

The principal asset of the marriage was a newsletter published under the name of Monday Morning Quarterback (MMQB), which was a publication owned by Zig Zag Corporation. This publication was also distributed by Zig Zag Corporation. Mr. Wolf asserts no ownership interest in MMQB, but acknowledges that he worked for Zig Zag Corporation from July 30, 1987 until 2013. Mr. Wolf asserts that MMQB and Zig Zag are not marital assets and were not owned by either of the parties at the start of these divorce proceedings. Mrs. Wolf asserts that MICHAEL divested his interest in MMQB and Zig Zag shortly before this divorce was filed. No evidence was produced as to the value of MMQB and Zig Zag. The Court acknowledges Mrs. Wolf's position that information, including the value of MMQB was not available due to fraud and the failure to comply with discovery by Mr. Wolf. Mrs. Wolf thus requested that this Court retain jurisdiction over the division of property for an additional three years. The Court declines this request, the matter has been pending for four years (acknowledging much of this delay has been while the case was on the Court's bankruptcy call). If Mrs. Wolf has been unable to discover the value of MMQB and Zig Zag through discovery in this Court and the federal bankruptcy proceedings, it is unlikely that an additional three (3) years will lead to additional evidence. Additionally, Mrs. Wolf would still have relief under 2-1401 of the Illinois Code of Civil Procedure if she can prove fraud.

Important to this Court's Findings and Rulings is the credibility of each party since they were the only witnesses who testified at the trial.

### Michaels' Lack of Credibility

Petitioner's Exhibit 33, is the opinion of Judge Thorne, who is presiding over MICHAEL'S bankruptcy. She cited his willful bad faith and refusal to cooperate with the Trustee.

This Court finds MICHAEL to be a witness devoid of credibility.

MICHAEL asserts that the parties' son, SCOTT, took his business (MMQB). That business, in the last year of operation grossed $1.2 million and had paid MICHAEL as much as $400,000 in 2006 or 2007 and $120,000 in 2013. Further, he asserts his son paid him zero for the business. This is the same son who pays MICHAEL $600 per month for babysitting, provides him a house in Idaho, access and use of an apartment in Streeterville and transportation from Idaho to Chicago on a regular basis. MICHAEL asserts that he is working for CFN Website but earns no money.

MICHAEL asserts that the parties' son, SCOTT, also pays his attorney's bills and MICHAEL asserts that he owes SCOTT $128,781 pursuant to a Promissory Note, Exhibit 77(c) which is signed only by MICHAEL and not by SCOTT. This purported Note is not persuasive evidence of an actual debt obligation and the court considers it something manufactured for these proceedings.

MICHAEL'S trial testimony included a discussion of his current lifestyle which includes living rent free with his son, PETE in Post Falls Idaho. The house is described as 3 bedroom, 2.5 bath and approximately 1,600 square feet. His other son, SCOTT, lives nearby. MICHAEL also has access to a condominium or rental unit at 160 E. Illinois in the Streeterville section of Chicago. This location is near Lake Michigan and is a very expensive location to live. MICHAEL travels to Chicago every four to five weeks in order to have his hair colored and cut at a cost of $110. He also remains at the Streeterville unit for 2-3 weeks at a time in order to work on his bankruptcy and PETE provides the Streeterville Unit, and air fare for MICHAEL. MICHAEL "believes" that PETER works for MMQB and that SCOTT runs MMQB. SCOTT also pays MICHAEL'S attorney bills. PETER is either the Owner or the Lessee of the Streeterville housing unit.

In addition to working approximately ten hours a week for CFN at no pay, MICHAEL also testified to doing work for an entity called Jupiter Mars but could not discuss what he does because of a

[Srt App SA-147]

purported "confidentiality agreement". No such confidentiality document was produced by MICHAEL at trial.

ELIZABETH'S attorney cross examined MICHAEL about several Facebook posts, see Exhibit 78, which appeared to show MICHAEL attending Lollapalooza Music Festival, parking an expensive sports car outside of a restaurant in Chicago, riding jet skis, flying a private jet, and driving expensive automobiles. MICHAEL asserts that these postings were all fake and generated by him in an attempt to have the bankruptcy trustee waste money tracking down these events.

Whether Mr. Wolf's deceit is in his postings or in his testimony at trial, is not something that the Court will spend time discussing further, other than to find that Mr. Wolf is not a credible witness and his testimony is of little or no value to this Court.

### Mrs. Wolf's Credibility

Unfortunately Mrs. Wolf does not fare much better than Mr. Wolf when this Court considers the credibility of the witnesses. She admits to on three (3) separate occurrences, filing documents (Financial Affidavits, Petitioner Exhibits 71 and 75, Respondent Exhibit 2) which are blatantly not true and her excuse is that she mistakenly thought that she was to show the standard of living of the parties during the marriage and not her current living expenses. The Court questions why she would need to file successive financial affidavits if that were true, since the standard of living during the marriage had not changed, the parties have been separated and Mr. Wolf has claimed to be insolvent since 2013.

The parties both claim poverty yet have the funds for protracted legal battles both in this Court and in the United States District Court for the Northern District of Illinois. The parties very competent attorneys produced large binders with multiple exhibits and spent three days on trial on a case where Mr. Wolf asserts there are no assets, but he is willing to assign any rights, claims or interests that he has to Mrs. Wolf, and Mrs. Wolf asserts that there is a sizable marital estate but she cannot tell the Court what it is because of Mr. Wolf's fraud and deceit and cannot accept his settlement offer because to do so would be in violation of the bankruptcy court's orders.

Fortunately for the parties, neither sympathy or prejudice is to play any part in the Court's decision since neither party deserves any sympathy and their misrepresentations, for the most part, cancel each other out, although Mr. Wolf's testimony is far more incredible than Mrs. Wolf's.

### Award of the Marital Estate

Mr. Wolf asserts no interest in any marital assets and assigns any interest that he might have in Zig Zag Corporation, the proceeds from the sale of the marital home in Highland Park, the proceeds from the sale of the home in New Mexico, the proceeds from the sale of the lot in New Mexico, a Fiat automobile, the Mercedes Benz that Mrs. Wolf drives, his forty-nine per cent (49%) interest in Zig Zag Corporation and any claim that he has arising out of the bankruptcy proceeding (he has a rather substantial counter-claim on file) to Mrs. Wolf.

Based upon Mr. Wolf's offer, the Court will, to the extent that this Court can, award those properties to Mrs. Wolf subject to determination by the bankruptcy court that Mr. Wolf has an ownership interest in any of those assets and can transfer those assets to Mrs. Wolf. This Court cannot and will not attempt to allocate property which is under the jurisdiction of the bankruptcy court; but, will award to Mrs. Wolf any interest that Mr. Wolf had subject to determination of assets owned by Mr. Wolf by the bankruptcy court in case no. 14 B 27066 in the United States Bankruptcy Court Northern District of Illinois.

[Srt App SA-148]

## Maintenance

Mr. Wolf's attorney argues against an award of maintenance on two grounds:

First, he asserts that since 100% of the marital assets were assigned to Mrs. Wolf and that pursuant to §504(a)(1) this Court needs to consider the award of marital property and what non-marital property the other party has.  The award of any interest that Mr. Wolf has in assets subject to the bankruptcy court jurisdiction is similar to Mr. Wolf assigning to Mrs. Wolf sleeves out of his vest. While Mr. Wolf's counsel argues that this factor should weigh heavily in favor of awarding no maintenance there exists no evidence in the record that these assets have any tangible value.

504(a)(2) directs the court to consider the needs of the parties and the court has. Mr. Wolf claims no income aside from $600 per month which he receives for babysitting.  No tax records for 2016 were produced to corroborate this assertion. Petitioner's Exhibit 73 did include Mr. Wolf's 2014 and 2015 tax return.  Mr. Wolf's 2014 tax return showed IRA distributions of $8,354 and unemployment compensation of $1,722.  His 2015 tax return showed $6,000 in business income only and listed his occupation as "entrepreneur".  A second 2014 return dated 8-29-2016 claims income for 2014 of $5,000 plus an IRA distribution of $106,464, unemployment compensation of $5,453 and distributions of $8,342 from a Health Savings Account for a combined amount of $125,259. Mrs. Wolf earns $40,000 per year and while she has approximately $9,700 in checking, $34,900 in money market accounts, and $15,770 in an IRA, this is in essence her retirement funds and she is annually depleting these funds as her annual expenses exceed her income.  She claims a non-marital asset of inherited shares of Exxon Mobile stock and that is awarded to her as her non-marital property. All of Mr. Wolf's expenses are met by his sons including, a home in Idaho, use of a condo in the Streeterville area of Chicago, travel to and from Idaho to Chicago at least monthly so that he can have his hair colored and styled for $110 per visit.

The Court finds that Mrs. Wolf's needs are not met by her $40,000 annual income.

504(a)(3) present and future earning capacity of the parties.  Mrs. Wolf's present income level of $40,000 annually appears to be her maximum earning ability.  Her career appears to have been working for the family business (Monday Morning Quarterback on its corporate publisher) and that she never made $40,000 working in the business.  She was terminated upon filing for divorce.

Mr. Wolf testified that in 2014 MMQB had gross revenue of between $300-600,000 per year and about the same in 2013.  Mr. Wolf asserts that he has not been employed by MMQB since 2014.  His testimony was that his last year of work was 2013 when he made $120,000 and that he earned between $120,000-$150,000 between 2011 and 2013. His best year was approximately $400,000 in 2006 or 2007.  Mr. Wolf asserts that his son, SCOTT WOLF, is now the owner of MMQB, that SCOTT paid him nothing for the business, and that he does not discuss MMQB with SCOTT.  Mr. Wolf also lives with PETER, rent free.  PETER owns the Streeterville condo where Mr. Wolf resides when in Chicago and SCOTT pays his travel expenses to Chicago as well as his attorney's fees.  Mr. Wolf retestified that he "believes" PETER works for MMQB.

Finally, Mr. Wolf stated that he works approximately ten hours per week for an entity called CFN from which he derives no income.

It is clear to this Court that Mr. Wolf has the ability to work and to earn a six figure income, and that he chooses not to work.

504(a)(4) and (5) any impairment to present or future earning capacities of either party. No evidence was presented which would suggest impairment to either party's earning ability.

[Srt App SA-149]

504(a)(6) time necessary to party seeking maintenance to acquire education or training to obtain employment. Mrs. Wolf's age, 63, physical condition, arthritic hip, and lack of prior work experience are all factors weighing against Mrs. Wolf being able to seek training or education that would assist her in obtaining employment earnings in excess of $40,000 annually.

504(a)(7) standard of living during the marriage. The testimonies at trial established that both parties enjoyed a comfortable, although not lavish, lifestyle. They had a very nice home in Highland Park, a vacation home in Santa Fe, New Mexico, and enjoyed travel together. Mrs. Wolf now rents a condo unit, has to lower the heat in the winter in order to afford heating bills and still has a monthly deficit of $2,000 to $2,500 per month. Clearly she is living at a reduced life style as compared to the years of the marriage. Mr. Wolf lives rent free in Idaho and in the Streeterville area of Chicago, travels to and from Idaho and Chicago for hair cuts and coloring at someone else's expense, and enjoys access to boats and jet skis.

504(a)(8) Duration of the Marriage. The parties were married 42 years and therefore Mrs. Wolf qualifies for permanent maintenance.

504(a)(9) age, health, status of occupation, amount and source of income, vocational skills, employability, estate, liabilities of each party. None of these factors are particularly applicable to this case. Parties are approximately the same age. Mrs. Wolf asserts a "hip condition". Neither party presented any doctor's records as witness to such that would support a finding of ill health. Mrs. Wolf has no income other than a small amount of interest and approximately $40,000 of savings and her $40,000 annual income. The Court has already found that Mr. Wolf has the ability to earn a six figure income and chooses not to work. Certainly Mr. Wolf has considerable liabilities; however, he has the protection of an automatic stay from his creditors in bankruptcy court and the prospect of having all creditors discharged.

504(a)(10) all sources of public and private income including without limitation disability and retirement income. Mrs. Wolf, pursuant to her Financial Affidavit of June 29, 2017, Respondent #2, has her $40,000 income, an IRA of $15,770, money market accounts of $34,900, checking accounts totaling $9,700. Additionally Mrs. Wolf has 200 shares of Exxon Mobil Stock worth $16,000, which this Court finds to be non-marital. Each party will be eligible for social security benefits.

Mr. Wolf's sources of income are far more difficult to determine. While his Financial Affidavit, Respondent's #1, asserts no income other than from babysitting $600 per month and gifts of $606 per month, his lifestyle clearly contradicts this Affidavit. As previously mentioned, Mr. Wolf has the use of a house in Idaho, a condo in Streeterville, frequent travel, use of jet skis and boats and other expenses including his legal fees being paid from other sources. This has gone on during the length of time this divorce has been pending. The Court may include in a party's income, gifts that are regularly made available to the party, see IRMO: Ruvola, 2017 Ill.Ap.(2d) 160737; IRMO: Rogers, 213 Ill.2d 129 (2004).

The free housing in Idaho, the travel expenses, the annual use of a condo in one of the most exclusive and expensive areas of Chicago, and payment of legal fees, would certainly be the equivalent of a $120,000 annual salary (approximately the amount earned by Mr. Wolf when he last elected to work). Further Mr. Wolf is receiving this income tax free. There is no evidence to suggest that the monies paid on Mr. Wolf's behalf are a loan, see IRMO: Brill, 2017 Ill.App.(2d) 160604. The Court will accordingly impute income to Mr. Wolf of $120,000 for each year that this case has been pending.

[Srt App SA-150]

504(a)(11) tax consequences.  The Court recognizes that it's award of maintenance will be of no tax benefit to Mr. Wolf since he asserts no income and will be included in Mrs. Wolf's gross income.

504(a)(12) contributions by the party seeking maintenance to the education, training, career, a career potential, or license of the other spouse.  Testimony at trial supported Mrs. Wolf's claim that she worked in the family business and that the company grew and prospered during the marriage. The contributions of Mrs. Wolf to the success of MMQB do not support an upward deviation from the provisions of §504(b-1)(1)(A) of the Act.

504(a)(13) any other agreement between the parties.  The Court does not find any such agreement between the parties.

504(a)(14) any other factors the court expressly finds to be just and equitable.  The Court does not find this provision to be applicable.  As stated previously, neither party was particularly credible in their testimony.  Mr. Wolf, clearly is hiding from this Court and the Bankruptcy Court (see Petitioner's Exhibit 33) his sources of income.  The Court finds no equitable reason to deviate from the statutory formula for maintenance.

### Award of Maintenance

Pursuant to the provision of 750 ILCS 5/504(b-1)(1)(A) the Court calculates maintenance to be awarded to Mrs. Wolf as follows:

| | |
|---|---|
| 30% of Mr. Wolf's imputed income of $120,000 annually | $36,000.00 |
| Less 20% of Mrs. Wolf's income of $40,.000 | -8000.00 |
| Divided by 12 = monthly award | $2,333.33 |

Because 40% of the combined income of the parties is $64,000 and the maintenance award added to Mrs. Wolf's income exceeds that amount, the annual maintenance is reduced to $24,000 payable monthly at the rate of $2,000 per month.  This Court specifically rejects the arguments of Mr. Wolf that the award of 100% of the martial estate should result in no maintenance award to Mrs. Wolf. There is virtually no marital estate and while Mrs. Wolf's Financial Affidavits as to her "needs" are not accurate, she still has a need for maintenance which clearly will not enable her to enjoy the lifestyle the parties enjoyed during the marriage, however, the Court will award her an amount set by the legislature as maintenance.

The Court further rejects Mr. Wolf's argument, based upon the Ruvola case, that the Court cannot impute income for the purpose of setting maintenance.

The Court rejects the argument that SCOTT WOLF took all the assets of Zig Zag Corporation and MMQB and left Mr. Wolf with nothing.  The evidence suggests that SCOTT is supporting Mr. Wolf to a lifestyle that equates to $120,000 annually.  Mr. Wolf cannot on one hand attempt to convince this Court that SCOTT essentially stole a business that generates significant income from Mr. Wolf and at the same time acknowledge that the same son is subsidizing his lifestyle.

This award of maintenance shall be retroactive to February 25, 2015 when Mrs. Wolf initially sought temporary support and shall be permanent based upon the age of Mrs. Wolf (age 63 years) and the length of the marriage (42 years).

[Srt App SA-151]

The request of Mrs. Wolf for contribution to her attorney's fees is denied based upon the Court's inability to determine a source from which her attorney's fees can be paid.  Again, should Mrs. Wolf find assets which were fraudulently concealed from her she has the possibility of relief under §1102 of the Code of Civil Procedure.

Mrs. Wolf's attorney shall prepare a Judgment in accord with these Findings and Ruling and attach this Order as an Exhibit to the Judgment.  This matter is continued to December 4, 2017 for entry of the Judgment, although it may be filed sooner.

ENTER:

Charles W. Smith

**JUDGE CHARLES W. SMITH**

Dated at Waukegan, Illinois

12th day of November, 2017.

[Srt App SA-152]